AL-Quan Jackson
FULL NAME

_____
COMMITTED NAME (if different)

C.S.P. -Corcoran -SATF   P.O. Box 5246
FULL ADDRESS INCLUDING NAME OF INSTITUTION

Corcoran, CA  93212
_____

V14160
PRISON NUMBER (if applicable)

ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

Oct. 24, 2014

CENTRAL DISTRICT OF CALIFORNIA
BY:    KL    DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

AL-Quan Jackson

PLAINTIFF,

v.

Los Angeles County Sheriff's Dept.
(See Attachment)

DEFENDANT(S).

CASE NUMBER

CV12 -10393  JLS (JEM)
To be supplied by the Clerk

CIVIL RIGHTS COMPLAINT
PURSUANT TO (Check one)
☒ 42 U.S.C. § 1983 (Third Amended Complaint)
☐ Bivens v. Six Unknown Agents 403 U.S. 388 (1971)

## A. PREVIOUS LAWSUITS

1. Have you brought any other lawsuits in a federal court while a prisoner: ☐ Yes  ☒ No

2. If your answer to "1." is yes, how many? ___N/A___

Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on an attached piece of paper using the same outline.)

— See Attachments —

1. Los Angeles County Sheriff, Leroy Baca

2. Undersheriff, Paul Tanaka

3. Assistant Sheriff, Cecil Rhambo

4. Chief of Custody Operations, Dennis Burns

5. Captain Dan Fedele

6. Captain Ralph Ornelas

7. Lieutenant Tracy Stewart

8. Lieutenant Edwin Alvarez

9. Sergeant Kevin Roberts

10. Sergeant Nicole Zonver

11. Sergeant Shawnee Hinchman

12. Sergeant Rojas

13. Deputy Patrick Rivera

14. Deputy Samel Aldama

15. Deputy Agustine De La Torre

16. Deputy Jason Rodriguez

17. Deputy Kevin Ethridge

18. Deputy Salvador Valencia

19. Deputy Joshua Raniag

20. Deputy Lance Moorman

21. Deputy David Navarette

22. Deputy James Sharp

23.

24.                    Defendants,

25.

26.

27.

28.

(1-A·1)

13

# JURISDICTION AND VENUE

1.    This is a civil action authorized by 42 U.S.C. section 1983 to redress the deprivation, under color of law, of rights secured by the Constitution of the United States. This court has jurisdiction based upon 28 U.S.C. sections 1331 and 1343. This court also has jurisdiction (pendant) over State law claims. Plaintiff seeks Declatory relief pursuant to 28 U.S.C. section 2201 and 2202 and punitive and compensatory damages.

2.    The Central District of California United States District Court is an appropriate Venue under 28 U.S.C. section 1391 because it is where the Plaintiff's claims for relief arose in this District.

3.    Plaintiff has complied with the California Claims statute, California Government Code section 910 et seq.

4.    Plaintiff has suffered an injury and damages that are traceable to the actions of the Defendants, and this action is a case or controversy over which this court has jurisdiction under Article III of the United States Constitution.

# PARTIES

5.    The Plaintiff, AL-Quan Jackson was at all times mentioned herein an incarcerated Pre-trial Detainee at the

(1-A·2)

14

1     Los Angeles County Sheriff's Department Men's Central

2     Jail during the events described in this complaint.

3

4     6.     Defendant Leroy Baca has been the Sheriff of Los

5     Angeles County since 1998. As Sheriff, he is the chief

6     executive officer of the LASD. By California law, the Sheriff

7     is answerable for the safekeeping of the inmates in his custody.

8     Cal. Gov't Code §§ 26605, 26610; Cal. Penal Code § 4006. Sheriff

9     Baca is responsible for the management and control of all Los

10     Angeles County Jails, and for all matters relating to the selection,

11     supervision, promotion, training, and discipline of the uniformed

12     staff, including the supervisory security staff, of the County

13     Jails. He is also responsible for the care, custody, and control

14     of all inmates housed in the County Jails. Sheriff Baca is

15     regularly provided with reports of applications of force, alle-

16     gations of unreported and excessive use of force, and other

17     breaches of security in the County Jails.

18

19     7.     Defendant Paul Tanaka is the Undersheriff of the LASD.

20     He serves as second-in-command of the Department and oversees

21     its daily operations. Along with Sheriff Baca, Undersheriff

22     Tanaka is also responsible for the care, custody, and control of

23     all inmates housed in the County Jails.

24

25     8.     Defendant Cecil Rhambo is one of two Assistant

26     Sheriffs of the LASD. He oversees the leadership of the

27     Department's Custody Division, among other responsibilities.

28

(1-A.3)        15

9.     Defendant Dennis Burns has been employed by the LASD for more than 36 years. He is currently assigned as the Chief of Custody Operations Division which, along with the Correctional Services Division, is responsible for the operation of the County Jails. The responsibilities of the Custody Operations Division include the tracking of violent incidents and the formulation of responses designed to protect the personal safety of Department staff and inmates in its custody. He has formerly served as Captain of the LASD's Internal Affairs Bureau ("IAB"), which is responsible for conducting administrative investigations against Department members who have engaged in misconduct by violating the Department's policies and procedures.

10.     Defendant Dan Fedele is Captain/Unit Commander within the LASD's County Jail. His responsibilities include but are not limited to the overall supervision of the staff and inmates within the facility in which he has command of. He is responsible for ensuring the safety and security of the Jail and its occupants as well as investigating, approving, and disproving all use of force reports. He is also responsible for reporting any discovered Deputy misconduct within or outside of the Department.

11.     Defendant Ralph Ornelas is a Captain/Unit Commander within the LASD's County Jail. His responsibilities include but are not limited to the overall supervision of the staff and inmates within the facility in which he has command of. He is

(1-A.4)                                                    16

1 responsible for ensuring the safety and security of the jail

2 and its occupants as well as investigating, approving, and

3 disapproving all use of force incidents and reports. He in

4 addition to investigating use of force reports and incidents

5 is responsible for reporting any discovered Deputy misconduct

6 within or outside the LASD.

7

8 12.    Defendant Tracy Stewart is a Lieutenant/Watch Com-

9 mander at the LASD's Men's Central Jail. Her responsibilities

10 include but are not limited to supervising Deputy Sheriffs,

11 Sergeants, and inmates housed within Men's Central Jail. She

12 is responsible for maintaining the safety and security within

13 the facility. She is responsible investigating, approving, dis-

14 approving any use of force incidents and reports. She is also

15 responsible for reporting any Deputy misconduct within or

16 outside of the LASD.

17

18 13.    Defendant Edwin Alvarez is a Lieutenant at the LASD's

19 Men's Central Jail. His responsibilities include but are not

20 limited to the supervision of Sergeants, Deputy Sheriff's, and

21 the inmates housed within the Men's Central Jail. He is respons-

22 ible for maintaining the safety and security within the facility.

23 He is responsible for investigating, approving, and disapprov-

24 ing any use of force incidents and reports. He is also respons-

25 ible for reporting any Deputy misconduct within or outside of

26 the LASD.

27

28 14.    Defendant Kevin Roberts is a Watch Sergeant at the

(1-A-5)                                          17

1 LASD's Men's Central Jail. His responsibilities include but

2 are not limited to the direct supervision of Deputy Sheriff's

3 and the inmates housed within the Men's Central Jail. He is

4 responsible for maintaining the safety and security within the

5 facility. He is responsible for investigating, approving, and dis-

6 approving any use of force incidents and reports. He is also

7 responsible for reporting any Deputy misconduct within or

8 outside of the LASD.

9

10 15. Defendant Nicole Zonver is a Sergeant within the

11 LASD's Men's Central Jail. Her responsibilities include but are

12 not limited to the direct supervision of Deputy Sheriff's and

13 the inmates housed within the Men's Central Jail. She is resp-

14 onsible for maintaining the safety and security within the

15 facility. She is responsible for investigating, approving, and dis-

16 approving any use of force incidents and reports. She is also

17 responsible for reporting any Deputy misconduct within or out-

18 side of the LASD.

19

20 16. Defendant Shawnee Hinchman is a Sergeant within

21 the LASD's Men's Central Jail. Her responsibilities include but

22 are not limited to the direct supervision of Deputy Sheriff's

23 and the inmates housed within the Men's Central Jail. She is

24 responsible for maintaining the safety and security within the

25 facility. She is also responsible for reporting any Deputy

26 misconduct within or outside of the LASD.

27

28 17. Defendant Rojas is a Sergeant within the

(1-A-6)                                                    18

1  LASD's Men's Central Jail. His responsibilities include but are

2  not limited to the direct supervision of Deputy Sheriff's and

3  the inmates housed within the Men's Central Jail. He is respon-

4  sible for maintaining the safety and security within the facility.

5  He is also responsible reporting any Deputy misconduct within

6  or outside of the LASD.

7

8  18.    Defendant Patrik Rivera is a Deputy Sheriff at LASD's

9  Men's Central Jail.

10

11  19.    Defendant Samel Aldama is a Deputy Sheriff at LASD's

12  Men's Central Jail.

13

14  20.    Defendant Agustine DeLaTorre is a Deputy Sheriff at

15  LASD's Men's Central Jail.

16

17  21.    Defendant Jason Rodriguez is a Deputy Sheriff at LASD's

18  Men's Central Jail.

19

20  22.    Defendant Kevin Ethridge is a Deputy Sheriff at

21  LASD's Men's Central Jail.

22

23  23.    Defendant Salvador Valencia is a Deputy Sheriff at LASD's

24  Men's Central Jail.

25

26  24.    Defendant Joshua Baniag is a Deputy Sheriff at LASD's

27  Men's Central Jail.

28

(1-A-7)

19

1   25.   Defendant Lance Moorman is a Deputy Sheriff at LASD's

2   Men's Central Jail.

3

4   26.   Defendant David Navarette is a Deputy Sheriff at

5   LASD's Men's Central Jail.

6

7   27.   Defendant James Sharp is a Deputy Sheriff at LASD's

8   Men's Central Jail.

9

10   28.   All of the Defendant's named in paragraphs 18 throu-

11   gh 27 are Deputy Sheriff's at LASD's Men's Central Jail

12   . Their responsibilities include but are not limited to the

13   general supervision of inmates housed within the facility. They

14   are responsible for maintaining the safety and security within

15   the facility. They are responsible for accurately reporting their

16   actions or observations in any use of force incidents as well as

17   reporting any Deputy misconduct within or outside of the LASD.

18

19               Statement of the Case.

20

21   29.   On December 11, 2011 the Plaintiff Al-Quan Jackson

22   was an inmate in the custody of Sheriff Leroy Baca in the

23   Los Angeles County Men's Central Jail. On December 11, 2011

24   the Plaintiff was assaulted and battered by Deputy Sheriff's

25   of the Los Angeles County Sheriff's Department for no

26   justifiable or legal reason. In an effort to conceal, cover up,

27   and justify their criminal acts, Deputy misconduct, and

28   violations of Department policy and procedure. the Defendants

                    ( 1-A-8 )                              20

1    falsified reports, witheld incriminating evidence that was unfavor-

2    able to them, sent the Plaintiff to disciplinary detention for alleged-

3    ly assaulting staff, and denied the Plaintiff a proper hearing

4    all togather which the Plaintiff had a right to to address the

5    charges.

6

7    30.    The abuse that the Plaintiff suffered is typical of the

8    abuse inflicted by Deputies on countless inmates in the jails, and is

9    part of a pattern and practice of deputy-on-inmate violence that

10    has persisted for many years. In the last few years alone, there

11    have been dozens of documented cases of extreme and unjustified

12    violence by deputies against inmates. The Defendants are aware

13    of the culture of Deputy violence that pervades the Jails but

14    have failed to take reasonable measures to remedy the problem.

15    The Plaintiff charges the Defendants with violations of the Plaintiffs

16    Eighth, Fourteenth, and Fifth Amendment rights to reasonable

17    protection from violence, cruel and unusual punishment, excessive

18    force, Denial of due process, and a State Tort Claim of assault and

19    battery. The Plaintiff also charges the Defendants with conspiring to

20    deny Rights, Failing to train, Supervise and Discipline Employees.

21    The Plaintiff is seeking damages, injunctive, and declatory relief.

22

23    31.    Los Angeles County has the largest jail system in the world,

24    with an average daily population of approximately 15,000 inmates.

25    The great majority of the inmates are pre-trial detainees who

26    are not being held pursuant to a criminal conviction. Deputy

27    violence against inmates in the Los Angeles County Jails is comm-

28    onplace, but it is especially pervasive in three facilities that

(1-A-9)

2/

1  Comprise a single complex on Bauchet Street in downtown Los Ange-

2  les: Men's Central Jail, Twin Towers Correctional Facility and

3  the Inmate Reception Center.

4

5  32.    Inmates in the Jails live in fear of deputy violence. It is

6  typical for deputies to subject unresisting inmates to grossly

7  excessive force by slamming inmates' heads into walls, punching

8  them in the face with their fist, kicking them with their boots, and

9  shooting them multiple times with their tasers - and for these

10  beatings to result in serious injuries to the inmates, including

11  broken legs, fractured eye sockets, shattered jaws, broken teeth,

12  severe head injuries, nerve damage, dislocated joints, collapsed

13  lungs, and wounds requiring dozens of stitches and staples. Depu-

14  ties sadistically beat inmates with serious mental illness. They

15  have beaten inmates who are already in fragile medical con-

16  dition, including inmates in wheelchairs. Deputies have beaten

17  inmates for asking for medical treatment, for the color of their

18  skin, or for no apparent reason at all.

19

20  33.    Many of the beatings that routinely occur in the jails

21  are far more severe than the infamous 1991 beating of Rodney

22  King by members of the Los Angeles Police Department. The

23  violence is not the work of a few rogue deputies. Rather, it is a

24  systematic problem that has continued unchecked for decades.

25

26  34.    Many deputies belong to gangs inside the Jails. Like

27  members of street gangs, these deputies sport tattoos to signal

28  their gang membership. They beat up inmates to gain prestige

(1-A-10)

22

among their peers, and "earn their ink" by breaking inmates' bones. They seek to control the Jails, and to a significant degree they do control the areas where they work.

35.     The "3000 Boys" is one such deputy gang, named for the third floor of Men's Central Jail where its members work. Members of the 3000 Boys, who sport a "3000" tattoo on the backs of their necks, inflict violence on inmates, foment violence among inmates, and even deploy violence on other deputies who resist their violent and abusive practices. A similar deputy gang operates on the second floor of Men's Central Jail. On information and belief, members of the "2000 Boys" designate their gang membership with tattoos of a Roman numeral "II" on their legs. Violent deputy gangs have operated in the LASD at least since the 1980s and perhaps since the early 1970s. The 3000 Boys and 2000 Boys have been operating with all the supervisors and high-ranking officials within the LASD's knowledge and acquiescence.

36.     The supervisors and high-ranking official Defendants' ongoing failure to halt these abuses has communicated to the deputy gangs that the can carry out brutal assaults on inmates with impunity. In fact, the Defendants' permissiveness has so emboldened the deputy gangs that they have begun to carry out their brutal assaults on inmates more and more openly, and even in the presence of civilian volunteer workers in the Jails. Jail chaplains and the court-appointed jail monitors of the American Civil Liberties Union ("ACLU") have provided

23

(1-A-11)

1  eyewitness accounts of deputies beating non-resisting inmates in

2  the jails.

3

4  37.  There is widespread fear among inmates of reporting

5  deputy misdeeds to the ACLU or anyone else, because deputies

6  regularly retaliate against those who lodge complaints, with

7  beatings, strip searches, body cavity searches, destructive cell

8  shake-downs, confiscation of belongings, and trumped-up discip-

9  linary and criminal charges.

10

11  38.    The Defendants are aware - and, in the case of at least three

12  of them, have been aware for years - of the pattern of deputy violence,

13  intimidation, and retaliation against inmates.  It has been publicly

14  reported, documented, and condemned on scores of occasions during

15  the past twenty years. Starting in 2006, a captain and a now

16  retired commander, both in the custody division, have reported

17  to Defendants Baca, Tanaka, Rhambo, and Burns problems

18  with deputy gangs and deputies using excessive and unneces-

19  sary force, but the said Defendants did not take appropriate

20  steps to address the problem. Sheriff Baca, Undersheriff

21  Tanaka, Chief Burns, and other supervisors in these jails

22  and at the highest levels of the Department have acquiesced

23  in, fostered, and implicitly authorized the abuse by failing

24  to promulgate adequate policies on the use of force, failing

25  to train and supervise deputies in the face of historical

26  and continued evidence of abuse, failing to conduct meaning-

27  ful investigations of reports of excessive force, failing to

28  hold guilty deputies accountable, and ignoring evidence

(1-A-12)

24

1    that deputies and other Department officials are covering up

2    incidents of excessive force.

3

4    39.     In 1992, the prestigious Kolts Commission- formed at

5    the behest of the Los Angeles County Board of Supervisors to

6    conduct a review of the policies, practices, and procedures

7    of the Sheriff's Department- issued a scathing report docum-

8    enting numerous incidents of excessive force, lax discipline,

9    and the presence of deputy gangs. The Kolts Report resulted

10   in the appointment of Special Counsel to the Board of

11   Supervisors for oversight of the Sheriff's Department,

12   Merrick Bobb. Bobb issued 30 semi-annual reports between

13   1993 and 2011. The County's Office of Independant Review

14   ("OIR"), headed by Michael Gennaco, has repeatedly reported

15   incidents of serious abuse to Sheriff Baca. The ACLU, which

16   serves as a class counsel to all detainees in Los Angeles

17   County Jails in Rutherford v. Baca, No. 75-04111 (C.D. Cal.),

18   and which has been appointed by the District Court in that

19   case to monitor conditions in the Los Angeles County Jails,

20   has submitted multiple reports to Sheriff Baca over several

21   years, documenting more than 70 cases of extreme deputy-on-

22   inmate violence.

23

24   40.     Despite Sheriff Baca's actual knowledge of this pattern

25   of violence and cover-ups, he has failed over a period of many

26   years to take reasonable measures to halt the abuses. Even now

27   that the pervasiveness and the extraordinary brutality of the

28   deputy-on-inmate abuse has become common knowledge through

(1-A-13)

25

1 the release of reports by the ACLU, Sheriff Baca has left in
2 place his principle subordinates in charge of supervising the
3 Custody Division of the Sheriff's Department; Undersheriff
4 Paul Tanaka and Chief Burns, who have day-to-day responsib-
5 ility for ensuring the inmates' safety, and under whose regime
6 this pattern of abuse has flourished.

7

8 41. The ultimate goal of this lawsuit is to hold all of the
9 Defendants directly and indirectly involved punatively liable and
10 accountable for their actions and to end the longstanding
11 pattern of deputy-on-inmate abuse by requiring the Defendants
12 to put in place a system of accountability, which they have
13 for so long failed to do. That system must include, at minimum,
14 adequate policies on the use of force, proper training on the
15 policies, proper supervision of deputies, thorough review of use
16 of force incidents, and appropriate discipline for improper use of
17 force or failure to report its use.

18

19 ## FACTUAL ALLEGATIONS COMMON TO ALL
20 ## CAUSES OF ACTION
21 ### A.

22 42. On December 11, 2011, between 8:00 and 9:00 a.m. in the
23 Los Angeles County Jail, Men's Central Jail, on the 3000 floor
24 section of the Jail, the Plaintiff Al-Quan Jackson and a group
25 of about approximately 10 to 15 other inmates were being
26 transfered from housing modules 3600-3800 to 3200-3400
27 due to modules 3600-3800 no longer accepting or housing
28 "level 8" custody level inmates.

(1-A-14)                                    26

43. Prior to entering housing module 3200-3400 the Plaintiff along with the 10 to 15 other inmates who accompanied the Plaintiff were asked by the Deputy personnel present · to place our personal property behind us and then strip down to our boxers and place our "Blues" (Jail issued clothing) behind us as well in order to be searched before entering Module 3200-3400. As the Plaintiff placed his personal property behind him, before stripping down to his boxers the Plaintiff reached into his pants pocket and retrieved a printed movement pass and as he placed the movement pass in his property bag, he told the Deputy Sheriff behind him that it was very important that he be allowed and permitted to keep the pass and once more he stressed the fact that the pass was important and he needed to keep it.

44. Once the search of the inmates and their property was drawing to a conclusion the inmates were rushed and instructed by Deputy personnel to gather their property and "take it inside" the module. As the Plaintiff was gathering his property he asked Deputy Kevin Ethridge a Deputy whom he was familiar with and recognized as a regular Deputy assigned to Module 3200-3400 if he could retrieve the pass for him. Deputy Patrick Rivera who was further down from the Plaintiff and Deputy Ethridge was concluding his search of another inmates property said "Fuck you, Fuck the pass" take it inside. Deputy Ethridge told the Plaintiff that the pass was probably in his property bag. The Plaintiff told Deputy Ethridge that the pass was not in his property bag because he saw the Deputy who searched his property discard the pass, the Plaintiff said he could actually see the pass

(1-A-15)

27

amongst the items the Deputies confiscated. Deputy Ethridge walked away without looking at the pass in question or returning it to the Plaintiff. Deputy Rivera then said "Fuck that pass it's two days old and besides you ain't gonna need it now take it inside". The Plaintiff then asked Deputy Rivera to please return the pass because it was important and that he the Plaintiff needed to keep it. Deputy Rivera in return said "Fuck you and that pass, you've got 3 seconds to get your shit and get the Fuck out of here or else. Seeing that pleading and trying to appeal to Deputy Rivera was unsuccessful and going nowhere the Plaintiff got up from the Floor and turned to Deputy Jason Rodriguez with his property in hand and pleaded with him to return the pass because the Plaintiff was familiar with Deputy Rodriguez and recognized him as also a Deputy regularly assigned to Module 3200-3400. The Plaintiff told Deputy Rodriguez that he needed the pass because it was going to save his life. Deputy then told the Plaintiff that if he needed it for legal reasons then it would be stored and could be found in his the Plaintiff's movement history. The Plaintiff then told Deputy Rodriguez that it wasn't that type pass and went to explain further that it was a Ficticious pass created by Operation Safe Jail Deputies Colon and Lane and was approved by Homicide Bureau Detective Angus Ferguson and with that he should know what it was needed for. At that point Deputy Rivera said "what, fuck you, I said get the Fuck out of here". The Plaintiff in return said "fuck you", this all lead to Deputy Rivera in an attempt to provoke the Plaintiff began saying fuck you, fuck you more loudly and aggressively. Seeing other Deputies begining to respond in the Plaintiff's direction and that the already hostile situation was about

(1-A-16)                                                    28

1   escalate, the Plaintiff without being told to do so voluntarily

2   turned around faced the wall placed his bag on the floor beside

3   him and then proceded to lay flat on his stomach on the ground

4   placing both of his hands behind his head at which point the

5   Plaintiff was assaulted and battered by several Deputy personnel

6   (Rivera, De La Torre, Aldama, Rodriguez, and Ethridge.).

7

8   45.     Following the assault on the Plaintiff, the Plaintiff was

9   handcuffed then escorted to the Men's Central Jail Clinic to

10  recieve treatment for his injuries.

11

12  46.     Once the Plaintiff was cleared by the Doctor and Nurse's

13  concerning his injuries he was interviewed by Watch Commander

14  Tracy Stewart, Lieutenant Edwin Alvarez, and Supervising Sergant

15  Nicole Zonver regarding the incident. During the interview the

16  Plaintiff told the interviewers how he was assaulted and battered

17  by Sheriff Deputy personnel for no justified or legal reason and

18  that everything could be confirmed by the hallway video footage.

19

20  47.     Following the incident and the interview the Plaintiff was

21  taken to disciplinary detention for assault on staff

22

23  48.     Following the incident the defendants, Rivera, De La Torre,

24  Aldama, Rodriguez, Ethridge, Raniag, Valencia, Moorman, Navarette,

25  Sharp, Hinchman, Zonver and Stewart conspired to and covered-up their

26  foreknowledge of the assault and battery on the Plaintiff and deliberate

27  use of excessive force through false incident reports. This cover-up

28  was initiated, promoted and ratified by the sheriff Deputies'

(1-A-17)                                    29

1  superiors including Defendants: Stewart, Alvarez, Ornelas, Fedele,

2  Roberts, Rojas, Zonver, and Hinchman.

3

4  49.  The Plaintiff was unarmed with his hands behind his

5  head, was helpless, and in no way posed a threat to the Deputy

6  personnel present during the incident or to the security of the

7  Jail. No Sheriff Deputy present during the incident was in

8  imminent danger of great bodily injury or death.

9

10  50.  The use of force on the Plaintiff was an unnecessary,

11  unwarranted, unlawful, and excessive use of force which proximately

12  cause the Plaintiff great pain and suffering. Further, the purposeful

13  and intentional use of excessive force was without any legal

14  justification whatsoever.

15

16  51.  Approximately 3 hours after the Plaintiff was taken to

17  Disciplinary detention he was removed and transferred to another

18  facility, Twin Towers Correctional Facility Tower 1 121 disciplinary

19  detention module for assaulting Staff. While in disciplinary

20  detention the Plaintiff was never given a hearing to address

21  the charges against him. Thereby denying him his right to a

22  fair and impartial hearing within 24 to 72 hours as per Depart-

23  ment policy. Eventually the false charges against the Plaintiff

24  were dismissed. Once the Plaintiff's false charges of assault

25  on staff were dismissed he was then transferred back to Men's

26  Central Jail where he was illegally placed in 3500-3700 K-10

27  orientation module which is a "high power" module designed for highly

28  or extremely violent inmates. This was all done in order to prevent

(1-A-18)

30

1  the Deputy misconduct and illegal actions from being reported by the

2  Plaintiff to his family and legal aid.

3

4  52.    On December 9, 2011 in housing module 3200 cell C-10 the

5  Plaintiff was assigned to cell C-10 and was a witness to a

6  murder which occurred inside of that cell. After the murder

7  occurred the Plaintiff contacted Operation Safe Jail Deputies

8  and notified them about the murder. The Fictitious pass

9  was produced and approved to serve as an alibi for the Plaintiff

10 in the event that he should be questioned by or threatened by other

11 inmates or staff, he could produce the pass and not appear as

12 a "snitch". All of the Deputies who were searching the inmates

13 property and person on December 11, 2011 knew that the Plaintiff

14 was the only witness to the Dec. 9, 2011 murder and was cooperat-

15 ing with authorities concerning the crime. The Deputies knew that

16 by denying the Plaintiff the pass that it would endanger and place

17 his life in jeopardy as well as compromise the ongoing investigat-

18 ion.

19              B.

20 53.    There is a longstanding pattern and practice in the

21 Los Angeles County Jails, and particularly in the Jail Complex in

22 downtown Los Angeles, of deputy-on-inmate violence and deputy-

23 instigated inmate-on-inmate abuse. Multiple oversight and mon-

24 itoring agencies, including the U.S. Department of Justice,

25 the LASD's OIR, the Special Counsel to the Los Angeles County

26 Board of Supervisors for oversight of the Sheriff's Department,

27 and the ACLU, have issued reports on the use of excessive

28 force and other abuses by the LASD against inmates in its

(1-A-19)                                    31

1 custody and in many cases made recommendations to address

2 the problem.

3

4 54. According to Thomas Parker, a former FBI agent and

5 Assistant Special Agent in Charge of the Bureau's Los Angeles

6 Field Office, who oversaw the FBI investigation into the force,

7 "There is at least a two-decade history of corruption within the

8 ranks of the LASD.... [N]o one at the command level ....

9 appears to have been held accountable and appropriately punished

10 for failure to properly supervise and manage their subordinate

11 personnel and resources. In my opinion, this has provided the

12 "seedbed" for continued lax supervision, violence, and corruption

13 within LASD and the county jails it administers". Sheriff Baca

14 and other LASD officials have "essentially abdicated their

15 responsibilities to provide a safe, secure, and corruption-free

16 incarceration environment within the Los Angeles County Jail System".

17 The result, Mr. Parker concluded, is a pattern of inmates "suffering

18 severe injuries, maiming, and death, some caused by fellow inmates,

19 but most often at the hands of, or with the acquiescence or

20 assistance of, the deputy sheriffs who are their keepers".

21 Mr. Parker states, "I have never experienced any facility exhibiting

22 the volume of repetitive patterns of violence, misfeasance, and

23 malfeasance impacting the Los Angeles County Jail system".

24

25 55. In May 1990, the Los Angeles Times published an invest-

26 igative report disclosing that excessive force cases represented

27 three-fourths of all major legal settlements and jury awards

28 over a three-year period; that half of the deputies involved in

(1-A-20)                                    32

major cases had been sued in the past for brutality; and that one training officer had been sued ten times in ten years. The newspaper quoted sources familiar with the Department who claimed that a code of silence made deputies reluctant to testify against fellow officers, even those who repeatedly used excessive force. The Department kept no separate records of the deputies who were sued for excessive force or the outcomes of the suits.

56.    In 1989, the Los Angeles County Board of Supervisors formed a blue-ribbon commission to conduct a review of "the policies, practices and procedures of the Sheriff's Department, including recruitment, training, job performance and evaluation, record keeping and management practices, as they relate to allegations of excessive force, the community sensitivity of deputies and the Department's citizen complaint procedure". The Board of Supervisors appointed the late Judge James G. Kolts ("Kolts") as special Counsel to the Board. Kolts was a former star prosecutor and a highly respected former Los Angeles County Superior Court Judge. The team Kolts assembled for this project became known as the Kolts Commission. In July 1992, after an extensive investigation, the Kolts Commission issued a scathing 359-page report ("the Kolts Report"). The Kolts Report detailed a history of excessive use of force and lax discipline within the LASD, and concluded that the Department had failed to reform itself. The Commission recommended civilian monitoring of the LASD.

57.    In January 1993, the Board of Supervisors passed a resolution to carry out the recommendations of the Kolts

1   Commission, and the Board retained Special Counsel, Merrick J.

2   Bobb, to monitor LASD's compliance with the Kolts Report

3   and to report to the Board semi-annually regarding such compli-

4   ance. Bobb continues to serve to this day as Special Counsel

5   to the Los Angeles County Board of Supervisors, and remains the

6   Board of Supervisors' monitor of the LASD and its operations.

7

8   58.    In his fourth Semiannual Report, dated June 1995,

9   Special Counsel Bobb reported the following:

10

11  59.    "[W]e continued to find too many cases involving

12  unnecessary force in responses to verbal taunts or passive

13  noncompliance. Most of these incidents arose in the jails,

14  where we found a substantial number of instances where

15  deputies appear to over-react to apparently slight provocat-

16  ions, like stepping out of the chow line, by shoving the

17  inmate against the wall or slapping him in the face". Further,

18  the use of "transparently phony pretext[s] ('the suspect

19  stared at me aggressively') to justify or excuse unnecessary

20  or excessive force ... is still practiced to an uncomfortable

21  and unacceptable degree in the custody setting".

22

23  60.    ("W]e do not believe that the Department has yet

24  implemented the Kolts recommendations with respect to force

25  investigations".

26

27  61.    In it's analysis of over 1,000 force-related investiga-

28  tions spanning a five-year period, the Kolts Report concluded

(1-A-22)                                              34

1  that the Department was too lenient in the way it disciplined

2  officers it found to have engaged in excessive force. The

3  situation has not changed very much... [C]aptains remain disin-

4  clined to impose substantial penalties for serious misconduct."

5  "[W]e continue to find cases in which the decision to exoner-

6  ate the officer [in excessive force cases] simply defies explanation

7  , and there are still incidents, almost all in the custody setting, where

8  the use of force is either senseless or overly severe."

9

10  62.     In a 1997 letter from the Acting Assistant Attorney

11  General of the Civil Rights Division of the U.S. Department of

12  Justice ("DOJ") to the then- Los Angeles County Executive,

13  Joanne Sturges, the DoJ reported that "Inmates who are ment-

14  ally ill or housed in mental health housing are subject to an

15  unacceptably high risk of physical abuse and other mistreatment

16  at the hands of other inmates and custodial staff. Moreover, the

17  Jail does not adequately investigate allegations of abuse against

18  its inmates." The DOJ reported that they had "recieved numerous

19  reports from inmates and advocates regarding serious physical

20  abuse of inmates in mental health housing... including kicks,

21  punches, beatings, and sexual assaults. Although the Jail claims that

22  it has discounted some of these claims... the investigation of

23  these claims was inadequate and serious questions remain regarding

24  the extent of physical abuse of mentally ill inmates. We agree with

25  Special Counsel Merrick Bobb's finding that in the Jail 'there is

26  callous treatment [of inmates] at times, a problem that LASD

27  management knows about but has not acted sufficiently aggress-

28  ively to resolve'". Furthermore, "the Jail's failure to investigate

(1-A-23)

35

promptly and thoroughly allegations of abuse against mentally ill inmates, and its failure to take appropriate action in response to incidents of abuse, enables the abuse of these inmates to continue". The report also stated, "The treatment recieved by one inmate indicates that excessive of force and physical mis-treatment of inmates with mental illnesses may be in part the result of inadequate training".

63.    In his tenth Semiannual Report, dated Febuary 1999, Special Counsel Bobb pointed to a long list of recent crises on the custody side of the Department, including "troubling inmate deaths at the hands of custody personnel," inmate on inmate violence," and "vigilante-like behavior at Twin Towers".

64.    On December 19, 2002, the Los Angeles County and the United States entered into a Memorandum of Agreement Regarding Mental Health Services at the Los Angeles County Jail ("MOA"). Sheriff Baca was one of the signers of the MOA, which was entered into 'to avoid potential litigation concerning the mental health services at the Jail." Among the provisions in the MOA were ones addressing training of correctional staff in "professional and humane treatment of mentally ill inmates," and the prevention and investigation of abuse of mentally ill inmates.

65.    In March 2003, the US DOJ sent to County Counsel a compliance letter on the 2002 MOA about treatment of the mentally ill. The letter concluded that the Sheriff's Department was not in compliance with the requirement of the MOA that

(1-A-24)

36

1  LASD "provide mandatory orientation and continuing competency-
2  based training for correctional staff in the identification and
3  and custodial care of mentally ill inmates but not necessarily
4  limited to
5  a. interpreting or responding to bizarre or aberrant behaviors,
6  b. recognizing and responding to indications of suicidal thoughts,
7  c. proper suicide observation,
8  d. recognizing common side effects of psychotropic medications,
9  e. professional and humane treatment of mentally ill inmates, and
10  f. response to mental health crises including suicide intervention
11  and cell extractions."
12
13  66.    In November 2004, Special Counsel Merrick Bobb
14  presented to Sheriff Baca and the Board of Supervisors a
15  confidential report finding that "Los Angeles County's largest
16  jail is so outdated, understaffed and riddled with security flaws
17  that it jeopardizes the lives of guards and inmates." The report
18  concluded that Men's Central Jail suffers from "lax supervision
19  and a long-standing jail culture that has shortchanged accountability
20  for inmate safety and security."
21
22  67.    In his nineteenth Semiannual Report, dated February
23  2005, Special Counsel Merrick Bobb noted:
24        From the Kolts Report onward, there has been a
25  paradoxial contradiction between Internal Affairs investigations
26  that exonerated the officer and litigation arising out of the
27  same incident that cost the County substantial money in settle-
28  ment and judgements. Those same disparities continue to exist

(1-A-25)

37

after 2003 and 2004 . . . . While at times one might find instances in which the County's lawyers have unwisely settled, it is far more common to find cases where the LASD let an officer off the hook when a judge or jury would not. We can only say as we have in the past that the disparities "fuel the fire of those who would strip the Sheriff of the privilege of investigating and disciplining his own employees". (citing the Fifthteenth Semiannual Report at 73).

68.    In June 2008 the ACLU issued a report by Dr. Terry Kupers, an expert on mental illness among incarcerated populations. The report was filed in the Rutherford litigation, served on Sheriff Baca's counsel, and sent directly to a number of high-ranking officials in the LASD Custody Division. In his report Dr. Kupers made a number of conclusions including: "[A]t the Los Angeles County Jail the claims by prisoners [of abuse by deputies] are so widespread, and the reports of abuse so consistent among multiple reporters, that it seems very likely there is an unacceptably high incidence of custodial abuse. Multiple prisoners have told me about abuse they have undergone or witnessed, and most say it is disproportionately directed at prisoners with serious mental illness". Dr. Kupers opined that the problem "is made worse by inappropriate undiagnosing and consignment of prisoners suffering from serious mental illness to general population housing". Dr. Kupers further found that "there seems to be very little mental health training for most other officers, and given the fact that officers work over-time in most assignments, this means that prisoners with mental illness outside of Tower 1 are

(1-A-26)                                          38

often guarded by officers with little or no training in mental health." He also found "disturbing evidence of custodial abuse of prisoners with serious mental illness", and "crowding and idleness at every level further exacerbate the problems."

69.    Dr. Krupers also made numerous recommendations to address the serious problems he found with the treatment of mentally ill prisoners including that "[a]ll officers ... be required to undergo intensive training in working with prisoners with mental illness" and that jail officials "halt custodial abuse" by implementing "zero tolerance from the top, education for prisoners about their rights and the grievance process, training and support to encourage staff to report abuse by other staff, a confidential complaint system that fosters prisoner trust and action, and prompt and thorough investigation with appropriate consequences for offending staff."

70.    In April 2010, a Los Angeles County Sheriff's deputy, Joshua Sather, who graduated at the top of his recruit class, resigned after only a few weeks on the job, alleging that a supervisor made him beat up a mentally ill jail inmate. Sather was the sole Honor recruit in his graduating class from the academy, and had been recognized for his leadership and other abilities. As with virtually all rookies, his first assignment was jail duty. On March 22, 2010, Sather was working on the sixth floor mental health ward of Twin Towers. At some point during Sather's shift, he, his supervisor and other deputies used force on a mentally ill inmate. Soon afterward, Sather, crying

1  and distraught, called his uncle, a veteran Sheriff's detective,

2  and told him that he participated in an unjustified beating, that

3  shortly before the beating his supervisor said, "We're gonna

4  go in and teach this guy a lesson", and that the attack had been

5  covered up. Sather's uncle confronted the supervisor about

6  making his nephew "beat up dings". Sheriff's officials launched

7  an investigation and determined that an uncooperative inmate had

8  been subdued by force, but concluded that no misconduct had

9  occurred.

10

11  71.    In May 2010, the ACLU National Prison Project and

12  the ACLU of Southern California submitted to Sheriff Baca and

13  to the Rutherford Court the ACLU's Annual Report on Conditions

14  Inside Los Angeles County Jail - 2008-2009. The report included

15  declarations documenting scores of complaints from inmates

16  and their families about deputy-inflicted injuries, ranging from

17  broken ribs and black eyes to severe head wounds and staples.

18  The report also documented a persistent pattern of retaliation

19  and threats of retaliation by deputies against inmates who

20  protested the conditions of their confinement.

21

22  72.    In September 2010, the ACLU National Prison Project

23  and the ACLU of Southern California submitted to Sheriff

24  Baca and filed with the Rutherford Court the ACLU's

25  "Interim Report on Conditions in the Los Angeles County Jails".

26      The ACLU's 2009 Annual Report describes the per-

27  vasive pattern of violence that we observed in Men's Central Jail

28  (M.C.J) in 2009. During the first eight months of 2010, the

(1-A-28)

40

violence has continued unabated. One aspect of the violence we discussed in our 2009 report was deputies' use of excessive and unjustified force, which continues to date: in the five-month period from March 10 through August 10, 2010, we recieved more than 70 complaints of excessive and/or unjustified force, or retaliation by deputies against prisoners, or both. Twenty of the prisoners making these complaints have provided us with sworn written statements.

73. In December 2010, the media reported on a large-scale brawl at an LASD Christmas party at a banquet hall in Monte-bello. The brawl was between members of the 3000 Boys (the dep-uty gang discussed in paragraph 35) and other deputies who worked in Men's Central Jail. In commenting publicly on the incident, Sheriff Baca characterized it as the "drunkenness of a few bad apples", and opined that cops "know how to take care of themselves", and that they need to "man up and say, 'I'm not a whimp.'" Sher-iff Baca insisted that the "core of what occurred with these 3000 Boys... wasn't their tattoo. It wasn't their unit. It was their friendship and their drinking."

74. The OIR, however, disagreed, stating, "Perhaps most concerning is the evidence that jail supervisors apparently knew about the use of 'gang-like' signs and other troubling behavior well before the eruption of violence at the Christmas party!"

75. On September 25, 2011, the Los Angeles times reported that the FBI was conducting a criminal investigation into

(1-A-29)

41

deputy abuse in the Jails.

76.     On September 28, 2011, the ACLU filed an Annual Report in Rutherford v. Baca, reporting seventy cases of extreme deputy abuse in the previous year, including accounts by civilian eyewitnesses of savage deputy beatings of inmates in the Jails.

77.     On October 13, 2011, the OIR issued a report stating that the Sheriff's Department has failed over many years to follow through on proposals to address violence in the Jails.

78.     In early December 2011, Robert Olmsted, a retired to LASD official who had been the Captain in charge at Men's Central Jail before being promoted to Commander in the LASD's Custody Division, and who oversaw both Men's Central Jail and Twin Towers, publicly disclosed that Sheriff Baca and other senior Department staff, including Defendants Tanaka, Rhambo, and Burns, have long had actual knowledge of the pattern of widespread deputy violence in the Jails. Olmsted had repeatedly informed Defendants Baca, Tanaka, and Burns of such problems, and tried to raise red flags about shoddy investigations that allowed deputies to escape scrutiny for using force. Olmsted had also voiced concerns to them about deputies forming gang-like cliques that were aggressive. Chief Burns told Olmsted that it was impossible to change the deputy culture in Men's Central Jail. Sheriff Baca never followed up with Commander Olmsted after he twice approached him

(1-A-30)                                    42

about problems in Men's Central Jail.

79.   On January 10, 2012 Sheriff Baca testified to the Board of Supervisors that use of force often arises when inmates have been declassified from mental health housing in T.T.C.F Tower 1 to be returned to Men's Central Jail. This practice of improperly declassifying mentally ill from mental health housing in Tower 1 and placing them in general population in MCJ is one that Dr. Krupers identified almost four years earlier as resulting in the abuse of mentally ill inmates.

80.   On January 11, 2012, the Los Angeles Times reported that the Sheriff's Department had admitted that use of force against inmates in the Los Angeles County jails was disproportionately directed at inmates with mental illness." Los Angeles County jailers are more likely to use force against mentally ill inmates than other prisoners, according to a new Sheriff's Department report that acknowledges the lockups need specially trained staff to reduce the violence". This admission comes almost four years after, Dr. Krupers concluded that deputy on inmate abuse was disproportionately directed at mentally ill inmates, that deputies lacked proper training in dealing with the mentally ill, and recommended that "[a]ll officers . . . be required to undergo intensive training in working with prisoners with mental illness".

81.   On January 14, 2012, the Los Angeles Times reported

(1-A-31)                          43

1  that the United States had filed felony bribery charges against

2  Gilbert Michel, a deputy in the Sheriff's Department Custody

3  Division. The article also reported that Deputy Michel had

4  "made statements which implicated him, along with several

5  other jail employees, as having participated in four prior

6  unreported incidents of improper uses of force".

7     At a later court appearance Michel testified under oath

8  and described a culture among deputies guarding the high-security

9  floors of the jails that led to excessive force and frequent

10 cover ups. He described beating inmates unprovoked, slapping

11 them, shooting them with a Taser gun and aggressively searching

12 them to pick a fight — something he learned "on the job". He said

13 he would huddle with other jail guards to get their stories

14 straight and write up reports with bogus scenarios justifying

15 the brutality. If the inmate had no visible injuries, he wouldn't

16 report the use of force, period. He did all this with impunity,

17 knowing that even if inmates reported the abuse it "wouldn't

18 go anywhere". If they were to put it in writing and drop it in a

19 complaint box, it was his fellow deputies who opened that box too.

20

21 82.  Degrading, cruel, and sadistic deputy attacks on inmates

22 are not isolated incidents at the Jails; they are commonplace.

23 Time and again, numerous deputies attack one inmate. Even as

24 the inmate lies motionless on the ground, new deputies are

25 summoned by radio and join in on the attack. In the course

26 of the attack/beating it is a common practice for deputies to yell

27 "Stop fighting"! or "Stop resisting"! to an inmate who is neither

28 fighting nor resisting. This practice is an effort to fabricate

(1-A-32)

44

1  a reason to blame the inmates for the attacks.

2

3  83.   Supervisory Officials have condoned a pattern of inadequate

4  investigations and cover-ups.

5

6  84.   The LASD brushes aside most inmate reports of violence.

7  The Department's apparent indifference to such complaints gives

8  deputies a sense of unchecked autonomy in the way they perform

9  their jobs. Incidents of deputy-on-inmate violence, after nominal

10  or no investigation by LASD, are routinely reported by deputies

11  as an unprovoked inmate-on-deputy assault, and if an inmate

12  complains of being beaten or injured by jail deputies, those

13  complaints are almost universally declared unfounded. Most

14  of these complaints get "resolved" at the lowest levels in the

15  LASD. Proper reporting procedures are routinely ignored.

16

17  84.   Defendants Baca, Tanaka, Rhambo, Burns, Ornelas,

18  Fedele, Stewart, Alvarez, Roberts, Rojas, Zonver, and Hinchman

19  have actual knowledge of deputy violence and have failed to

20  take reasonable measures to avert it.

21

22  85.   Rampant violence at the jails has resulted from a failure

23  of leadership at the top level of the Department. Such a pervasive,

24  deeply-entrenched, and notorious pattern of excessive force could not

25  have continued unabated over a period of many years without

26  a code of silence on the part of front-line and supervisory staff,

27  combined with management staff's failure to require account-

28  ability, and their engaging in outright cover-up.

(1-A-33)

45

# INJURIES

86.   As a result of the unnecessary and unjustified attack on the Plaintiff, the Plaintiff sustained the following injuries:

    a. Chemical Burns to eyes
    b. Chemical Burns to head and upper torso
    c. Bruising to upper back from use of taser
    d. Abraisions to upper back from use of taser
    e. Emotional and psychological pain and suffering
    f. Fear of further attacks by LASD if the Plaintiff is ever in the custody or presence of Sheriff Deputy or LASD's member.

(1-A-34)

46

a. Parties to this previous lawsuit:
   Plaintiff _____ N/A _____

   _____

   Defendants _____ N/A _____

   _____

b. Court _____ N/A _____

c. Docket or case number _____ N/A _____

d. Name of judge to whom case was assigned _____ N/A _____

e. Disposition (For example: Was the case dismissed? If so, what was the basis for dismissal? Was it
   appealed? Is it still pending?) _____ N/A _____

f. Issues raised: _____ N/A _____

   _____

   _____

g. Approximate date of filing lawsuit: _____ N/A _____

h. Approximate date of disposition _____ N/A. _____

## B. EXHAUSTION OF ADMINISTRATIVE REMEDIES

1. Is there a grievance procedure available at the institution where the events relating to your current complaint
   occurred? ☒ Yes   ☐ No

2. Have you filed a grievance concerning the facts relating to your current complaint? ☒ Yes   ☐ No

   If your answer is no, explain why not _____

   _____

   _____

3. Is the grievance procedure completed? ☒ Yes   ☐ No

   If your answer is no, explain why not _____

   _____

4. Please attach copies of papers related to the grievance procedure.

## C. JURISDICTION

This complaint alleges that the civil rights of plaintiff ____ Al-Quan Jackson _____
                                                              (print plaintiff's name)

who presently resides at __ C.S.P.- Corcoran P.O. Box 5246 _____
                                          (mailing address or place of confinement)

were violated by the actions of the defendant(s) named below, which actions were directed against plaintiff at

Los Angeles County Sheriff's Department Men's Central Jail. L.A/CA
                    (institution/city where violation occurred)

47

CV-66 (7/97)                    CIVIL RIGHTS COMPLAINT

on (date or dates) <u>12-11-11</u> , _____ , _____
          (Claim I)              (Claim II)           (Claim III)

NOTE:    You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

1.  Defendant  <u>Leroy Baca</u>               resides or works at
        (full name of first defendant)

        <u>4700 Ramona Blvd. Monterey Park, CA 91764</u>
        (full address of first defendant)

        <u>Los Angeles County Sheriff</u>
        (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual  ☒ official capacity.

Explain how this defendant was acting under color of law:

<u>The Defendant was acting within the course and scope of his employment and was acting under the color of law.</u>

2.  Defendant  <u>Paul Tanaka</u>              resides or works at
        (full name of first defendant)

        <u>4700 Ramona Blvd. Monterey Park, CA 91754</u>
        (full address of first defendant)

        <u>Undersheriff</u>
        (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual  ☒ official capacity.

Explain how this defendant was acting under color of law:

<u>The Defendant was acting within the course and scope of his employment and was acting under the color of law</u>

3.  Defendant  <u>Cecil Rhambo</u>             resides or works at
        (full name of first defendant)

        <u>4700 Ramona Blvd. Monterey Park, CA 91754</u>
        (full address of first defendant)

        <u>Assistant Sheriff</u>
        (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual  ☒ official capacity.

Explain how this defendant was acting under color of law:

<u>The Defendant was acting within the course and scope of his employment and was acting under the color of law</u>

48

on (date or dates) _____ , _____ , _____ .
                            (Claim I)                      (Claim II)                     (Claim III)

NOTE:    You need not name more than one defendant or allege more than one claim. If you are naming more than
         five (5) defendants, make a copy of this page to provide the information for additional defendants.

1.  Defendant  Dennis Byrns _____ resides or works at
               (full name of first defendant)

               4700 Ramona Blvd. Monrey , CA 91754 _____
               (full address of first defendant)

               Chief of Custody Operations _____
               (defendant's position and title, if any)

    The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

    Explain how this defendant was acting under color of law:

    The Defendant was acting within the course and scope of his
    employment and was acting under the color of law.

2.  Defendant  Dan Fedele _____ resides or works at
               (full name of first defendant)

               441 Bauchet St. Los Angeles, CA 90012 _____
               (full address of first defendant)

               Captain _____
               (defendant's position and title, if any)

    The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

    Explain how this defendant was acting under color of law:

    The Defendant was acting within the course and scope of his employ-
    ment and was acting under the color of law

3.  Defendant  Ralph Ornelas _____ resides or works at
               (full name of first defendant)

               441 Bauchet St. Los Angeles, CA 90012 _____
               (full address of first defendant)

               Captain _____
               (defendant's position and title, if any)

    The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

    Explain how this defendant was acting under color of law:

    The Defendant was acting under the course and scope of his employ-
    ment and was acting under the color of law.

49

on (date or dates) _____ , _____ , _____ .
                       (Claim I)             (Claim II)          (Claim III)

NOTE:    You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

1.   Defendant **Tracy Stewart** resides or works at
               (full name of first defendant)

    **441 Bauchet St. Los Angeles, CA 90012**
    (full address of first defendant)

    **Lieutenant**
    (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual  ☒ official capacity.

Explain how this defendant was acting under color of law:

The Defendant was acting within the course and scope of her employ-ment and was acting under the color of law.

2.   Defendant **Edwin Alvarez** resides or works at
               (full name of first defendant)

    **441 Bauchet St. Los Angeles, CA 90012**
    (full address of first defendant)

    **Lieutenant**
    (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual  ☒ official capacity.

Explain how this defendant was acting under color of law:

The Defendant was acting within the scope and course of his employment and was acting under the color of law

3.   Defendant **Kevin Roberts** resides or works at
               (full name of first defendant)

    **441 Bauchet St. Los Angeles, CA 90012**
    (full address of first defendant)

    **Sergeant**
    (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual  ☒ official capacity.

Explain how this defendant was acting under color of law:

The Defendant was acting within the course and scope of his employ-ment and was acting under the color of law.

on (date or dates) _____ , _____ , _____ .
　　　　　　　　　　　　　(Claim I)　　　　　　　　(Claim II)　　　　　　　(Claim III)

NOTE:　　You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

1.　Defendant　Nicole Zonver _____ resides or works at
　　　　　　　　(full name of first defendant)

　　　　　　　441 Bauchet St. Los Angeles, CA 90012 _____
　　　　　　　(full address of first defendant)

　　　　　　　Sergeant _____
　　　　　　　(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both):  ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:

The Defendant was acting within the course and scope of her employ-
ment and was acting under the color of law.

2.　Defendant　Shawnee Hinchman _____ resides or works at
　　　　　　　　(full name of first defendant)

　　　　　　　441 Bauchet St. Los Angeles, CA 90012 _____
　　　　　　　(full address of first defendant)

　　　　　　　Sergeant _____
　　　　　　　(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both):  ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:

The Defendant was acting within the course and scope of her employ-
ment and was acting under the color of law.

3.　Defendant _____ resides or works at
　　　　　　　　(full name of first defendant)

　　　　　　　441 Bauchet St. Los Angeles, CA 90012 _____
　　　　　　　(full address of first defendant)

　　　　　　　Sergeant _____
　　　　　　　(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both):  ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:

The Defendant was acting within the course and scope of his employ-
ment and was acting under the color of law.

51

on (date or dates) _____ , _____ , _____ .
　　　　　　　　　　　　(Claim I)　　　　　　(Claim II)　　　　　　(Claim III)

NOTE:　　You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

1.　Defendant　Patrick Rivera _____ resides or works at
　　　　　　　　(full name of first defendant)

　　　　　　　441 Bauchet St. Los Angeles, CA 90012
　　　　　　　(full address of first defendant)

　　　　　　　Deputy Sheriff
　　　　　　　(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:

The Defendant was acting within the course and scope of his employment and was acting under the color of law.

2.　Defendant　Samel Aldama _____ resides or works at
　　　　　　　　(full name of first defendant)

　　　　　　　441 Bauchet St. Los Angeles, CA 90012
　　　　　　　(full address of first defendant)

　　　　　　　Deputy Sheriff
　　　　　　　(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:

The Defendant was acting within the course and scope of his employment and was acting under the color of law.

3.　Defendant　Augustine DeLaTorre _____ resides or works at
　　　　　　　　(full name of first defendant)

　　　　　　　441 Bauchet St. Los Angeles, CA 90012
　　　　　　　(full address of first defendant)

　　　　　　　Deputy Sheriff
　　　　　　　(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:

The Defendant was acting within the course and scope of his employment and was acting under the color of law.

52

on (date or dates) _____ , _____ , _____ .
                           (Claim I)                (Claim II)              (Claim III)

NOTE:    You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

1.   Defendant  **Jason Rodriguez** _____ resides or works at
           (full name of first defendant)

           **441 Bauchet St. Los Angeles, CA 90012**
           (full address of first defendant)

           **Deputy Sheriff**
           (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:

The Defendant was acting within the course and scope of his employ-ment and was acting under the color of law.

2.   Defendant  **Kevin Ethridge** _____ resides or works at
           (full name of first defendant)

           **441 Bauchet St. Los Angeles, CA 90012**
           (full address of first defendant)

           **Deputy Sheriff**
           (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:

The Defendant was acting within the course and scope of his employ-ment and was acting under the color of law.

3.   Defendant  **Salvador Valencia** _____ resides or works at
           (full name of first defendant)

           **441 Bauchet St. Los Angeles, CA 90012**
           (full address of first defendant)

           **Deputy Sheriff**
           (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:

The Defendant was acting within the course and scope of his employment and was acting under the color of law.

53

on (date or dates) _____ , _____ , _____ .
                (Claim I)          (Claim II)        (Claim III)

NOTE:     You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

1.   Defendant _Joshua Ranieg_____ resides or works at
              (full name of first defendant)
            _441 Bauchet St. Los Angeles, CA 90012_____
            (full address of first defendant)
            _Deputy Sheriff_____
            (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual  ☒ official capacity.

Explain how this defendant was acting under color of law:

_The Defendant was acting within the course and scope of his employ-_
_ment and was acting under color of law._

2.   Defendant _Lance Moorman_____ resides or works at
              (full name of first defendant)
            _441 Bauchet St. Los Angeles, CA 90012_____
            (full address of first defendant)
            _Deputy Sheriff_____
            (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual  ☒ official capacity.

Explain how this defendant was acting under color of law:

_The Defendant was acting within the course and scope of his employ-_
_ment and was acting under the color of law._

3.   Defendant _David Navarrette_____ resides or works at
              (full name of first defendant)
             _441 Bauchet St. Los Angeles, CA 90012_____
            (full address of first defendant)
             _Deputy Sheriff_____
            (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual  ☒ official capacity.

Explain how this defendant was acting under color of law:

_The Defendant was acting within the course and scope of his employ-_
_ment and was acting under the color of law._

54

4. Defendant James Sharp _____ resides or works at
   (full name of first defendant)

   441 Bauchet St. Los Angeles, CA 90012
   (full address of first defendant)

   Deputy Sheriff
   (defendant's position and title, if any)

   The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

   Explain how this defendant was acting under color of law:

   The Defendant was acting within the course and scope of his
   employment and was acting under the color of law.

5. Defendant _____ resides or works at

   _____
   (full name of first defendant)

   _____
   (full address of first defendant)

   _____
   (defendant's position and title, if any)

   The defendant is sued in his/her (Check one or both): ☐ individual   ☐ official capacity.

   Explain how this defendant was acting under color of law:

   _____

   _____

D. CLAIMS*

CLAIM I

The following civil right has been violated:

First Cause of Action
(Violation of 42 U.S.C. 1983)

Denial of Rights Under the United States Constitution
Eighth and Fourteenth Amendments )

Supporting Facts:  Include all facts you consider important.  State the facts clearly, in your own words, and without citing legal authority or argument.  Be certain you describe, in separately numbered paragraphs, exactly what each DEFENDANT (by name) did to violate your right.

87.  Plaintiff incorporate by reference paragraphs 1 through 141, inclusive, as though set forth here in full, and as a First cause of action alleges:

88.  This is an action at law to redress the deprivation under color of statute, ordinances, regulations, custom, or usage of rights, privileges and immunities secured to the Plaintiff AL-Quan Jackson, by the Eighth and Fourteenth Amendments to the Constitution of the United States and arising under the laws and statutes of the State of California.

89.  During all times mentioned herein, defendants, and each of them, seperately and in concert, acted under color of law, to wit, under the statutes, ordinances, policies, regulations, customs, and usages of the

*If there is more than one claim, describe the additional claim(s) on another attached piece of paper using the same outline.

1  County of Los Angeles and of the State of California. Each Defend-

2  ant, seperately and in concert, acted outside the scope of his or

3  her jurisdiction and without authorization of law, willfully and

4  knowingly, to deprive AL-Quan Jackson the Plaintiff of his

5  right to freedom from cruel and unusual punishment, and from harm

6  , injury, and damage to bodily integrity.

7

8  90.  On December 11, 2011, Defendant Rivera took the plaintiff's

9  left hand from behind the Plaintiff's head while maintaining a

10  grip and control of the Plaintiff's left wrist slammed it on the

11  ground. Rivera also placed his right knee on the Plaintiff's

12  back (upper) preventing any rotation and or movement of the Plain-

13  tiff's left arm. Rivera let five seconds lapse before he scream-

14  ed "stop resisting" and "give us your hand!" Rivera then discharged his

15  Department issued Oleresin Capsium spray without warning in a

16  wanton, reckless manner, and without justification into the eyes,

17  ears, onto the entire head of the Plaintiff.

18

19  91.  Defendant DeLaTorre without warning discharged his Depart-

20  ment issued X-26 ECD Taser in a wanton, reckless manner, and

21  without justification, willfully, maliciously, sadistically and intention-

22  ally fired his X-26 ECD on the Plaintiff.

23

24  92.  Defendant Aldama pinned the Plaintiff down with his right

25  knee on the Plaintiff's lower back thus preventing the Plaintiff from

26  protecting himself as he was assaulted by Rivera, DeLaTorre,

27  Aldama, Rodriguez, and Ethridge.

28

(5-A-2)

57

93.  Defendant Rodriguez straddled the Plaintiff's right leg and pinned it down preventing the Plaintiff from protecting himself as Rodriguez, Ethridge, Aldama, De La Torre, and Rivera Assaulted the Plaintiff.

94.  Defendant Ethridge pinned the Plaintiff's left ankle down with his foot preventing the Plaintiff from protecting himself as he was assaulted by Rivera, De La Torre, Aldama, Rodriguez, and Ethridge.

95.  At all times mentioned the Plaintiff was proned out on the ground in a helpless state, he was non-resisting and attempted to comply with the orders of Defendants Rivera, De La Torre, Aldama, Rodriguez, and Ethridge to give up his hand. The Plaintiff even attempted to raise his arm followed up by a verbal offering of saying Take my hand... Take my hand.

96.  Defendant Raniag was present but failed to intervene to protect the Plaintiff from being assaulted and battered and from the use of excessive force by Defendants Rivera, De La Torre, Aldama, Rodriguez, and Ethridge.

97.  Defendant Valencia was present but failed to intervene to protect the Plaintiff from being assaulted and battered and from the use of excessive force by Defendants Rivera, De La Torre, Aldama, Rodriguez, and Ethridge.

98.  Defendant Moorman was present but failed to intervene

(5-A-3)

58

1  to protect the Plaintiff from being assaulted and battered and from

2  the use of excessive force by Defendants Rivera, DelaTorre, Aldama

3  , Rodriguez, and Ethridge.

4

5  99. Defendant Hinchman was present but failed to intervene

6  to protect the Plaintiff from being assaulted and battered and from

7  the use of excessive force by Defendants Rivera, DelaTorre, Aldama,

8  Rodriguez, and Ethridge.

9

10  100. Defendant Navarrete was present but failed to intervene to

11  to protect the Plaintiff from being assaulted and battered and from

12  the use of excessive force by Defendants Rivera, DelaTorre, Aldama,

13  Rodriguez, and Ethridge.

14

15  101. Defendant Sharp was present but failed to intervene to

16  protect the Plaintiff from being assaulted and battered and from

17  the use of excessive force by Defendants Rivera, DelaTorre,

18  Aldama, Rodriguez, and Ethridge.

19

20  102. Defendants Raniag, Valencia, Moorman, Hinchman, Navarrete,

21  and Sharp stood by and watched and observed the deputy miscon-

22  duct and were clearly aware that the Plaintiff was being niether

23  verbally or physically resistive.

24

25  103. All of the above named Defendants acts, and omissions in

26  depriving the Plaintiff of his rights, privileges and immunities

27  secured to him by the laws of this state and nation, the Plain-

28  tiff was injured and incurred damages as described here in.

(5-A-4                                                    59

104.   Plaintiff alleges that the Defendant's policies and/or practices with respect to the use of force under circumstances where there is no immediate threat to life were devoid of legitimate purpose, deliberately indifferent to inmate safety, and were so disproportionate as to show an intent to inflict unnecessary and wanton pain.

105.   Plaintiff further allege that it is the policy and/or practice of all defendants, promulgated by the administrative personnel and practiced by the Sheriff Deputies, to deliberately cultivate an enviroment of intimidation, fear and violence among inmates.

106.   As a direct and proximate result of the above-described unlawful and malicious and sadistic acts of Defendants Rivera, DeLaTorre, Aldama, Rodriguez, and Ethridge committed under color of their authority as LASD deputies, and while acting in that capacity, The Plaintiff suffered grevious bodily harm, and extreme pain, all in violation of his rights under the laws and Constitution of the United States, in particular the Eighth and Fourteenth Amendments thereof and 42 U.S.C. §1983.

107.   The Plaintiff was the victim of punishment administered in a grossly disproportionate manner to whatever his acts may have been, and that punishment constituted cruel and unusual punishment, and deprived him of his right to due process of law under the laws and Constitution of the United States, in particular the Eighth and Fourteenth Amendments thereof. The force used of the Plaintiff was excessive, unwarranted, unjustifiable, cruel, and

(5-A-5)

60

sadistic.

108.    As a further result of the above-described act, The Plaintiff was deprived of rights and immunities provided to him, under the Constitution and laws of the United States and the State of California, including, but not limited to, his rights under the Fourteenth Amendment to the equal protection of the laws.

109.    The failure of Defendants Baca, Tanaka, Rhambo, Burns, Fedele, Ornelas, Stewart, Alvarez, Roberts, Rojas, Zonver, and Hinchman and other unknown supervising personnel to provide training, supervision, and discipline regarding the lawful use of force amounts to deliberate indifference to the safety and lives of inmates. This deliberate indiffence was a proximate cause of the assault and battery on the Plaintiff.

110.    Plaintiff further allege that Defendants Baca, Tanaka, Rhambo, Burns, Fedele, Ornelas, Stewart, Alvarez, Roberts, Rojas, Zonver, and Hinchman and other unknown supervising personnel are directly liable and responsible for the acts of Defendants Rivera, De La Torre, Aldama, Rodriguez, Ethridge, Raniag, Valencia, Moorman, Navarrete, and Sharp because they failed knowingly to enforce the laws of the State of California and the policies and regulations of the LASD pertaining to the use of force by Sheriff Deputies in the jails, thereby creating and encouraging an atmosphere of lawlessness in which Sheriff Deputies employed excessive and illegal force and violence, in the belief that such acts would be condoned and justified by their superiors. Defendants Baca,

(5-A-6)

61

1  Tanaka, Rhambo, Burns, Fedele, Ornelas, Stewart, Alvarez, Roberts,

2  Rojas, Zoover, and Hinchman and other unknown supervising

3  personnel were aware, or should have been aware of such

4  unlawful acts and practices prior to and during the time

5  of the assault and battery on the Plaintiff.

(5-A-7)

62

D. CLAIMS*

CLAIM I

The following civil right has been violated:

Second Cause of Action

(violation of 42 U.S.C. 1983)

(Conspiracy to Deny Rights Under the United States Constitution Fourteenth Amendment and Fifth Amendment / Due Process of Law)

Supporting Facts: Include all facts you consider important. State the facts clearly, in your own words, and without citing legal authority or argument. Be certain you describe, in separately numbered paragraphs, exactly what each DEFENDANT (by name) did to violate your right.

111. Plaintiff incorporates by reference paragraphs 1 through 141, inclusive and Supervisior's Report on Use of Force and Taser International's Taser CAM RECORDER User Manual marked as EXHIBIT's B and C, as though set forth here in full, and as a second cause of action allege:

112. Plaintiff alleges that the following defendants conspired to deny Al-Quan Jackson his civil rights.

113. Defendants Rivera, DeLaTorre, Aldama, Rodriguez, Ethridge, Raniag, Valencia, Moorman, Navarette, Sharp, Zonver, Hinchman, Roberts, Rojas, Stewart, Alvarez, Ornelas, and Fadele conspired to deny Al-Quan Jackson his civil rights by deliberately and in concert agreeing to manipulate the facts as to what happen

*If there is more than one claim, describe the additional claim(s) on another attached piece of paper using the same outline.

1  on December 11, 2011 in the 3000 Floor hallway of Men's Central

2  Jail in order to justify the malicious and sadistic assault and battery

3  of Al-Quan Jackson and their own actions. This conspiracy to cover-

4  up the facts is reflected in the failure of the LASD custody

5  Force Review Commitee to investigate thoroughly the Use of Force

6  incident which involved the Plaintiff on December 11, 2011 in

7  compliance with the LASD's Use of Force reporting procedures and

8  Use of Force review procedures.

9

10  114.  Plaintiff alleges that the named defendants' fabrications

11  on official incident reports were done consciously, in defiance

12  of and in violation of California law, in violation of their pro-

13  fessional duties, and for the dual purposes of obstructing justice

14  and denying the Plaintiff's due process of law.

15

16  115.  The following allegations are backed and further substan-

17  tiated by the following evidence, Supervisor's Report on Use of Force,

18  LASD's Use of Force Policy, Taser International's Taser Cam Rec-

19  order Manual, and the 3000 Floor Hallway video and the X-26 Taser

20  video. The Use of Force Policy, Taser Cam Recorder Manual, and Supervis

21  or's Report on Use of Force will be attached as Exhibits B, C, and D.

22

23  116.  Defendant Rivera alleges in his Deputy's Use of Force

24  Report that the Plaintiff lay face down on the floor on his own and

25  that his left arm was extended out and Defendant Rivera grabbed the

26  Plaintiff's left wrist with his left hand, so that he could cuff the

27  Plaintiff. Deputy Defendant Aldama handcuffed the Plaintiff's

28  right arm. At this point Rivera alleges that the Plaintiff used

(5-B-2)                                          64

1  his strength and tensed his left arm making it impossible for him

2  to place it behind the Plaintiff's back. Rivera alleges that while

3  maintaining a hold of the Plaintiff's left wrist, the Plaintiff

4  began to forcefully move his arm up and down attempting to

5  to break Rivera's hold. Rivera alleges that he told the Plaintiff

6  to place his hand behind his back and the Plaintiff said "Fuck you"!

7  At that point, while maintaining the Plaintiff's left wrist Rivera

8  says he pulled out his O.C. Spray and warned the Plaintiff that

9  he would be sprayed if he didn't put his hand behind his back. Rivera

10  alleges the Plaintiff said "Motherfucker". Rivera says he sprayed

11  a 3 second burst of "Sabre Red" O.C. Spray to the Plaintiff's face

12  and the spray had little effect and only caused the Plaintiff to become

13  more enraged.

14

15  117.  Defendant Aldama alleges in his Deputy's Use of force

16  Report that the Plaintiff went down to the floor and placed both

17  of his hands on top of his head. Aldama alleges that he then ordered

18  the Plaintiff to place the both of his hands behind his back in order

19  to handcuff him. Aldama says the Plaintiff then brought his right

20  arm down to his back where Aldama was able to control it and

21  place it in a handcuff. Aldama alleges that he heard Deputy Defend-

22  ant Rivera order the Plaintiff to give up his left arm. Aldama says

23  he saw that the Plaintiff was tensing his body and both arms in

24  attempt to keep from getting handcuffed. Aldama alleges that he saw

25  Defendant Rivera struggling with the Plaintiff's left arm. Due to

26  the Plaintiff's large build and fearing that the Plaintiff would attempt

27  to get up Aldama says he placed his right knee on his back to prev-

28  ent the Plaintiff from getting up and fighting with deputy personnel

(5-B-3)

65

while simultaneously holding the Plaintiff's cuffed right arm. Aldama says he gave the Plaintiff commands several times to give up his left arm so that he could handcuff the Plaintiff but the Plaintiff failed to comply. Aldama says then he saw Deputy Defendant Rivera spray the Plaintiff on his face and the O.C. spray did not effect the Plaintiff as he refused to give up his left arm. Aldama says that deputy personnel then gave the Plaintiff several commands to "stop fighting" and to give up his left hand but he refused to comply with the orders given. In addition, prior to the force being administered Defendant Aldama says he requested the 3000 floor Sergeant via his hand held radio to respond to the 3000 floor hallway regarding an uncooperative inmate.

118. Defendant Hinchman alleges that as she walked onto the 3000 floor she heard someone yelling "Fuck you guys". Also she says she heard deputy personnel saying, "stop fighting". As she approached the low end of the hallway, Hinchman says she saw Deputy Defendant Rivera hovering over an inmate and trying to handcuff him. The inmate was later identified as the Plaintiff. Simultaneously, Hinchman says she saw Deputy Defendant Aldama trying to gain control of the Plaintiff's upper Torso by placing his right knee across the Plaintiff's upper back. Hinchman alleges that the Plaintiff was lying face down on the floor, rolling his body from side to side making it hard for deputies to handcuff him. Hinchman says she also saw the Plaintiff pulling his legs apart, and sliding them from side to side.

119. Defendant Rodriguez alleges that after the Plaintiff was ordered to face the wall and place his hands behind his back

(5-B-4)                                    66

1  the Plaintiff then turned towards the wall and proceded to lay on

2  the floor. Rodriguez says he saw Deputy Defendant Aldama take

3  control of the Plaintiff's right hand and handcuff it. He says

4  he heard Deputy Defendant Rivera give the Plaintiff orders to

5  place his left hand behind his back several times. Rodriguez

6  says he then noticed that the Plaintiff no longer had his legs

7  together but rather they were sprawled out so he grabbed hold of

8  right leg so he could not get up and begin to fight with Rodriguez's

9  partners.

10

11  120.    Defendant Moorman alleges that he saw the Plaintiff lay

12  on the floor and as Deputy personnel went to handcuff the Plaintiff,

13  he could see that the Plaintiff began to struggle. Moorman says

14  he immediately began to respond to the location and he put out radio

15  traffic via his hand held radio "415 Deputy involved 3000 hallway"

16  (415 Deputy involved is code for an officer is involved in a fight). Moor-

17  man says that as he responded, he could hear verbal commands

18  being given to the Plaintiff that the Plaintiff give up both of his

19  hands.

20

21  121.  Defendant Raniag alleges that he saw the Plaintiff lay down

22  on the floor with his hands behind his head. Raniag says he saw Deputy

23  Defendant Aldama contact the Plaintiff by grabbing his right

24  hand in order to handcuff it. However the Plaintiff would not place

25  his left hand behind his back. Raniag says he saw Deputy Defend-

26  ant Rivera struggling to control the Plaintiff's left arm. Raniag

27  says he heard Rivera give the Plaintiff multiple commands to comply

28  and put his hands behind his back, but to no avail the Plaintiff

(5-B-5)                                          67

1  continued to say "Fuck you, I'm not giving it up". Deputy Rivera

2  then sprayed the Plaintiff in the face with a burst of O/C spray,

3  however Raniag says the spray didn't have the desired effect as

4  the Plaintiff still didn't put his hand behind his back.

5

6  122.   Defendant Valencia alleges that he saw deputy personnel

7  on the floor attempting to gain control of the Plaintiff's hands. He

8  says he saw the Plaintiff struggle with deputy personnel and ignore

9  orders to comply and place his hands behind his back.

10

11  123.   Defendant Ethridge alleges that he saw the Plaintiff turn

12  towards the wall and lay down in a "prone" position. Deputies who

13  were standing across the hallway approached the Plaintiff. As Ethridge

14  approached the deputies location he says he could hear them instruct-

15  ing the Plaintiff to give up his left arm, he could hear him yelling,

16  "Fuck y'all motherfuckers".

17

18  124.  Defendant De La Torre alleges that Deputy Defendant Rivera

19  was still struggling with the Plaintiff's left arm/hand so he turned

20  on the "taser" and placed it on the Plaintiff's upper back and told

21  the Plaintiff to give up his left arm or he will be tased, the Plain-

22  tiff still didn't comply and continued to try and break away from

23  Rivera's grasp. De La Torre alleges that he announced to his partners

24  that he was going to use the taser. At that time he says he "DRIVE STUN-

25  NED" the Plaintiff on the upper portion of his middle back for five

26  seconds. De La Torre alleges that the Plaintiff still didn't render his

27  left arm/hand and Rivera continued to struggle in gaining control of the

28  Plaintiff's left arm/hand. De La Torre says his fear level became

(5-B-6)                                          68

1  elevated since the "DRIVE STUN" didn't gain compliance. De La Torre

2  alleges that he announced to his partners that he was going to

3  use the "taser" again and he "DRIVE STUNNED" the Plaintiff in the

4  middle of his upper back for another five seconds.

5

6  125.   Defendant Zonver alleges in the Additional Information

7  section of the Supervisor's Report on Use of Force pertaining to

8  the Data for X-26 Taser that the data was found in firing count sequence

9  433-436; the two sequences used on the Plaintiff were 435 and 436.

10 She alleges she was able to determine which two sequences were used

11 on the Plaintiff because the "Taser" battery life will always indicate

12 0% when used in "drive stun" mode. In addition, two trigger pulls

13 were recorded prior to the "drive stun" (sequence 433 and 434). However,

14 these charges did not make contact with the Plaintiff; the battery life

15 indicated 99% during both trigger pulls. Zonver further alleged

16 that the video camera for the "Taser" only captured about 4 seconds

17 of its first application. She says she reviewed the footage and saw

18 Deputy Defendant Rivera maintaining a grip on the Plaintiff's left wrist.

19 He orders the Plaintiff several times to give up his hand. The Plaintiff

20 does not comply, and pulls his left arm up. Deputy Rivera pepper

21 sprays the Plaintiff in an effort to gain compliance. At this point

22 you hear the Plaintiff say, "Take my hand... Take my hand. Deputy

23 Rivera maintains his grip but still can't get the Plaintiff's hand behind

24 his back. Within seconds, the Plaintiff is "drive stunned" for about

25 five seconds. Zonver alleges that; Unfortunately that is the extent of

26 what the camera captured since the battery life dropped down to

27 0% shortly thereafter.

28    Pertaining to the 3000 Floor hallway camera, Zonver alleges

(5-B-7)

69

that she reviewed footage of the incident, which was captured from the 3000 floor hallway camera. She says she watched the video footage in slow motion and at normal speed. She alleges that the footage paralleled the supplemental reports provided by the deputies involved, minus a few minor discrepancies. Zonver alleges that the deputies were not given the privilege of watching the footage, so she questioned them about each divergence.

126. Taser International is the manufactuer of the X-26 Taser.

127. Taser International owns the patent and copyrights to the brand, name, and model of the X-26 and is the only supplier of the X-26 ECD Taser

128. Taser International is the supplier of Taser devices to most if not all law enforcement agencies in the United States.

129. The Taser CAM battery supplies less voltage to the X26 ECD than a standard X26 DPM/XDPM (regular/standard battery that is used in an X26 ECD without a Taser CAM); therefore when a Taser CAM is installed the X26 ECD's Low Intensity Lights may flash when the unit is firing. This is normal and DOES NOT indicate a low battery or a low output.

130. The battery life for the X26 ECD does not indicate 0% when used in DRIVE STUN mode nor when equipped with a Taser CAM.

131. The X26 ECD does not have a secondary power supply

(5-B-8)                                                  7D

1  and will completely cease to operate when the battery life drops
2  to 0%.

3

4  132. The Taser Cam system records both video and audio
5  anytime the ECD's safety is in the up (ARMED) position, and stops
6  recording when the safety is in the down (SAFE) position.

7

8  133. The 3000 Floor Hallway video cameras record in live time
9  with no delays.

10

11  134. Defendants Rivera, De La Torre, Aldama, Rodriguez, Ethridge,
12  Raniag, Hinchman, Moorman and Valencia, each either allege that
13  the Plaintiff was resisting while on the ground or yelling explitives /
14  profanities. Rivera in addition alleged that the Plaintiff's arm
15  (left) was extended out and he grabbed it. The video footage
16  captured Deputy Rivera grab the Plaintiff's left arm from behind
17  his head. The video also captures the Plaintiff saying take my hand
18  ...take my hand instead of "Fuck you guys" "bitch," "Mother fucker",
19  or "Fuck you I'm not giving it up" which contradicts their claims
20  and substantiates and confirms those of the Plaintiff's

21

22  135. Defendant Zonver withheld pertinent and exculpatory
23  evidence choosing not to include it in the Supervisor's Report on
24  Use of Force. Hallway video clearly showed the Plaintiff lay
25  on the ground with both hands behind his head. It clearly showed
26  Defendant Rivera grab the Plaintiff's hand from behind his head
27  and slam it on the floor. The Taser video captured Rivera grabbing
28  the Plaintiff's hand as well and it's audio captured the Plaintiff

(5-B-9)                                              71

in a sign of submission and nonresisting saying take my hand...
take my hand. Further the audio and video footage captured on the
Taser CAM showed the deputy Defendants yelling "stop resisting",
give us your hand as the Plaintiff is still submitting and not
resisting as he is being tased and saying "take it" (take my hand).
The captured footage does not show any O.C. pepper spray or
Taser warnings as required by Use of Force policy from the LASD
in which each Defendant (Rivera, DeLaTorre) claimed to have given
before administering force.

136. Defendant Aldama alleged in his use of force report that
he requested the 3000 floor Sergeant na his handheld radio regard-
ing an uncooperative inmate. Following the request the Plaintiff
layed on the ground voluntarily. At that juncture Defendants
Rivera, DeLaTorre, Aldama, Rodriguez, and Ethridge all engaged
the Plaintiff and assaulted, battered, and used excessive and unnecess-
ary force on the Plaintiff.

137. As per LASD policy (5-05/090.05 Handling insubordinate,
recalcitrant, hostile, or aggressive inmates). Withstanding the
imminent threat of physical injury or the need for immediate
intervention, personnel shall request the presence of appropriate
back-up and a Sergeant or supervising line deputy, prior to handl-
ing any recalcitrant inmate.

138. Defendants Zoover and Stewart both acknowledged in
their individual Supervisor's Report the fact that Defendant's
Rivera, DeLaTorre, Aldama, Rodriguez, and Ethridge all violated

(5-B-10)                                           72

1 the above mentioned policy and failed to discipline them or ackn-

2 owledge the fact that had they not violated the said policy,

3 the Plaintiff's civil or constitutional rights would never have

4 been violated.

5

6 139.    It is the supervising Sergeants to investigate all force

7 incidents and then submit his or her findings to the Watch

8 Commander and Supervising Lieutenant and their duties are

9 to evaluate the incident and then submit their findings to

10 to the Unit Commander/Captain who has the final decision

11 or makes the final decision as to if further investigation is

12 needed because of inconsistent reports from Deputies and the evidence

13 available. Any supervising personnel who investigates a force

14 incident has the option of requesting further investigation if it

15 evident that excessive force or unnecessary force was used.

16 Defendants Zonver, Roberts, Stewart, Alvarez, and Fedele all invest-

17 igated the force incident and were aware of the excessive force and

18 Deputy misconduct, all signed the force packet, all approved of the

19 misconduct, and all conspired to deny the Plaintiffs Due process rights.

20

21 140.    Defendant Ornelas was the Unit Commander/Captain

22 on Dec 11, 2014 and was aware of the excessive force used on

23 the Plaintiff. He viewed all video regarding the incident and allowed

24 the Deputies involved in the incident misconduct to go unpunished.

25 Ornelas personally, consciously and knowingly allowed the Plaintiff to

26 remain in disciplinary detention and later made the decision to transfer

27 the Plaintiff to T.T.C.F Tower 1-121 disciplinary detention under false

28 charges of assault on Staff where ultimately the Plaintiff was

(5-B-11)                                    73

1  never given a hearing to address the charges. Defendant Ornelas
2  along with the above named Defendant's conspired to deny the
3  Plaintiffs Rights under the United States Constitution Fourteenth
4  and Fifth Amendments / Due Process of law.

5

6  141.    Defendant Rojas on December 11, 2011 was standing at the
7  entrance of the Watch Commander's Office as the Plaintiff waited
8  there in the hallway to be taken to the disciplinary module. The
9  Plaintiff "pleaded" Rojas to intervene and watch the recording from
10 the hallway video camera and stop the Plaintiff from going
11 to the disciplinary module because he had not violated any rules.
12 Plaintiff gave Rojas a detailed account of the events. Rojas told
13 the Plaintiff that if it was found that the Plaintiff had not in fact
14 done anything wrong then he would not allow the Plaintiff to remain in
15 Disciplinary detention. Rojas later on December 11, 2011 told the
16 Plaintiff he was transfering to another facility. He explained that
17 he "indeed did see the Plaintiff lie down on the ground and not
18 resisting but he did not know what was said". Rojas explained
19 that the Plaintiff's transfer to another facility was not his call
20 but that of his supervisors. Defendant Rojas was required by ethics
21 and law to report any misconduct of his fellow deputies and superiors
22 his failure to do so amounted to deliberate indifference and resulted
23 in the continual denial of the Plaintiff's rights. Defendant Rojas
24 along with the above named Defendants conspired to deny the Rights
25 under the United States Constitution Fourteenth Amendment and
26 Fifth Amendment / Due Process.

27

28

(5-B-12)                                                    74

D. CLAIMS*

CLAIM I

The following civil right has been violated:

Third Cause of Action
(Violation of 42 U.S.C. 1983)
(Failure to Train, Supervise and Discipline Employees)

Supporting Facts: Include all facts you consider important. State the facts clearly, in your own words, and without citing legal authority or argument. Be certain you describe, in separately numbered paragraphs, exactly what each DEFENDANT (by name) did to violate your right.

142. Plaintiff refers to and hereby incorporate all of the allegations of paragraphs 1 through 141, inclusive, of this complaint, as if fully set forth herein, and as a third cause of action allege:

143. On or about December 11, 2011, Defendants Baca, Tanaka, Rhambo, Burns, Ornelas, Fedele, Stewart, Alvarez, Roberts, Rojas, Zonver, and Hinchman and other unknown supervising personnel were charged by law and regulations of the Los Angeles County Sheriff's Department with the selection, assignment, discipline, and discharge of officers and employees of said Department. At all times material herein, Defendants Baca, Tanaka, Rhambo, Burns, Ornelas, Fedele, Stewart, Alvarez, Roberts, Rojas, Zonver, and Hinchman had the power and authority to discharge or reassign sworn personnel of LASD's M.C.J, who were or believed to be emotionally unstable, untrustworthy,

*If there is more than one claim, describe the additional claim(s) on another attached piece of paper using the same outline.

75

(B-C-1)

1   and/or prone to the use of unreasonable or excessive force, or

2   otherwise exhibited tendacies, traits of character, behavior, habits,

3   conduct or attitudes which rendered such sworn personnel unfit

4   or undesirable for the positions of Deputy Sheriffs for assignment

5   to enforcement functions and duties involving contact with the

6   inmate population held in the Men's Central Jail.

7

8   144.   The following training, supervision, and investigation policies

9   and practices and failure to discipline employees resulted in

10  the Constitutional violations and injuries described in this complaint.

11  Defendants Baca, Tanaka, Rhambo, Burns, Fedele, Ornelas, Stewart,

12  Alvarez, Roberts, Rojas, Zonver and Hinchman and other unknown

13  LASD supervising personnel have promulgated vague and contrad-

14  ictory written and verbal policies that failed to provide Sheriff

15  Deputies with meaningful guidance with respect to the use of force.

16  There is no meaningful guidance with respect to the circumstances

17  when force can be used, or the ways in which to correctly

18  administer it so as to minimize rather than increase violence.

19  The lack of guidance on the use of force resulted in the indis-

20  criminate misuse of weapons to control inmate behavior. This

21  routine use of unnecessary and excessive force resulted in the

22  assault of the Plaintiff.

23

24  145.   Defendants Baca, Tanaka, Rhambo, Burns, Fedele, Ornelas,

25  Stewart, Alvarez, Roberts, Rojas, Zonver, and Hinchman, and other

26  unknown LASD supervising personnel have failed to train staff

27  in the use or misuse of weapons. These named defendants failed

28  to train and provide training that would permit Sheriff Deputies

(5-C-2)                                        76

1   to properly employ and administer force. There is an absence of
2   clear LASD guidlines on the use of Tasers and Chemical
3   Agents. Promulgated LASD guidelines were changed frequently,
4   causing confusion and uncertainty among Sheriff Deputy custody
5   line staff who were armed with weapons. Further, the verbal
6   policy and practice differed from the written policy which rout-
7   inely resulted in the unconstitutional use of force. The use of
8   Tasers training is perfunctory and superficial. For this reason
9   the deputies frequently, and as in this case the deputies used
10  excessive force in violation of the Constitution of the United States.
11
12  146.   Defendants Baca, Tanaka, Rhambo, Burns, Fedele, Ornelas,
13  Stewart, Alvarez, Roberts, Rojas, Zonver, and Hinchman and other
14  unknown LASD supervising personnel have failed to provide policies
15  and procedures  to provide for the meaningful reporting, monitoring
16  and investigation of the misuse of force by staff. Custody Force
17  Review Commitee, Review procedures do not result in control of offi-
18  cer misuse and over-use of force. Instead they whitewash both,
19  as they did in this case. Handwritten reports on incidents are
20  "Corrected" by supervisory officers, a process which is routinely
21  used to mask highly questionable if not clearly improper uses
22  of force. Reports are frequently demonstrably incomplete. The
23  Use of Force reporting process within the Los Angeles County
24  Jails reflects a failure to train officers in this essential
25  duty. The final drafts of reports are routinely not subject
26  to review by senior and supervising staff, even if the use of force
27  described in the report is one which should raise suspicion or
28  caused sufficient injury to warrant supervising review.

(5-C-3)                                              77

147. Custody Force Reviews are mandated by law whenever there is a "reportable" incident involving the use of a Taser or Chemical Agent. The purpose of the Force review are training, supervision, and discipline. However the Force reviews have never served this purpose. Instead they were conducted with the goal of justifying officers' use of force without independant investigation and inquiry into the facts of each incident. Such was the case in this instance.

148. The overall failure to restrain the use of excessive or over-use of Force in the Jails is part of a deliberate administrative policy to intimidate inmates into total submission to Staff control. The direct and immediate result of these systemic failures to train, supervise, investigate and discipline the use of force by deputies is a pattern of excessive and uncontrolled force. This failure to train, supervise, investigate and and discipline is, for the reasons described, deliberate, malicious and sadistic in that its intent is to terrify inmates and to reinforce the attitude that inmates are less than human.

149. By reason of the aforementioned acts and omissions of Defendants Baca, Tanaka, Rhambo, Burns, Fedele, Ornelas, Stewart, Alvarez, Roberts, Rojas, Zonver, and Hinchman and other unknown LASD personnel were allowed to commit the described assault, battery, and use of excessive force on the Plaintiff Ai-Quan Jackson. Furthermore, by reason of the aforementioned acts and omissions, the Plaintiff was deprived of his civil and constitutional rights by defendants Baca, Tanaka, Rhambo, Burns

(5-C-4)

78

Fedele, Ornelas, Stewart, Alvarez, Roberts, Rojas, Zonver,
Hinchman, Rivera, De La Torre, Aldama, Rodriguez, Ethridge,
Raniag, Valencia, Moorman, Navarrete, and Sharp, thereby
injuring the Plaintiff as more fully described herein.

(5-C-5)                                                    79

D. CLAIMS*

CLAIM I

The following civil right has been violated:

Fourth Cause of Action

(Failure to Protect in violation of the Eighth Amendment.)

Supporting Facts: Include all facts you consider important. State the facts clearly, in your own words, and without citing legal authority or argument. Be certain you describe, in separately numbered paragraphs, exactly what each DEFENDANT (by name) did to violate your right.

150. Plaintiff incorporate by reference paragraphs 1 through 141, above, as if set forth herein full, and as a fourth cause of action allege:

151. Defendants Baca, Tanaka, Rhambo, Burns, Fedele, Ornelas, Stewart, Alvarez, Roberts, Rojas, Zonver, and Hinchman have long been aware of the Deputy-on-inmate abuses, cover-ups, sadistic and malicious uses of unnecessary, unjustified exceess force, Violation of LASD policy and procedure regarding the Use of force, and the same narratives time after time of how and why force was administered, yet they have failed to remedy and correct the problems that have plagued the jails. Therefore they failed to protect the Plaintiff and failed to prevent the assault and battery.

*If there is more than one claim, describe the additional claim(s) on another attached piece of paper using the same outline.

153. On December 11, 2011 Defendants Raniag, Valencia, Moorman, Navarrete, Sharp, and Hinchman were all present during the time the Plaintiff was assaulted and battered and the Plaintiff's rights were violated. The above named Defendants were aware that Defendants Rivera, De La Torre, Aldama, Rodriguez, and Ethridge were violating LASD policy, using unnecessary and excessive force, and clearly assaulting and battering the Plaintiff. Though they had more than enough opportunity, they failed to intervene and prevent or stop the violations and uphold the law and carry out their duties as officers of the law.

154. This was entirely preventable violence, unjustified by any legal objective. The above named Defendants acted with deliberate indifference.

(5-D-2)

81

D. CLAIMS*

CLAIM I

The following civil right has been violated:

Fifth Cause of Action
(Denial of Rights under the Fifth and Fourteenth Amendments and
42 U.S.C. §1983) (Due Process)

Supporting Facts: Include all facts you consider important. State the facts clearly, in your own words, and without citing legal authority or argument. Be certain you describe, in separately numbered paragraphs, exactly what each DEFENDANT (by name) did to violate your right.

155. Plaintiff incorporates by reference paragraphs 1 through 141, above, as if set forth herein in full, and as a fifth cause of action allege:

156. On December 11, 2011 The Plaintiff was placed in disciplinary dentention under false charges of assaulting staff.

157. Plaintiff was transfered from M.C.J 2401 disciplinary detention to T.T.C.F Tower 1-121 disciplinary detention.

158. LASD custody Division policy requires that any inmate charged with violating a rule be given notice of the complaint filed against him or her alleging the Jail Rules violation and to be given a hearing within 24 to 72 hrs of the violation to determine guilt or innocence

*If there is more than one claim, describe the additional claim(s) on another attached piece of paper using the same outline.

82

( 5-E-1 )

1  and give the accused an opportunity to present a defense.

2

3  159.  The falsified Use of force incident reports made and

4  prepared by the Defendants Rivera, De LaTorre, Aldama, Rodriguez

5  , Ethridge, Raniag, Valencia, Moorman, Navarrete, Sharp, Zonver,

6  Hinchman, and Stewart, led to the Plaintiff being placed in

7  disciplinary detention. The Plaintiff was never given a hear-

8  ing and notice of Disciplinary violation within the required

9  24 to 72 hrs. and the Plaintiff remained in Detention.

10

11  160.  The False Charges were later dismissed but instead

12  of the Plaintiff being transfered back to general population

13  he was transfered to 3600-3700 K-10 Orientation module in M.C.J

14  which is still another detention module.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(S-E-2)                                        43

D. CLAIMS*

CLAIM I

The following civil right has been violated:

Sixth Cause of Action
(Pendent State Claim)
(Assault and Battery - State Tort Law)

Supporting Facts: Include all facts you consider important. State the facts clearly, in your own words, and without citing legal authority or argument. Be certain you describe, in separately numbered paragraphs, exactly what each DEFENDANT (by name) did to violate your right.

161. Plaintiff incorporates by reference paragraphs 1 through 44, inclusive, as set forth here in full, and as a sixth cause of action allege:

162. The unjustified injury of the Plaintiff Al-Quan Jackson on December 11, 2011 constituted an intentional assault and battery prohibited by California State law.

163. As a direct result of Defendants Rivera, De La Torre, Aldama, Rodriguez, and Ethridge's assault and battery on the person of Al-Quan Jackson, Al-Quan Jackson suffered great physical pain, great mental pain and shock to his nervous system.

164. Plaintiff is entitled to recover compensatory and punitive

*If there is more than one claim, describe the additional claim(s) on another attached piece of paper using the same outline.

(E-E-1)

84

1  damages against the defendants.

(5-F-2)

85

E. REQUEST FOR RELIEF

I believe that I am entitled to the following specific relief:

Defendants Baca, Tanaka, Rhambo, Burns, Ornelas, Fedele, Stewart, Alvarez, Zonver, Hinchman, Roberts, Rojas, Rivera, DeLa-Torre, Aldama, Rodriguez, Ethridge, Raniag, Valencia, Moorman, Sharp, and Navarette to be held punitively responsible for their acts, omissions, failure to act, deliberate indifference, and blatant disregard for human life. The Plaintiff, upon a jury verdict favorable to the Plaintiff asks that all court cost and fees be paid by the Defendants. The Plaintiff seeks compensatory and punitive damages upon proof in specific amounts according to each individuals actions. The Punitive and Compensatory Damages are to be paid seperately by each individual and the damages are to be paid as follows:

Defendants: Baca, Tanaka, Rhambo, Burns, Ornelas, Fedele, Stewart, Alvarez, Zonver, Hinchman, Roberts, and Rojas to each pay #1,500,000 in compensatory damages and #2,000,000 in punitive damages.

Defendants: Rivera, DeLaTorre, Aldama, Rodriguez, and Ethridge to each pay $1,500,000 in compensatory damages and #3,000,000 in punitive damages.

Defendants: Raniag, Valencia, Moorman, Navarrette, and Sharp to each pay #1,000,000 in compensatory damages and #1,500,000 in punitive damages.

9/9/14
(Date)

CN. Juan Jackson
(Signature of Plaintiff)

86

E. REQUEST FOR RELIEF

The failures of Defendants Baca, Tanaka, Rhambo, Burns, Ornelas, Fadele, Stewart, Alvarez, Roberts, Rojas, Zonver, and Hinchman to take appropriate steps to curb the widespread pattern of brutality in Men's Central Jail, the Twin Towers, and the IRC, as described in this complaint, constitutes deliberate indifference to the Plaintiffs basic need for reasonable protection from harm and violates Plaintiff's rights to be free from cruel and unusual punishment, including physical abuse and intimidation, degrading, cruel, and sadistic treatment, and the wanton and needless infliction of pain, as guaranteed to the Plaintiff by the Eighth and Fourteenth Amendments to the United States Constitution.

The Plaintiff request the following:

1. Declare that the continuing inaction of the supervisory defendants, as described above, violates the rights of the Plaintiff under the Eighth and Fourteenth Amendments to the United States Constitution;

2. Grant preliminary and permanent injunctive relief, enjoining Defendants, their successors, and all those in active concert or participation with them, from subjecting inmates in the jails to physical abuse and the threat of physical abuse;

3. Require Defendants Baca, Tanaka, Rhambo, and Burns to formulate a remedy, subject to the court's approval and modification, if necessary, to end the pattern of excessive force and physical abuse in the jails including:

(A.) adequate policy on the use of force;

9/9/14                          N. Juan Jackson
(Date)                          (Signature of Plaintiff)

81

E. REQUEST FOR RELIEF

    (B.) adequate investigation of all use of force incidents, with investigations performed by personnel unconnected to the attack under investigation;

9/9/14
*(Date)*

N. Juan Jackson
*(Signature of Plaintiff)*

88

# EXHIBIT COVER PAGE

A

EXHIBIT

Description of this Exhibit: CLAIM FORM AND DENIAL OF CLAIM

Number of pages to this Exhibit:__4__ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

89



# COUNTY OF LOS ANGELES
## OFFICE OF THE COUNTY COUNSEL
648 KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012-2713

TELEPHONE
(213) 974-1913
FACSIMILE
(213) 687-8822
TDD
(213) 633-0901

JOHN F. KRATTLI
County Counsel

July 2, 2012

Al-Quan L. Jackson
c/o Thomas L. Adams
15720 Glendon Creek Ct.
Riverside, California 92503

Re:     Claim(s) Filed:          **May 11, 2012**
        File Number(s):          **12-1098397*001**

Dear Mr. Adams:

Notice is hereby given that the above-referenced claim which you filed with the Los Angeles County Board of Supervisors was deemed denied by operation of law on **June 26, 2012**, in accordance with Government Code, §912.4(a).

STATE LAW REQUIRES THAT YOU BE GIVEN THE FOLLOWING "WARNING:"

Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim. SEE GOVERNMENT CODE SECTION 945.6.

This time limitation applies only to causes of action for which Government Code Sections 900 - 915.4 required you to present a claim. Other causes of action, including those arising under federal law, may have different time limitations.

You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.

Very truly yours,

JOHN F. KRATTLI
County Counsel

By

LILIANA CAMPOS
Deputy County Counsel
General Litigation Division

LC:ce

HOA.883689.1

90

## DECLARATION FOR SERVICE BY MAIL

STATE OF CALIFORNIA
County of Los Angeles

I am and at all times herein mentioned have been a citizen of the United States and resident of the County of Los Angeles, over the age of eighteen years and not a party to nor interested in the within action; that my business address is 648 Kenneth Hahn Hall of Administration, City of Los Angeles, County of Los Angeles, State of California 90012.

That on the 3rd day of **July 2012**, I served the attached **"Notice of Denial Letter"** upon claimant by depositing a copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in a United States mail box in Los Angeles, California addressed as follows:

> Al-Quan L. Jackson
> c/o Thomas L. Adams
> 15720 Glendon Creek Ct.
> Riverside, California 92503

and that the person on whom said service was made has/resides his/her office at a place where ~~there is a regular communication by mail between the place of mailing and the place so~~ addressed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3rd day of **July 2012,** at Los Angeles, California.

Signature

HOA.803643.1

a1

1. Read entire claim thoroughly.
2. Fill out the claim completely.
3. Sign the claim completely.
4. Submit original, signed copy.
5. Photocopies can be made for your records.

WARNING
- Claims for death, injury to person or to personal property must be filed no later than 6 months after the occurrence.
  (GOV. CODE SECTION 911.2)
- All other claims for damages must be filed no later than one year after the occurrence.
  (GOV. CODE SECTION 911.2)
- Subject to certain exception, you have only six months from the date of written notice of rejection of your claim to file a court action.
  (GOV. CODE SECTION 945.6)
- If written notice of rejection of your claim is not given, you have 2 years from accrual of the cause of the action to file a court action.
  (GOV. CODE SECTION 945.6)

TIME STAMP HERE
FOR OFFICE USE ONLY

**1. WHEN AND WHERE DID DAMAGE OR INJURY OCCUR?**

| DATE: | TIME: | STREET ADDRESS OR LOCATION: | CITY: | ZIP: |
|---|---|---|---|---|
| 12-11-11 | 9:00 - 10:00 AM | 441 BAUCHET ST | LA | 90012 |

**15. WERE THE PARAMEDICS CALLED?**

**2. NAME(S) OF SHERIFF PERSONNEL INVOLVED:**

| NAME: DEPUTY RIVERA | STATION / FACILITY: MEN'S CENTRAL JAIL |
|---|---|
| NAME: SGT. ZHONDVER CPT. ORNELAS | STATION / FACILITY: MEN'S CENTRAL JAIL |

**16. DID THE CLAIMANT VISIT A PHYSICIAN?**
PHYSICIAN'S NAME: IN HOUSE MEDICAL UNI
ADDRESS/PHONE: 441 BAUCHET S
LA, CA 90012
DATE OF VISIT:

**3. DESCRIBE IN DETAIL HOW DAMAGE OR INJURY OCCURRED:**
(Use attachments if necessary)

(SEE ATTACHMENT)

**4. WHY DO YOU CLAIM THE SHERIFF'S DEPARTMENT IS RESPONSIBLE?**
UNNESSARY FORCE USED ON HANDCUFFED INMATE
(SEE VIDEO FOOTAGE)

**5. LIST DAMAGES INCURRED TO DATE (Attach Copy of Receipts & Repair Estimates)**
BRUISING (SEE MEDICAL REPORT)

**17. WITNESS TO DAMAGE OR INJURY?**
NAME: SEE
ADDRESS: VIDEO
CITY/PHONE: FOOTAGE

**6. SHERIFF'S DEPARTMENT FILE OR REPORT#**

**7. NAME OF CLAIMANT (Print Clearly)**
AL-QUAN L. JACKSON

**8. DRIVER'S LICENSE OR I.D. #**
D2673841

| 9. DATE OF BIRTH | 10. SOCIAL SECURITY | 11. Booking Number (if applicable) |
|---|---|---|
| 3-16-84 | # 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 | 22495 |

NAME:
ADDRESS:
CITY/PHONE:

**12. CORRESPONDENCE ADDRESS - (STREET, CITY, STATE, ZIP)**
15720 GLENDON CREEK CT. RIVERSIDE, CA. 92503

TOTAL DAMAGES TO DATE
$ N/A

| 13. HOME PHONE (or phone you can be contacted at) | 14. BUSINESS PHONE |
|---|---|
| 323 308-9907 | ( ) N/A |

TOTAL ESTIMATED DAMAGES
$ N/A

**THIS CLAIM MUST BE SIGNED**
NOTE: PRESENTATION OF A FALSE CLAIM IS A FELONY (PENAL CODE SEC. 72.)

**18. SIGNATURE OF CLAIMANT OR PERSON FILING ON HIS/HER BEHALF:**
Thomas L. Adams

**19. PRINT OR TYPE NAME**
THOMAS L. ADAMS

**DATE**
5-11-12

Deliver or mail to Executive Officer, Board of Supervisors, County of Los Angeles, Room 383, Kenneth Hahn Hall of Administration, 500 W. Temple St. LA, CA 90012

SH-AD-672

92

between 9:00 - 10:00 am, Al-Quan Jackson was transferring between modules 3638 to 3234. Just before he and the other inmates were strip searched, he presented his personal property, along with a ficticious pass made by Deputies Colon & Lane from OSJ (Operation Safe Jail) on 12-9-11, pertaining to an ongoing murder investigation of an inmate. When retrieving his personal property, words were exchanged with one of the officers regarding the pass not being returned to Al-Quan, as the other inmates left the area. In order to deescalate the situation, Al-Quan voluntarily laid on the floor, placing his hands behind him without resistance. While cuffed, he was tazered, sprayed and kicked.

Arlington Station Post Office
Riverside, California
925033457
0567760503 -0093
05/11/2012   (800)275-8777   11:19:27 AM

Sales Receipt

| Product Description | Qty | Sale Unit Price | Final Price |
|---|---|---|---|
| LOS ANGELES CA 90012 | | | $0.45 |
| Zone-1 First-Class Letter | | | |
| 0.60 oz. | | | |
| | | ======== | |
| Issue PVI: | | | $0.45 |
| Certificate of Mailing | 1 | $1.15 | $1.15 |
| Miscellaneous Purchases | | | $0.25 |
| AIC: 126 | | | |
| Misc Rev - Other | | | |
| | | ======== | |
| Total: | | | $1.85 |

Paid by:
Cash                  $1.90
Change Due:          -$0.05
*************************************
*************************************
BRIGHTEN SOMEONE'S MAILBOX. Greeting cards available for purchase at select Post Offices.
*************************************
*************************************

$1.15

0000 234 95-15

U.S. POSTAGE
RIVERSIDE, CA
92506
MAIL 12
AMOUNT

UNITED STATES
POSTAL SERVICE

1000

Certificate Of Mailing

From: THOMAS ADAMS
15720 GLENDON CREST
RIVERSIDE, CA 92506

To: EXEC. OFFICER, BD. OF SUPRV.
CO. OF LA - KENNETH HAHN HALL
500 W. TEMPLE ST.
LA, CA 90012

PS Form 3817, April 2007 PSN 7530-02-000-9065

93

# EXHIBIT COVER PAGE



EXHIBIT

Description of this Exhibit: Use of Force Report

Number of pages to this Exhibit: 37 pages.

JURISDICTION: (Check only one)

- [ ] Municipal Court
- [ ] Superior Court
- [ ] Appellate Court
- [ ] State Supreme Court
- [X] United States District Court
- [ ] State Circuit Court
- [ ] United States Supreme Court
- [ ] Grand Jury

94

# Los Angeles County Sheriff's Department
## Supervisor's Report on Use of Force

Page 1 of 21

102

### Incident Information

| | |
|---|---|
| URN: 9 1 1 - 0 1 2 4 5 - 5 1 0 0 - 5 0 5 | Date: 12/11/11  Time: 0837 hours |

| Location: 441 Bauchet Street Los Angeles 90012 | City or Station: Los Angeles |
|---|---|

Bureau/Station/Facility: Custody Division/Men's Central Jail  Admin. Investigation: YES ☐ NO ☒

Type of Force: Significant-Control Technique / Oleoresin Capsicum Spray / Taser / Hobble

Deputy Injury: YES ☐ NO ☒   Suspect Injury  YES ☒ NO ☐

☐ Call   ☒ Observation   ☐ Detail   ☐ Foot Pursuit   ☐ Vehicle Pursuit

IAB Notified: YES ☐ NO ☒  Person Notified:
Emp:   IAB Roll Out: YES ☐ NO ☒

### Involved Employee

**E 1**

| Employee # 531579 | Last Name Rivera | First Name Patrick | Middle Name P |
|---|---|---|---|

Sex: ☒ Male ☐ Female   Race: O   Unit of Assignment: Men's Central Jail   Work Assignment (Unit #, Module, etc.): 31/3300 Prowl Movement

Shift: ☐ EM ☒ Day ☐ PM   ☒ Regular Shift ☐ OT Shift ☐ Off Duty   Age: 30   Height: 506   Weight: 190

☐ Injured ☐ Treated ☐ Admitted  Hospital:   Coroner Case #   Directed Force ☐  Significant Force ☐

**E 2**

| Employee # 522138 | Last Name Delatorre | First Name Agustine | Middle Name |
|---|---|---|---|

Sex: ☒ Male ☐ Female   Race: H   Unit of Assignment: Men's Central Jail   Work Assignment (Unit #, Module, etc.): 31/3300 Movement

Shift: ☐ EM ☒ Day ☐ PM   ☒ Regular Shift ☐ OT Shift ☐ Off Duty   Age: 33   Height: 509   Weight: 205

☐ Injured ☐ Treated ☐ Admitted  Hospital:   Coroner Case #   Directed Force ☐  Significant Force ☒

**E3**

| Employee # 531565 | Last Name Aldama | First Name Samuel | Middle Name |
|---|---|---|---|

Sex: ☒ Male ☐ Female   Race: H   Unit of Assignment: Men's Central Jail   Work Assignment (Unit #, Module, etc.): 3600 Module

Shift: ☐ EM ☒ Day ☐ PM   ☒ Regular Shift ☐ OT Shift ☐ Off Duty   Age: 24   Height: 509   Weight: 180

☐ Injured ☐ Treated ☐ Admitted  Hospital:   Coroner Case #   Directed Force ☐  Significant Force ☒

☒ Additional Involved Employees

### On Duty Supervisor

| Emp. # 48132 | Last Name Zonver | First Name Nicole | Middle Name L. | Rank Sgt. | Present YES ☐ NO ☒ | Witness to Incident YES ☐ NO ☒ |
|---|---|---|---|---|---|---|
| Emp. # 460227 | Last Name Hinchman | First Name Shawnee | Middle Name N. | Rank Sgt. | Present YES ☒ NO ☐ | Witness to Incident YES ☒ NO ☐ |

### Watch Sergeant

| Emp. # 207270 | Last Name Roberts | First Name Kevin | Middle Name D. |
|---|---|---|---|

### Watch Commander

| Emp. # 413093 | Last Name Stewart | First Name Tracy | Middle Name D. |
|---|---|---|---|

Lieutenant Tracy Stewart
Watch Commander (Print Name)   DF FOR T. Stewart   Watch Commander's Signature: 413093  1/18/12  Emp #:  Date

Sergeant Nicole L. Zonver
Supervisor Completing Form: (Print Name)   458132  Emp #:   Copy Provided to Employee by: ___ 25B441  1/18/12  Emp #:  Date

Acting Captain Dan Fedele
Unit Commander (Print Name)   Unit Commander's Signature: ___  Emp #:  Box#2  95

DISCOVERY Use Only.
FO# 2302778

1- DV60
2- CN-R'S

Original: Discovery Unit
Copy: Unit Commander   SH-R-438P (Rev. 07/08)

Supervisor's Report on Use of Force
## INVOLVED EMPLOYEE - Continuation
### 9 1 1 - 0 1 2 4 5 - 5 1 0 0 - 5 0 5

Page 2 of 21

**Involved Employee**

**E 4**

| Employee #: 532460 | Last Name: Rodriguez | First Name: Jason | Middle Name: O |
|---|---|---|---|

| Sex: ☒ Male ☐ Female | Race: H | Unit of Assignment: Men's Central Jail | Work Assignment (Unit #, Module, etc.): 3200/3400 Title 15 | | |
|---|---|---|---|---|---|
| Shift: ☐ EM ☒ Day ☐ PM | ☒ Regular Shift ☐ OT Shift ☐ Off Duty | Age: 28 | Height: 600 | Weight: 225 |
| ☐ Injured ☐ Treated ☐ Admitted   Hospital: | | Coroner Case # | Directed Force ☐   Significant Force ☒ |

**E 5**

| Employee #: 478963 | Last Name: Ethridge | First Name: Kevin | Middle Name: |
|---|---|---|---|

| Sex: ☒ Male ☐ Female | Race: W | Unit of Assignment: Men's Central Jail | Work Assignment (Unit #, Module, etc.): 3200/3400 Recreation Deputy | | |
|---|---|---|---|---|---|
| Shift: ☐ EM ☒ Day ☐ PM | ☒ Regular Shift ☐ OT Shift ☐ Off Duty | Age: 30 | Height: 5'10" | Weight: 180 |
| ☐ Injured ☐ Treated ☐ Admitted   Hospital: | | Coroner Case # | Directed Force ☐   Significant Force ☐ |

**E _**

| Employee #: | Last Name: | First Name: | Middle Name: |
|---|---|---|---|

| Sex: ☐ Male ☐ Female | Race: | Unit of Assignment: | Work Assignment (Unit #, Module, etc.): | | |
|---|---|---|---|---|---|
| Shift: ☐ EM ☐ Day ☐ PM | ☐ Regular Shift ☐ OT Shift ☐ Off Duty | Age: | Height: | Weight: |
| ☐ Injured ☐ Treated ☐ Admitted   Hospital: | | Coroner Case # | Directed Force ☐   Significant Force ☐ |

**E _**

| Employee #: | Last Name: | First Name: | Middle Name: |
|---|---|---|---|

| Sex: ☐ Male ☐ Female | Race: | Unit of Assignment: | Work Assignment (Unit #, Module, etc.): | | |
|---|---|---|---|---|---|
| Shift: ☐ EM ☐ Day ☐ PM | ☐ Regular Shift ☐ OT Shift ☐ Off Duty | Age: | Height: | Weight: |
| ☐ Injured ☐ Treated ☐ Admitted   Hospital: | | Coroner Case # | Directed Force ☐   Significant Force ☐ |

**E _**

| Employee #: | Last Name: | First Name: | Middle Name: |
|---|---|---|---|

| Sex: ☐ Male ☐ Female | Race: | Unit of Assignment: | Work Assignment (Unit #, Module, etc.): | | |
|---|---|---|---|---|---|
| Shift: ☐ EM ☐ Day ☐ PM | ☐ Regular Shift ☐ OT Shift ☐ Off Duty | Age: | Height: | Weight: |
| ☐ Injured ☐ Treated ☐ Admitted   Hospital: | | Coroner Case # | Directed Force ☐   Significant Force ☐ |

SH-R-438P (Rev. 07/08)

G6

# Supervisor's Report on Use of Force
## SUSPECT INFORMATION
### 9 1 1 - 0 1 2 4 5 - 5 1 0 0 - 5 0 5

Page 3 of 21

**Suspect Information**

**S 1**

| Last Name | Jackson | First Name | Alquan | Middle Name | L |
|---|---|---|---|---|---|

AKA  Last Name _____ First Name _____ Middle Name _____

Sex: ☒ Male ☐ Female | Race: B | Street Address: 3650 Madvale Street | City: Los Angeles | State & Zip Code: California

Work Phone: _____ | Home Phone: _____ | Age: 25 | Height: 603 | D.O.B. 03/16/64 | Weight: 211 | Armed? ☐

Booking #: 2249532 | Primary Charge Code: 211 PC | Secondary Charge Code: _____ | Criminal History ☒

EMT in attendance? ☐ YES ☒ NO  Name: _____ | Unit: _____ | Phone #: _____

Hospital Admission? ☐ Rec'd Treatment At: Men's Central Jail Clinic | Coroner Case #: _____ | Mental History ☒

By Doctor: Nurse Huynh #517496 | Address: 441 Bauchet St Los Angeles, Ca 90012 | Phone #: 213-974-4921

Under Influence? ☐ YES ☒ NO  Substance: _____ | Mental Illness ☐

**Suspect Interview**

Date: 12/11/11 | Time: 0900 | ☐ Audiotape: | ☒ Videotape: | ☒ Photos of Injuries: | ☐ ADMITS HEARING ANNOUNCEMENTS

**Suspect Information**

**S _**

Last Name _____ First Name _____ Middle Name _____

AKA  Last Name _____ First Name _____ Middle Name _____

Sex: ☐ Male ☐ Female | Race: | Street Address: | City: | State & Zip Code:

Work Phone: | Home Phone: | Age: | Height: | D.O.B. | Weight: | Armed? ☐

Booking #: | Primary Charge Code: | Secondary Charge Code: | Criminal History ☐

EMT in attendance? ☐ YES ☐ NO  Name: | Unit: | Phone #:

Hospital Admission? ☐ Rec'd Treatment At: | Coroner Case #: | Mental History ☐

By Doctor: _____ | Address: _____ | Phone #:

Under Influence? ☐ YES ☐ NO  Substance: | Mental Illness ☐

**Suspect Interview**

Date: ____ | Time: ____ | ☐ Audiotape: | ☐ Videotape: | ☐ Photos of Injuries: | ☐ ADMITS HEARING ANNOUNCEMENTS

**Suspect Information**

**S _**

Last Name _____ First Name _____ Middle Name _____

AKA  Last Name _____ First Name _____ Middle Name _____

Sex: ☐ Male ☐ Female | Race: | Street Address: | City: | State & Zip Code:

Work Phone: | Home Phone: | Age: | Height: | D.O.B. | Weight: | Armed? ☐

Booking #: | Primary Charge Code: | Secondary Charge Code: | Criminal History ☐

EMT in attendance? ☐ YES ☐ NO  Name: | Unit: | Phone #:

Hospital Admission? ☐ Rec'd Treatment At: | Coroner Case #: | Mental History ☐

By Doctor: _____ | Address: _____ | Phone #:

Under Influence? ☐ YES ☐ NO  Substance: | Mental Illness ☐

**Suspect Interview**

Date: ____ | Time: ____ | ☐ Audiotape: | ☐ Videotape: | ☐ Photos of Injuries: | ☐ ADMITS HEARING ANNOUNCEMENTS

SH-R-438P (Rev. 07/08) | ☐ Additional Suspects Involved

91

## Supervisor's Report on Use of Force
# EMPLOYEE / NON-EMPLOYEE INFORMATION
## 9 1 1 - 0 1 2 4 5 - 5 1 0 0 - 5 0 5

Page 4 of 21

### Employee Witness

| Emp. # | Last Name | First Name | Middle Name |
|---|---|---|---|
| 521421 | Valencia | Salvador | |
| 542837 | Raniag | Joshua | |
| 524009 | Sharp | James | |
| 525198 | Moorman | Lance | |
| 460227 | Hinchman | Shawnee | |
| | | | |

### Non-Employee Witnesses

| Last Name | First Name | Middle Name | Age | D.O.B. |
|---|---|---|---|---|
| Street Address | City | Zip Code | Work Ph. | Home Ph. |
| Last Name | First Name | Middle Name | Age | D.O.B. |
| Street Address | City | Zip Code | Work Ph. | Home Ph. |
| Last Name | First Name | Middle Name | Age | D.O.B. |
| Street Address | City | Zip Code | Work Ph. | Home Ph. |
| Last Name | First Name | Middle Name | Age | D.O.B. |
| Street Address | City | Zip Code | Work Ph. | Home Ph. |
| Last Name | First Name | Middle Name | Age | D.O.B. |
| Street Address | City | Zip Code | Work Ph. | Home Ph. |
| Last Name | First Name | Middle Name | Age | D.O.B. |
| Street Address | City | Zip Code | Work Ph. | Home Ph. |
| Last Name | First Name | Middle Name | Age | D.O.B. |
| Street Address | City | Zip Code | Work Ph. | Home Ph. |
| Last Name | First Name | Middle Name | Age | D.O.B. |
| Street Address | City | Zip Code | Work Ph. | Home Ph. |
| Last Name | First Name | Middle Name | Age | D.O.B. |
| Street Address | City | Zip Code | Work Ph. | Home Ph. |

SH-R-438P (Rev. 07/08)

☐ Additional Witness

98

Supervisor's Report on Use of Force

911 - 01245 - 5100 - 505

Page 5 of 21

## Method

| | | |
|---|---|---|
| (AW) Arwen | (FH) Firearm (Handgun) | (PO) Personal Weapon (Other) |
| (BC) Baton: (Control) | (FR) Firearm (Rifle) | (RS) Resistance |
| (BI) Baton: (Impact) | (FS) Firearm (Shotgun) | (CN) Restraint Device (Capture Net) |
| (BF) Bodily Fluids | (FO) Firearm (Other) | (RH) Restraint Device (Handcuffs) |
| (CN) Canine | (FB) Flashbang | (HB) Restraint Device: Hobble (Legs Only) |
| (CR) Carotid Restraint | (FL) Flashlight | (TP) Restraint Device: Hobble (TARP) |
| (CH) Choke Hold | (OE) Other Weapon: Edged | (RE) Restraint Device: REACT Belt |
| (CT) Control Holds: (Control Techniques) | (OV) Other Weapon: Vehicle | (SP) Sap |
| (TT) Control Holds: (Team Takedown) | (OB) Other Weapon: Blunt Object | (SH) Shield |
| (TD) Control Holds: (Takedown) | (OO) Other Weapon: Other | (SG) 37mm Stinger |
| (CE) Chemical | (PK) Personal Weapon: Feet/Leg: (Kick) | (SB) Sting Ball |
| (OC) Chemical Agents (OC Spray) | (PS) Personal Weapon: Feet/Leg: (Sweep) | (ST) Stun Bag |
| (TG) Chemical Agents (Tear Gas) | (PH) Personal Weapon (Hand/Arm) | (TR) Taser |
| (EX) Explosives | (PP) Personal Weapon (Push) | (UC) Uncooperative |

## Type of Injury

| | | |
|---|---|---|
| (AB) Abrasion | (DB) Dog Bite | (PA) Paralysis |
| (BR) Bruise | (FR) Fractures | (PW) Puncture Wound |
| (BU) Burn | (GS) Gunshot | (SD) Soft Tissue Damage |
| (CP) Complaint of Pain | (HB) Human Bite | (ST) Sprain/Twists |
| (CO) Concussion | (LC) Lacerations | (UN) Unconscious |
| (DH) Death | (ND) Nerve Damage | (RM) Refused Med Treatment |
| (DI) Dislocation | (OD) Organ Damage | (NN) NONE |

## Body Part Injured

| | | | | | |
|---|---|---|---|---|---|
| (AD) Abdomen | (FA) Face | (HI) Hip |
| (AK) Ankle | (FE) Feet | (IN) Internal |
| (AR) Arm | (FI) Fingers | (KN) Knees |
| (BK) Back | (GE) Genitals | (LE) Leg |
| (BT) Buttocks | (GR) Groin | (NK) Neck |
| (CH) Chest | (HD) Hands | (NO) Nose |
| (EL) Elbow | (HE) Head | (SH) Shoulder |
| | | (WR) Wrist |

| FORCE USED BY | | FORCE USED AGAINST | | Method (Code) | Type of Injury (Code) | Body Part (Code) |
|---|---|---|---|---|---|---|
| Name | E# or S# | Name | E# or S# | | | |
| Jackson | S#1 | Rivera | E#1 | | | |
| Aldama | E#3 | Jackson | S#1 | UC | NN | |
| Rivera | E#1 | Jackson | S#1 | RH | NN | |
| Jackson | S#1 | Rivera | E#1 | CT | NN | |
| Jackson | S#1 | Rivera | E#1 | RS | NN | |
| Aldama | E#3 | Jackson | S#1 | PH | NN | |
| Rodriguez | E#4 | Jackson | S#1 | CT | NN | |
| Jackson | S#1 | Rivera | E#1 | CT | NN | |
| Rivera | E#1 | Jackson | S#1 | PH | NN | |
| Ethridge | E#5 | Jackson | S#1 | OC | CP | FA |
| Jackson | S#1 | Rivera | E#1 | CT | NN | |
| De La Torre | E#2 | Jackson | S#1 | PH | NN | |
| Jackson | S#1 | Rivera | E#1 | TR | BU | BK |
| De La Torre | E#2 | Jackson | S#1 | PH | NN | |
| Aldama | E#3 | Jackson | S#1 | TR | BU | BK |
| Ethridge | E#5 | Jackson | S#1 | RH | NN | |
| Rivera | E#1 | Jackson | S#1 | HB | NN | |
| | | Jackson | S#1 | HB | NN | |

SH-R-438P (Rev. 07/08)

99

## Supervisor's Report on Use of Force
### 911-01245-5100-505

**Force Applied**

SIGNIFICANT FORCE- CONTROL TECHNIQUE / OC SPRAY / HOBBLE / "TASER" ®

**Incident Details**

On 12-11-11 at 0837 hours, 3000 Floor personnel searched out and re-housed a row of inmates that transferred from Module 3600 / 3800 to Module 3200 / 3400. After the search, the deputies ordered the row of inmates to enter Module 3200 / 3400. With the exception of Inmate Jackson, the row of inmates complied and entered the module. Inmate Jackson remained in the hallway and told Deputy Rivera, "I need that fucking pass you threw out." Deputy Rivera told Inmate Jackson that the pass was two days old, and he could not have it back. He also told Inmate Jackson to grab his property and go inside the module. Deputy Rodriguez assured Inmate Jackson that his movement history was stored in the computer, and he would not need his paper pass for future verification. Inmate Jackson responded, "Fuck you take me to the hole!" Deputy Rivera ordered Inmate Jackson to face the wall. Over his radio, Deputy Aldama requested my response to the 3000 Floor hallway regarding an uncooperative inmate. I was in the Watch Sergeant's office changing the battery on my radio when I heard the transmission. I acknowledged the transmission and responded to 3000 Floor.

Within seconds of the radio transmission, Inmate Jackson lay on the floor face down with his body perpendicular to the wall; he put his hands behind his head and remained still. Deputy Aldama ordered Inmate Jackson to place his hands behind his back so he could be handcuffed; Inmate Jackson brought his right arm down as directed. Based on Inmate Jackson's submissive behavior, three of the deputies (Deputy Rivera, Deputy Aldama and Deputy De La Torre) approached him with the intent to handcuff him.

Deputy Aldama placed a handcuff on Inmate Jackson's right wrist without delay. Inmate Jackson's left arm was extended, so Deputy Rivera grabbed his left wrist with his left hand so it could be handcuffed. Inmate Jackson tensed his left arm and made it impossible for Deputy Rivera to put it behind his back. Deputy Rivera held onto Inmate Jackson's left wrist, but Inmate Jackson forcefully moved his arm up and down in an attempt to break the grasp. Simultaneously, Deputy Rodriguez noticed that Inmate Jackson's legs were sprawled out. Deputy Rodriguez grabbed Inmate Jackson's right leg to minimize his ability to stand up. In addition, Deputy Ethridge placed his right foot on Inmate Jackson's left ankle to prevent any kicking. Deputy Aldama saw the struggle and placed his right knee on Inmate Jackson's back to prevent him from standing up as well. Deputy Moorman saw the incident unfold and broadcasted "415 deputy involved 3000 hallway" over his radio.

6

100

## Supervisor's Report on Use of Force
### 911-01245-5100-505

Deputy Rivera told Inmate Jackson to put his hand behind his back and he replied, "Fuck you!" At the same time, Deputy De La Torre retrieved his "Taser" and deactivated the safe; this automatically activated the device's lights and camera.  Deputy De La Torre ordered Inmate Jackson to surrender his left hand several times, but he was again non-compliant.  Deputy Rivera held onto Inmate Jackson's left wrist and retrieved his Oleoresin Capsicum spray.  He warned Inmate Jackson that he would be sprayed if he did not put his hand behind his back.  Deputy Aldama gave Inmate Jackson additional commands to give up his left arm, but he was still non-compliant; Inmate Jackson replied, "Motherfucker."  Deputy Rivera sprayed Inmate Jackson in his face with an approximate 3 second burst of Oleoresin Capsicum spray.  The spray had virtually no effect on Inmate Jackson and caused him to become angrier.

Deputy De La Torre saw Inmate Jackson pulling away from Deputy Rivera's grasp.  This instilled fear in him since Inmate Jackson is tall and well-built.  For instance, if Inmate Jackson broke free from Deputy Rivera's grasp, Deputy De La Torre or his partners could be seriously injured if attacked.  Deputy De La Torre removed the cartridge from his "Taser" and placed it on Inmate Jackson's upper back.  He again told Inmate Jackson to give up his left arm, and warned him that he would be "tased" if he remained non-compliant.  Inmate Jackson continued to try and break away from Deputy Rivera's grasp.  As a result, Deputy De La Torre "drive stunned" Inmate Jackson for about 5 seconds in the middle of his upper back.  Inmate Jackson yelled, "Fuck you bitches!" after the "drive stun."

The "drive stun" enabled Deputy Rivera to move Inmate Jackson's left hand to his lower back.  Deputy Rivera maintained his grip on Inmate Jackson's left forearm, while Deputy Aldama attempted to handcuff his left wrist.  Inmate Jackson again tried to pull his hand away and tensed his left arm.  Deputy De La Torre "drive stunned" Inmate Jackson a second time on his upper middle back for about 5 seconds.  Inmate Jackson placed his left hand behind his back and Deputy Aldama handcuffed his left wrist.

Sergeant Hinchman arrived at the 3000 Floor hallway and saw Inmate Jackson pull his legs apart, and move them from side to side.  In an effort to eliminate any possibility that Inmate Jackson could kick at the deputies, Sergeant Hinchman directed Deputy Ethridge to hobble his legs.  Deputy Ethridge placed the hobble around Inmate Jackson's ankles without incident.  Deputy Rivera moved the hobble up Inmate Jackson's legs, and secured it just below his knee caps.

Inmate Jackson was escorted to the Men's Central Jail Clinic to receive treatment for his injuries.

### Reported Use of Force by Involved Employee(s)

The following deputies completed written reports of their observations and actions, which were consistent with their verbal notifications to me:

-Deputy Rivera

7

101

## Supervisor's Report on Use of Force
## 911-01245-5100-505

-Deputy De La Torre
-Deputy Aldama
-Deputy Rodriguez
-Deputy Ethridge
-Sergeant Hinchman
-Deputy Moorman
-Deputy Sharp
-Deputy Raniag
-Deputy Valencia
-Deputy Navarrete

**Witness Interview(s)**

The following statements were provided by Sheriff's Department personnel in regards to this incident:

Deputy Raniag:

Deputy Raniag was standing next to the 3000 Floor Control Booth when he heard commotion at the other end of the hallway. Specifically, he heard Inmate Jackson say "Fuck you, fuck you!" to a group of deputies. Deputy Raniag walked down the hallway toward the commotion. Along the way, he heard Deputy Aldama request my response to 3000 Floor over the radio.

Deputy Raniag saw Inmate Jackson lay on the 3000 Floor hallway with his hands behind his head. Deputy Aldama approached Inmate Jackson and grabbed his right hand so he could handcuff it. However, Inmate Jackson refused to put his left hand behind his back. Deputy Raniag saw Deputy Rivera struggle to control Inmate Jackson's left arm. Deputy Rivera gave Inmate Jackson multiple orders to put his hand behind his back, but he was non-compliant. Inmate Jackson replied, "Fuck you, I'm not giving it up." Deputy Rivera sprayed Inmate Jackson in the face with a burst of Oleoresin Capsicum spray, but it was ineffective in gaining compliance.

Deputy Rivera again gave Inmate Jackson orders to comply. Inmate Jackson did not follow his instructions and replied, "Fuck you." Deputy Raniag heard Deputy De La Torre tell Inmate Jackson that he would be "tased" if he did not put his hand behind his back. Inmate Jackson did not comply, so Deputy De La Torre "drive stunned" Inmate Jackson in his back. Deputy Raniag turned around and directed responding deputies away from the incident as sufficient personnel were already on scene. When Deputy Raniag turned back around, Inmate Jackson was handcuffed. Sergeant Hinchman arrived at the incident and directed Deputy Ethridge to apply a hobble to Inmate Jackson's legs.

8

102

## Supervisor's Report on Use of Force
## 911-01245-5100-505

Deputy Valencia:

On 12-11-11 at approximately 0837 hours, Deputy Valencia stepped out of Module 3100 / 3300 to assist 3000 Floor deputies in searching inmates being re-housed in Module 3200 / 3400. He saw several deputies on the hallway floor trying to gain control of Inmate Jackson's hands; the deputies gave Inmate Jackson verbal orders to place his hands behind his back, but he was non-compliant. Deputy Valencia stood away from the incident and provided additional security in the hallway.

During the struggle, Deputy Valencia saw Deputy Aldama place Inmate Jackson's right arm behind his back and handcuff it. He also heard Deputy Rivera continually order Inmate Jackson to place his left hand behind his back. However, Inmate Jackson was still non-compliant.

Deputy Valencia saw Deputy Rivera retrieve his can of Oleoresin Capsicum spray. Deputy Rivera sprayed Inmate Jackson in the face with a 2-3 second burst of the chemical agent. The spray was ineffective as Inmate Jackson still refused to put his left hand behind his back. Soon after, Deputy Valencia saw Deputy De La Torre retrieve his "X-26 Taser" and "drive stun" Inmate Jackson in the middle of his upper back. The drive stun appeared to have little effect on Inmate Jackson as he still refused to give up his left hand. The deputies gave him more verbal orders to give up his hand, but he was again non-compliant. Deputy Valencia saw Deputy De La Torre "drive stun" Inmate Jackson a second time in the middle of his upper back. The second "drive stun" allowed Deputy Rivera to place Inmate Jackson's left hand behind his back; Inmate Jackson was handcuffed without further force. Deputy Valencia heard Sergeant Hinchman order deputies to place a hobble around Inmate Jackson's legs.

After the incident was over, Deputy Valencia, Deputy Raniag and Deputy Ethridge escorted Inmate Jackson to the Men's Central Jail Clinic to for treatment.

Deputy Sharp:

On 12-11-11, Deputy Sharp was assigned as a Prowler on 3000 Floor. At approximately 0837 hours, he assisted in the transfer of about 14 inmates from Module 3600 / 3800 to Module 3200 / 3400. Deputy Sharp searched inmates' property in the 3000 Floor hallway near Module 3600 / 3800 when he heard a radio transmission requesting my response to the floor. Deputy Sharp looked toward the opposite end of the hallway and saw deputy personnel standing over Inmate Jackson, attempting to gain control of him. Deputy Sharp heard the deputies order Inmate Jackson several times to place his hands behind his back. Deputy Sharp maintained his position in the hallway as to continue providing security for the

103

## Supervisor's Report on Use of Force
### 911-01245-5100-505

inmates around him. Deputy Sharp again heard the deputies tell Inmate Jackson several times to place his hands behind his back, as well as the sound of the "Taser" being employed.

At the conclusion of the incident, Deputy Sharp escorted Inmate Jackson to the Men's Central Jail Clinic to receive treatment for his injuries.

<u>Deputy Moorman:</u>

On 12-11-11, Deputy Moorman was assigned as the Module 3100 / 3300 Movement Deputy. He was assigned to carry the 40mm tactical weapon during the transfer of inmates from Module 3600 / 3800 to Module 3200 / 3400. At approximately 0837 hours, Deputy Moorman was standing in front of the 3000 Floor Control Booth when he heard profane language being yelled at the other end of the hallway. Deputy Moorman looked to his right and heard deputy personnel giving verbal commands to Inmate Jackson as he lay on the floor. Deputy personnel tried to handcuff Inmate Jackson and a struggled ensued. Deputy Moorman responded to the struggle and broadcasted "415 deputy involved 3000 hallway" over his radio.

As Deputy Moorman got closer to the incident, he heard the deputies give Inmate Jackson verbal commands to give up his hands. Subsequently, he heard "Code-4" broadcasted over his radio. When Deputy Moorman arrived at the incident, he kept a safe distance away from Inmate Jackson because still had possession of the tactical weapon. Once Deputy Moorman saw that Inmate Jackson no longer posed a threat to the other deputies, he returned to the other end of the hallway to continue providing security.

<u>Sergeant Hinchman:</u>

On 12-11-11, Sergeant Hinchman worked as the 2000 Floor Sergeant. At approximately 0837 hours, she heard a deputy transmit a request for a sergeant to respond to the 3000 Floor hallway regarding a recalcitrant inmate; she walked up to 3000 Floor. When Sergeant Hinchman arrived at the floor, she heard someone yell "Fuck you guys." In addition, she heard deputy personnel say "Stop fighting." Sergeant Hinchman walked over to the "low end" of the hallway and saw Deputy Rivera hovered over Inmate Jackson, attempting to handcuff him. Simultaneously, she saw Deputy Aldama attempt to gain control of Inmate Jackson's upper torso by placing his right knee across Inmate Jackson's upper back. Inmate Jackson lay face down on the floor and rolled his body from side to side; this made it difficult for the deputies to handcuff him. Sergeant Hinchman also saw Inmate Jackson pull his legs apart and slide them from side to side.

In an effort to eliminate Inmate Jackson from having the opportunity to kick personnel, Sergeant Hinchman ordered Deputy Ethridge to hobble his legs. She also directed Deputy

10

104

## Supervisor's Report on Use of Force
### 911-01245-5100-505

Aldama to continue pinning Inmate Jackson's upper torso to the floor. Deputy Etheridge, with the assistance of Deputy Rivera, hobbled Inmate Jackson's legs. Inmate Jackson stopped resisting at this point, but continued to yell obscenities at the deputies; they subsequently rolled Inmate Jackson up to a seated position on the floor. While seated on the floor, Inmate Jackson said, "Fuck you guys, I can't believe you'd do me like this." At this point, Sergeant Hinchman realized that Inmate Jackson had been pepper sprayed, but she did not know who used the chemical agent.

Deputy Navarrete:

On 12-11-11, Deputy Navarrete worked as the Title 15 Deputy in Module 2200 / 2400. At approximately 0837 hours, Deputy Navarrete was inside the 3000 Floor Control Booth. He left the booth and started to walk of 3000 Floor when he heard a radio transmission requesting my response to the 3000 Floor hallway. Deputy Navarrete saw Inmate Jackson lying face down on the floor and noticed sufficient personnel at the incident. He did not see any actions taken by the deputies or the inmate.

Fourteen inmates were present in the 3000 Floor hallway during the incident, so I conducted a videotaped interview with them. They each said the following in regards to the incident:

Inmate Santiago Lopez #2971969:

Inmate Lopez said he did not see anything in regards to the incident between Inmate Jackson and the deputies. I asked Inmate Lopez if saw anything that the deputies did, and he said "No." I asked Inmate Lopez if he saw anything that Inmate Jackson did, and he said "No." I asked Inmate Lopez if he saw Inmate Jackson talking to the deputies in the hallway, and he said "No." I asked Inmate Lopez if he heard anything, and he said "No." I asked Inmate Lopez how far he was from Inmate Jackson and the deputies. He said he was about 15 meters away.

Inmate Henry Barragan #2834896:

I asked Inmate Barragan if he saw anything in regards to the incident with Inmate Jackson and the deputies in the hallway. Inmate Barragan said he did not see anything because he was facing the wall. I asked Inmate Barragan if heard anything during the incident. He said, "Not really, I was just paying attention to what was being directed by the other deputies." Inmate Barragan reiterated that he did not see anything that was done by Inmate Jackson or the deputies. I asked Inmate Barragan his approximate distance from the incident. He said he was about 20 feet away.

105

# Supervisor's Report on Use of Force
## 911-01245-5100-505

### Inmate Shawn Chambers #2968660:

I asked Inmate Chambers if he saw anything in regards to the incident in the hallway with Inmate Jackson and the deputies, and he said "No." I asked Inmate Chambers if he saw any actions taken by the deputies or Inmate Jackson, and he said "No." I asked Inmate Chambers if he heard anything regarding the incident, and he said "No." I asked Inmate Chambers where he was at when the incident occurred. He replied, "Sitting on the floor, facing the wall." I asked Inmate Chambers how far he was in relation to the incident. He said he was about 30 feet away.

### Inmate Charles Yoakum #2925074:

I asked Inmate Yoakum if he saw anything in regards to the incident in the hallway with Inmate Jackson and the deputies. He said, "I was facing the wall and didn't see anything." I asked Inmate Yoakum if he heard anything during the incident. He said, "No...I was too preoccupied trying to get some sleep." I asked Inmate Yoakum for his approximate distance from the incident. He said he was about 50 feet away.

### Inmate Donald Freeman #2929177:

I asked Inmate Freeman if he saw anything in regards to the incident in the hallway involving Inmate Jackson and the deputies, and he said "No." I asked Inmate Freeman if he heard anything during the incident. He said he heard somebody scream, and it sounded like they said "Ah!" I asked Inmate Freeman his approximate distance from the incident. He said he was about 100 feet away.

### Inmate Billy Stewart #2929177:

I asked Inmate Stewart if he saw anything in regards to the incident in the hallway involving Inmate Jackson and the deputies, and he said "No." I asked Inmate Stewart if he heard anything. He said he heard somebody holler "Ouch!" I asked Inmate Stewart for his approximate distance from the incident. He said he was possibly 50 feet away. I asked Inmate Stewart what he was doing when he heard "Ouch!" He said he was sitting down, facing the wall.

### Inmate Mark Moore #2966589:

I asked Inmate Moore if saw anything in regards to the incident in the hallway involving Inmate Jackson and the deputies. He said, "I didn't see anything, I just heard something." I asked Inmate Moore what he heard. He replied, "A popping sound, somebody hit the ground, a yell and approximately 3 more popping sounds." I asked Inmate Moore what he meant when he said a "popping sound." He said, "Tat tat tat tat tat." I asked him if that was

12

106

## Supervisor's Report on Use of Force
### 911-01245-5100-505

possibly a "Taser" sound, and he said "Yes." I asked Inmate Moore how many times he heard that sound. He said he heard the sound of the "Taser," and then somebody yelled "Ah!", and then the sound of the "Taser" one more time. I asked Inmate Moore if he heard the deputies tell Inmate Jackson to stop fighting or stop resisting, and he said "No." I asked Inmate Moore where he was at when he heard the commotion. He said he was seated outside Module 3600 / 3800, facing the wall. I asked Inmate Moore for his approximate distance from the incident. He said he was about 50 feet away. Finally, I referenced Inmate Moore's remark about him hearing somebody hit the ground, and asked him to embellish on that. He said it was the sound of a body hitting the ground "kind of hard."

Inmate Frank Smith #2875509:

I asked Inmate Smith if he saw anything in regards to the incident in the hallway involving the deputies and Inmate Jackson. He said, "I didn't see anything." I asked Inmate Smith if he heard anything. He said he heard someone scream "Ah!" I asked Inmate Smith if he heard the deputies tell Inmate Jackson to stop fighting. He said he heard the command "Stop" and the sound of a scuffle. I asked Inmate Smith how far he was from the incident. He said he was sitting about 60 feet down the hallway, facing the wall.

Inmate Rakeem Williams #2808943:

I asked Inmate Williams if he saw or heard anything in regards to the incident in the hallway involving Inmate Jackson and the deputies. He answered "No" to both questions. I asked Inmate Williams where he was when the incident occurred. He said he was seated in the hallway by Module 3600 / 3800, facing the wall. I asked Inmate Williams how close he was to the incident. He said he was about 50 feet away.

Inmate Donald Ferrebee #2912338:

I asked Inmate Ferrebee if he saw anything in regards to the incident in the hallway between Inmate Jackson and the deputies, and he said "No." I asked Inmate Ferrebee if he heard anything, and he said "Just orders being barked." I asked Inmate Ferrebee what exactly he heard. He said he heard the deputies tell the inmate to face the wall. I asked Inmate Ferrebee for his approximate distance from the incident. He said he was between 100-200 feet away.

Inmate Edgar Mendoza #2788417:

I asked Inmate Mendoza if he saw or heard anything in regards to the incident in the hallway between Inmate Jackson and the deputies, and he answered "No" to both questions. I asked Inmate Mendoza how close he was to the incident. He said he was seated and facing the wall, possibly 50 feet away.

107

## Supervisor's Report on Use of Force
### 911-01245-5100-505

<u>Inmate Mario Almarez #2970043</u>:

I asked Inmate Almarez if he saw anything in regards to the incident in the hallway between Inmate Jackson and the deputies, and he said "No." I asked Inmate Almarez if he heard anything. He said, "No, I was nodding off and falling asleep." I asked Inmate Almarez how close he was to the incident. He said "I don't know because I don't know what happened...I was just falling asleep."

<u>Inmate David Lira #2967003</u>:

I asked Inmate Lira if he saw anything in regards to the incident in the hallway involving Inmate Jackson and the deputies. He said he did not see anything because he was facing the wall down the hallway. However, Inmate Lira did say he heard someone say "Hey hey...let me go." I asked Inmate Lira if he heard anything that the deputies said. Inmate Lira said he heard the deputies telling Inmate Jackson to get down. I asked Inmate Lira how close he was to the incident. He said he was about 50 yards away.

<u>Inmate Jose Velasquez #2821530</u>:

I asked Inmate Velasquez if he saw anything in regards to the incident in the hallway involving Inmate Jackson and the deputies, and he said "Nothing at all." I asked him if he heard anything, and he said "I didn't hear nothing." I asked Inmate Velasquez where he was during the incident. He said he was sitting down the hallway, facing the wall. I asked Inmate Velasquez how close he was to the incident. He said he wasn't sure, but it was probably more than 40 feet.

**Suspect Interview(s)**

Suspect Interview(s) Conducted by: ☒ Watch Commander  ☒ Supervising Sergeant

On 10-14-11 Lieutenant Stewart and Lieutenant Alvarez conducted a videotaped interview with Inmate Jackson in the holding area at the Men's Central Jail Clinic. I arrived at the interview toward its conclusion, and posed a few questions for Inmate Jackson as well. The following is a synopsis of the interview:

Lieutenant Stewart asked Inmate Jackson what happened in regards to the incident. Inmate Jackson said that he was in the 3000 Floor hallway with other inmates from Module 3600 / 3800; these inmates were being transferred over to Module 3200 / 3400. The inmates had to be searched in the 3000 Floor hallway prior to their admission into the new module. The deputies ordered the inmates to strip down to their boxers, and to place their property to the rear. Inmate Jackson reached back into his pants to grab a pass, and Deputy Rivera said "Fuck that pass, store

14

108

## Supervisor's Report on Use of Force
### 911-01245-5100-505

it behind you." Lieutenant Stewart asked Inmate Jackson what kind of pass it was. Inmate Jackson said it was a pass for the "Doctor's Line."

After the deputies were done searching the inmates, Inmate Jackson asked Deputy Ethridge if he could have his pass back. Deputy Ethridge told him that the pass was probably in his property. Inmate Jackson told Deputy Ethridge that he knew it was not in his property because he saw a deputy place it by the wall. Inmate Jackson then asked Deputy Rodriguez if he could get the pass back because it might save his life. Deputy Rivera asked Inmate Jackson what he was going to do with a pass that was 2 days old. Deputy Rivera also told him, "Fuck that pass, fuck you." In return, Inmate Jackson told Deputy Rivera "Fuck you."

Lieutenant Stewart asked Inmate Jackson which module and cell he came from. Inmate Jackson said he came from Module 3600, Denver-3. Inmate Jackson asked Lieutenant Stewart if she wanted to know what the pass was concerning, and she said "Yes." Inmate Jackson said, "Two days prior, Friday December 9th 2011, a murder occurred in Module 3200 Charlie-10." He then admitted to being a witness to the crime, and to contacting OSJ after it occurred. Inmate Jackson said he needed the pass to save his life because no suspects were taken to the hole or charged in connection with the murder. Rather, the same inmates remained on the tier in which the murder occurred. He needed the pass to prove that he left the module after the murder for medical reasons, not because he was a "snitch." Inmate Jackson told Deputy Rodriguez that he should know "what was up" with the pass. In regards to Deputy Rivera, he refused to listen to Inmate Jackson.

Inmate Jackson said he turned away from the deputies, and got into a verbal "Fuck you" match with them. He also said that he could identify all of the deputies that were present during the incident, except for the one that used the "Taser." Inmate Jackson said that Deputy Aldama and Deputy Rodriguez did not get involved and were "in compliance." Inmate Jackson added that he did not want to press any charges against the deputies.

Inmate Jackson said that the hallway camera will show him get down on his knees with his hands behind his back. It will also show him lay on the ground with his hands behind his back. And when the deputies told Inmate Jackson to give up his arms and hands, he gave them one of his hands. However, the deputies wouldn't let Inmate Jackson put his other hand behind his back. In fact, the deputies blocked Inmate Jackson's hand, which gave them a reason to spray him. Inmate Jackson said, "They tased me...you guys can see how many times they tased me."

Lieutenant Stewart asked Inmate Jackson if he resisted he deputies in getting handcuffed. Inmate Jackson said he did not resist, and the hallway cameras would show the deputies holding onto his left hand. Inmate Jackson added that he did not try to resist or fight, and he knows this is a "no winning situation."

Lieutenant Alvarez asked Inmate Jackson what happened after he placed one of his hands behind

15

## Supervisor's Report on Use of Force
### 911-01245-5100-505

his back. Inmate Jackson said he was trying to put his other hand behind his back as the deputies yelled, "Stop resisting...give us your hand." Inmate Jackson said that the deputies were not on him, and were not touching his handcuffed hand at this point.

Lieutenant Alvarez and Lieutenant Stewart asked Inmate Jackson for clarification as to the order of the pepper spray and the "Taser." Inmate Jackson said he felt the "Taser" before he felt the pepper spray. He was "tased" and pepper sprayed almost simultaneously, but the "tase" definitely came first. Inmate Jackson said he was "tased" again, and pepper sprayed one more time as well. When Inmate Jackson turned his head, they tried to spray him a third time; this was followed up with another "zap."

Lieutenant Stewart asked Inmate Jackson to clarify the "Taser" and pepper spray combo again. Inmate Jackson said he was "tased" before being pepper sprayed. He also added that he was on the ground first, and there was no reason for him to be "zapped"; he claimed to have been "zapped" multiple times. Lieutenant Stewart asked Inmate Jackson what happened after he was "tased." Inmate Jackson said, "I told you I was sprayed, and it just kept on going. I got sprayed all over my face, and they aimed right for my eyes. Before I was even zapped, the spray bottle was right there by my eyes." Inmate Jackson said that he was sprayed directly in his eye.

Lieutenant Alvarez asked Inmate Jackson how many times he was "tased." Inmate Jackson said it was over 3 times. He also asked Inmate Jackson how many times he was pepper sprayed. Inmate Jackson said it was 3-4 times. Inmate Jackson said he kept turning his head when the deputy tried to pepper spray him. He also said that the deputy tried to pepper spray him on his head and his ears.

Lieutenant Alvarez asked Inmate Jackson if he was hit at all during the incident. Inmate Jackson said, "I was not hit, and there was no boot treatment." Inmate Jackson said that there probably wasn't any "boot treatment" because Deputy Rodriguez and Deputy Aldama were there. He referred to them as "fine deputies." Inmate Jackson also said he has dealt with them in the past, and they are "outstanding deputies."

Inmate Jackson reiterated that the hallway camera will show him get down on the ground with his hands behind his head. It will also show him put one hand behind his back, followed up with an effort to give up his other hand to the deputies as he is being "zapped." Lieutenant Alvarez asked Inmate Jackson at what point he was handcuffed. Inmate Jackson said, "I'm pretty sure that it was after everyone else was down there and they had their little fun." Inmate Jackson also said, "That eye in the sky is my best friend right now."

Lieutenant Alvarez addressed Inmate Jackson's injuries from the incident. Inmate Jackson said that his ears, eyes and entire head were burning from the pepper spray. He also said he was injured from the "excessive force" involving the "Taser."

16

110

## Supervisor's Report on Use of Force
### 911-01245-5100-505

I asked Inmate Jackson why the deputies were unable to handcuff his left hand. He said he tried to give them his hand, and even lifted his left arm up. I asked Inmate Jackson what position his left arm was in, and he said it was straight out by his side. I asked Inmate Jackson if he remembered one of the deputies holding his legs. He said he remembered someone grabbing his legs and putting the band (hobble) around his legs.

Lieutenant Alvarez and I asked Inmate Jackson if he had any medical problems or if he took any medication for psychological problems, and he said no to both questions. Lieutenant Alvarez asked him if he drank any alcohol (pruno) or took medication before the incident, and he again said no to both questions. I asked Inmate Jackson if he had any preexisting injuries before the incident and he said "No." He also indicated that the deputies didn't hurt him as far as putting their "boot, fist or flashlight" in him.

I asked Inmate Jackson how tall he was, and he said "6 foot 3." I asked him how much he weighed, and he told me I was trying to "manipulate the situation." He then proceeded to tell me that he weighs 244 pounds.

Lieutenant Stewart asked Inmate Jackson what happened to his pass. Inmate Jackson said the pass is no longer in his property and was "thrown." He then reiterated some of the dialogue that was covered in the beginning of the interview. Lieutenant Stewart asked Inmate Jackson if he was upset prior to the incident. He told her he was trying to "twist things." Inmate Jackson again reiterated some of the dialogue that was covered in the beginning of the interview. Lieutenant Alvarez asked Inmate Jackson if he feared for his life, and he said "No."

**Medical Review**

Deputy Raniag, Deputy Valencia and Deputy Sharp escorted Inmate Jackson to the Men's Central Jail Clinic to receive treatment for his injuries.

On 12-11-11 at approximately 0943 hours, Sergeant De La Rosa conducted a videotaped interview with the nurse that treated Inmate Jackson, Nurse Huynh. The following is a synopsis of the interview:

Sergeant De La Rosa asked Nurse Huynh what kind of treatment Inmate Jackson received. She said she washed Inmate Jackson's eyes out with "Bio Shield" and gave him another eye wash; this was done to counteract the exposure to OC spray. Nurse Huynh also cleansed two small red spots found on Inmate Jackson's upper back. Sergeant De La Rosa asked her if the red spots were caused by the "Taser", and she said "possibly."

I saw the following obvious external injuries to Inmate Jackson after the incident:

## Supervisor's Report on Use of Force
### 911-01245-5100-505

- Redness to the face and nasal discharge
- 2 small square burn marks to the upper back

**Additional Information**

"X-26 Taser" Data #X00-574679:

The data for this incident was found in firing count sequence 433-436; the two sequences used on Inmate Jackson were 435 and 436. I was able to determine which two sequences were used on Inmate Jackson because the "Taser" battery life will always indicate 0% when used in "drive stun" mode. In addition, two trigger pulls were recorded prior to the "drive stun" (sequence 433 and 434). However, these charges did not make contact with Inmate Jackson; the battery life indicated 99% during both trigger pulls.

Firing Data

435 – 1 second

436 – 3 seconds

The video camera for the "Taser" only captured about 4 seconds of its first application. I reviewed the footage and saw Deputy Rivera maintaining a grip on Inmate Jackson's left wrist. He ordered Inmate Jackson several times to give up his hand. Inmate Jackson does not comply, and pulls his left arm up. Deputy Rivera pepper sprays Inmate Jackson in an effort to gain compliance. At this point, you hear Inmate Jackson say, "Take my hand...take my hand." Deputy Rivera still can't get his left arm behind his back, and maintains his grip. Within seconds, Inmate Jackson is "drive stunned" for about five seconds. Unfortunately, that is the extent of what the camera captured since the battery life dropped down to 0% shortly thereafter. In any event, this proves a couple of important facts:

1) Inmate Jackson was pepper sprayed before he was "drive stunned"

2) Inmate Jackson was not "drive stunned" 3-4 times, but rather 2 times; the first interval for 5 seconds, and the second interval for 1 second.

3000 Floor hallway camera:

I reviewed footage of the incident, which was captured from the 3000 Floor hallway camera. I watched the footage in slow motion and at normal speed. The footage paralleled the supplemental reports provided by the involved deputies, minus a few minor discrepancies. The deputies were

18

112

## Supervisor's Report on Use of Force
### 911-01245-5100-505

not given the privilege of watching the footage, so I questioned them about each divergence.

1) I saw that Inmate Jackson was in a prone position on the floor; his legs were stretched out toward Deputy Rivera. When Deputy Rivera approached Inmate Jackson, he used his left foot to move Inmate Jackson's right leg out of the way. I asked Deputy Rivera if he remembered using his right foot to move Inmate Jackson's right leg out of the way. He said he did not remember doing it.

2) I saw that when Deputy Aldama first approached Inmate Jackson to handcuff him, he put his right knee on Inmate Jackson's right back before switching to his left knee. I asked Deputy Aldama he remembered initially putting his right knee on Inmate Jackson's right back. He said he did not remember using his right knee at all.

3) I saw Deputy Rivera put his right knee on Inmate Jackson's back when he first approached him to handcuff his left hand. Deputy Rivera said he remembered that he put his right knee on Inmate Jackson's back for a brief moment when he initially tried to handcuff him.

### Training and Tactical Review

Debriefing held to discuss training and tactical issues.

Tactics:

- When Inmate Jackson became recalcitrant, Deputy Aldama requested my response to the floor over his radio.

- Inmate Jackson did something that I have never seen a recalcitrant inmate do, and that's prone himself out. It's not often that you see an inmate put himself back into a submissive and / cooperative state. With that being said, I like how the deputies took advantage of Inmate Jackson's submissive behavior, and opted to handcuff him before the situation could escalate. Even though they could have awaited my arrival, they took advantage of a unique opportunity to handcuff the inmate.

- When Deputy Moorman saw the altercation, he made a "415 deputy involved" broadcast over his radio.

- The deputies initially used verbal commands to gain compliance from Inmate Jackson. When that didn't work, they used pepper spray to gain compliance. When the pepper spray was ineffective, the deputies did not punch, kick or knee Inmate Jackson. Instead, they opted to use the "Taser" to gain compliance. This proved to be a great decision, as they were finally able to get Inmate Jackson's arm behind his back. As a result, Inmate Jackson had two tiny burn marks on his upper back from the "Taser", and burning to his face from

19

113

## Supervisor's Report on Use of Force
## 911-01245-5100-505

the OC exposure; he did not suffer any serious injuries.

- In this particular incident, the 4th and 5th deputies involved merely held Inmate Jackson down. In addition, responding deputies did not directly involve themselves in the incident. Instead, they assessed the situation and conducted themselves accordingly.

Training:

- Deputy De La Torre indicated that he removed the cartridge from the "Taser" prior to using because he was afraid that the dart spread would be too wide and may have hit one of his partners. Training Sergeant Hinchman re-briefed Deputy De La Torre on the functionality of the "Taser," and reminded him that the cartridge doors will still open if you attempt a contact shot. In addition, she reiterated the necessity of completing a 3-4 point contact for the electricity spread to be effective. Deputy De La Torre was receptive and understanding of the training.

Based on the circumstances and the actions by Inmate Jackson, I find that the force employed by the deputies was measured and objectively reasonable. In addition, the force was within the "Use of Force Options Chart" and the Department's "Use of Force Guidelines Policy."

**Watch Commander's Review**

I (Lieutenant Stewart) reviewed the video footage from the 3000 floor (without the advantage of audio) and video footage from the X-26 Taser. I also read the witness interviews and the deputies' use of force memorandums. Sgt. Zonver presented a detailed and concise investigation which included all of the above. In addition, I considered the recommendations of the Commander's Management Task Force.

After a brief conversation with Inmate Jackson, Deputy Aldama soon recognizes that Inmate Jackson is being verbally resistive and thereby, recalcitrant. He appropriately requested the floor Sergeant. Inmate Jackson decided to lie face down on the floor and place his hands behind his head, albeit passive aggressively. At this juncture, the deputies considered the inmate to be cooperative.

Sergeant Zonver addressed the MCJ Recalcitrant Inmate Policy and the deputies' actions during her de-briefing. The deputies who were moving this group of inmates were well aware of the fact that at least one of the inmates in the group was involved in an MCJ jail murder on 12/09/11. They

20

114

## Supervisor's Report on Use of Force
### 911-01245-5100-505

also knew that no one had been transferred out of the facility with respect to the murder.  That knowledge, coupled with what the deputies believed was the inmate's advantage in size, was a common thought for "moving in" on the inmate, even while he appeared to be submissive.  The thinking was that Inmate Jackson could possibly become more agitated while they awaited the sergeant's arrival.

The struggle/resistance by Inmate Jackson is captured on the Taser video footage.  While the video is only 4 seconds long, it does capture Inmate Jackson moving his left arm up and down.  He is clearly resisting and there is a struggle.  Most of the audio is un-intelligible; however, Inmate Jackson is heard saying "take my arm."  Conversely, he continues to pull away from Deputy Rivera.  At this point Inmate Jackson's behavior is both of physical and verbal resistance and the use of the OC spray, although not effective, was appropriate and in accordance with policy.  There were initial concerns with the proximity in which the OC was deployed by Deputy Rivera (almost directly on the face).  During de-briefing, it was discussed that had the OC spray been utilized from a farther distance, the deputies involved may have been affected.

The Deputies involved indicate that the OC spray did not have an immediate effect on the inmate.  Deputy De La Torre, in his memorandum, articulates that Inmate Jackson is very tall and well- built man/inmate, so he feared he would seriously injure him and his partners if he broke free.  Deputy De La Torres's subjective feeling and state of mind led him to believe that he was in a high risk situation and the only option was to use the Taser.

It is my conclusion that the deputies involved in this incident exercised proper judgment in dealing with Inmate Jackson.  Once they made contact with the inmate, the use of the OC spray, the Taser, the control holds and the hobble was within reason.

I recommend no further investigation into this incident.

**Case Status**

No charges were filed against Inmate Jackson regarding this incident.

115

Deputy's Use of Force Report

Force Review Package (Memorandum)

Page 1 of 2

☑ Primary Deputy /C.A.          ☐ Witness Deputy / C.A.

File #: 911-01245-5100-505

Unit Ref.#: 5100-2011-1211-223 002

Deputy / C.A.: Dep. Rivera, P          Emp.#: 531579

| Involved Inmate(s) | Booking Number |
|---|---|
| Jackson, Alquan | 2249532 |
| | |
| | |

Date: 12-11-11          Time: 0837          Location of Occurrence: 3000 Hallway

## Incident Narrative

The purpose of this Memorandum is to provide active information on the above file number:

On the above indicated date and time, I was working as 31/33 Movement Deputy. Deputy personnel were requested to assist with a search of inmates transferring from 3600/3800 module to 3200/3400 module.

The search was conducted on the lower end of the 3000 hallway. Upon completion of the search, inmates were instructed to pick up their property and go inside 3200/3400 module. At this time I was contacted by I/M Jackson. I/M Jackson said, "I need that fucking pass you threw out." I told I/M Jackson to grab his property and go inside the module. I also told him the pass was 2 days old and he did not need to have it in his possession. I/M Jackson said, "Fuck You, take me to the hole!" Due to I/M Jackson's advantage of size (HGT: 603) over me (HGT: 506) and present deputy personnel, and the possibility of him being able to take over this situation, I ordered him to face the wall. I/M Jackson said "Fuck you, Fuck all ya," then faced the wall.

As Deputy De La Torre #522138, Deputy Aldama #531565 and myself attempted to make contact, I/M Jackson lay face down on the floor on his own. I/M Jackson's left arm was extended out and I grabbed his left wrist with my left hand, so I could handcuff him. Dep. Aldama handcuffed I/M Jackson's right arm. At this point, I/M Jackson used his strength and tensed his left arm making it impossible for me to place it behind his back. While maintaining a hold of his left wrist with my left hand, I/M Jackson began to forcefully move his arm up and down, attempting to break my hold. I told I/M Jackson to place his hand behind his back and he said "Fuck you!" At this time, while maintaining his left wrist I pulled out my O.C. Spray and warned I/M Jackson that he would be sprayed if he didn't put his hand behind his back. I/M Jackson said "Motherfucker." I sprayed a 3 second burst of "Sabre Red" O.C. spray to his face. The O.C. spray had little effect on I/M Jackson, and only caused him to become more enraged.

Dep. De La Torre told I/M Jackson to place his hands behind his back, and I/M Jackson said "Fuck you bitches." Dep. De La Torre told I/M Jackson that he would be "tased" if he didn't put his hands behind his back. I/M Jackson ignored the given command and continued to move his arm up and down in an attempt to break my hold. Dep. De La Torre "Drive Stunned" I/M Jackson's mid back for 5 seconds. I/M Jackson began yelling, "Fuck you bitches!" At this point I was able to control I/M Jackson's left arm with my left hand and moved his left hand to his lower

Deputy's Signature: SGT. ZONVEL 458172

DEP. RIVERA #531579

110

Deputy's Use Of Force Report ... continued                                    Page 2 of 2

Deputy's / C.A.'s Last Name  Dep. Rivera, P

File #:  911-01245-5100-505

Unit Ref.#:  5100-2011-1211-223  002

back. I maintained a grip of I/M Jackson's left forearm as Dep. Aldama attempted to handcuff his left wrist. I/M Jackson pulled his hand away and began to tense his arm again. Dep. De La Torre "Drive Stunned" I/M Jackson a second time for 5 seconds. I/M Jackson placed his hands behind his back and Dep. Aldama was able to properly place the handcuff on his left wrist.

Sgt Hinchman # 460227, arrived on scene and observed I/M Jackson moving his legs. Sgt. Hinchman directed Dep. Ethridge to "Hobble" I/M Jackson. Dep. Ethridge placed the "hobble" around I/M Jackson's ankles and I moved it up just below I/M Jackson's knee caps and properly secured it. While on the floor I/M Jackson continued to use profanity toward deputy personnel.

I/M Jackson was taken to the MCJ Clinic for treatment.

Sgt, Zonver #458132 was notified of the incident.

I did not see nor did I use any other force.

117

Deputy's Use of Force Report

Force Review Package (Memorandum)

Page  1  of  1

File #:  911-01245-5100-505

Unit Ref.#:  5100-2011-5100-223  1211-002

☑ Primary Deputy /C.A.     ☐ Witness Deputy / C.A.

Deputy / C.A.:  Aldama, S

Emp.#:  531565

| Involved Inmate(s) | Booking Number |
|---|---|
| Jackson Alquan | 2249532 |
| | |
| | |

Date: 12-11-11      Time: 0837      Location of Occurrence: 3000 floor main hallway

### Incident Narrative

On 12-11-11, I was assigned as Module 3600 Deputy.  At approximately 0837 hours, I escorted a line of approximately 13 inmates from Module 3600 D-row and into the 3000 floor hallway to be search and then rehoused in Module 3200/3400.  While in the 3000 floor hallway, all inmates were searched and ordered to step in Module 3200/3400 laundry room (holding area for inmates) to be rehoused.

I was standing in front of the Module 3200/3400 entrance door, when I heard an unknown Inmate,( later identified as I/M Jackson #2249532), raise his voice at deputy personnel. He shouted "Fuck you, fuck you!."  Fearing that Inmate Jackson may attack deputy personnel, I requested the 3000 floor Sergeant via my hand held radio to respond to the 3000 floor hallway regarding an uncooperative inmate.  As I was getting closer to assess the situation, I heard I/M Jackson say "Fuck you take me to the hole" to an unknown deputy who was standing near him.  I/M Jackson then went down to the floor and placed both of his hands on top oh his head.  I then ordered I/M Jackson to place both of his hands behind his back in order to handcuff him.  I/M Jackson then brought his right arm down to his back where I was able to control it and place it in a handcuff.

I then heard Deputy Rivera #531579 order I/M Jackson to give up his left arm. I saw that I/M Jackson was already tensing his body and both arms in attempt to keep from getting handcuffed.  While holding his right arm with the cuff on, I saw Deputy Rivera struggling with his left arm.  Due to his large build, and fearing that I/M Jackson may attempt to get up, I placed my right knee on his back to prevent him from getting up and fighting with deputy personnel while simultaneously holding his cuffed right arm.  I then gave I/M Jackson commands several times to give up his left arm in order for me to handcuff him, but he failed to complied.  I then saw Deputy Rivera spray I/M Jackson on his face (refer to Deputy Rivera's force memo for further information).  The O.C. spray did not affect I/M Jackson as he refused to give up his left arm.  Deputy personnel then gave I/M Jackson commands to stop fighting and to give up his left hand but he refused to comply with the orders given. I then saw Deputy De La Torre #522138 "drive stun" I/M Jackson on his back area (refer to Deputy De La Torre's force memo for further information).  The "drive stun" had a negative effect on I/M Jackson. He pulled his hands away and began to tense his left arm again. Deputy De La Torre "drive stunned" I/M Jackson a second time for five seconds. I/M Jackson then placed his hands behind his back and with the help of Deputy Rivera, I was able to handcuff him without further incident.  I was then ordered by Sgt. Hinchman #460227 to keep my knee on his back, to enable Deputy personnel to hobble I/M Jackson's legs.  I/M Jackson was then escorted to the MCJ clinic for medical evaluation.

Sgt. Zonver #458132 was immediately notified of the force I used.

Deputy's Signature:  SGT. ZONVER 458132         DEPUTY ALDAMA #531565

118

Deputy's Use of Force Report

Force Review Package (Memorandum)

Page 1 of 1

☑ Primary Deputy /C.A.   ☐ Witness Deputy / C.A.

File #: 911-01245-5100-505

Unit Ref.#: 5100-2011-5100-505 1211-002

Deputy / C.A.: Sgt. Shawnee N. Hinchman          Emp.#: 460227

| Involved Inmate(s) | Booking Number |
|---|---|
| Jackson, Alquan | 2249532 |
| | |
| | |

Date: December 11, 2011      Time: 0837      Location of Occurrence: 3000 Hallway (Low end)

Incident Narrative

This force memo is being written to provide active additional information regarding my involvement in the above incident.

At approximately 0837 Hrs, while working as the 2000 floor Sgt., I heard an unknown deputy request a sergeant to respond to the 3000 hallway, regarding a recalcitrant inmate. As I walked onto the 3000 floor I heard someone yelling "Fuck you guys". I also heard deputy personnel saying, "Stop fighting". As I approached the low end of the 3000 hallway, I saw Deputy Rivera (#531579) hovering over an inmate and trying to handcuff him. The inmate was later identified as I/M Jackson. Simultaneously, I saw Deputy Aldama (# 531565 ) trying to gain control of I/M Jackson's upper torso by placing his right knee, across I/M Jackson's, upper back. I/M Jackson was lying face down on the floor, rolling his body from side to side, and making it difficult for deputies to handcuff him. I also saw I/M Jackson pulling his legs apart, and sliding them from side to side.

In an effort to eliminate I/M Jackson from kicking at myself or surrounding deputy personnel, I ordered Deputy Ethridge (#478963) to hobble I/M Jackson's legs and Deputy Aldama to remain pinning I/M Jackson's upper torso to the floor. Both deputies complied with my orders. Deputy Ethridge, along with the assistance of Deputy Rivera, hobbled I/M Jackson's legs. I/M Jackson stopped resisting deputy personnel at this time, but continued to yell obscenities at the deputies. Once deputies rolled I/M Jackson up and sat him on the floor, I/M Jackson said, "fuck you guys, I can't believe you do me like this". At this time I realized that I/M Jackson had been pepper sprayed (Sabre Red Spray). I do not know who sprayed I/M Jackson with pepper spray.

The 3000 floor sergeant, Sgt. Zonver (#458132) arrived on scene shortly after I/M Jackson was handcuffed and hobbled. I briefed her regarding my involvement in this use of force.

Deputy's Signature: _Sgt. Hinchman #460227_
SGT. ZONVER 458132

119

Deputy's Use Of Force Report

Force Review Package (Memorandum)

Page  1  of  2

☑ Primary Deputy /C.A.          ☐ Witness Deputy / C.A.

File #:  911-01245-5100-505

Unit Ref.#:  5100-2011-5100-223- 002

Deputy / C.A.:  Deputy De La Torre, A

Emp.#:  522138

| Involved Inmate(s) | Booking Number |
|---|---|
| Jackson, Alquan | 2249532 |
| | |
| | |
| | |

Date: 12-11-11          Time: 0837hrs      Location of Occurrence: 3000 Hallway

### Incident Narrative

While working as the 31/33 Movent Deputy, I assisted with a search that was being conducted in the 3000 Hallway. At this time, I noticed that my partner Deputy Rivera # 531579 ordered Inmate Jackson # 2249532 to take it inside (referring to modules 32/34).

At this time I/M Jackson yelled "fuck you, give me back my pass." Deputy Personnel told I/M Jackson that it was an old pass and that he wasn't going to get it back, and to just follow orders.
I/M Jackson again in a high aggressive voice and still looking at Deputy Personnel shouted "fuck you, just take me to the fucking hole".
At this time Deputy Personnel ordered I/M Jackson to turn around and face the wall.

This is when I saw I/m Jackson lay on his stomach on the floor and place his hands above his head. He screamed "fuck you take me to the fucking hole."

Deputy Personnel notified Sgt. Zonver # 458132 via Radio to come to our location for an uncooperative inmate in the 3000 Hallway.

At this point Deputy Rivera approached I/M Jackson from his left side and Deputy Aldama #531565 also approached I/M Jackson from his right side. I approached I/M Jackson from his right side due to the fact that I noticed Deputy Personnel were having a hard time controlling I/M Jackson's left arm.

While Deputy Personnel were having a hard time controlling I/M Jackson's left arm I activated/turned on the "taser" and told I/M Jackson several times to surrender his left hand. I/M Jackson did not comply nor did he follow my orders. I heard Deputy Rivera telling I/M Jackson that if he didn't surrender his left arm he was going to get sprayed.

Deputy's Signature: ___SGT. ZONNER 458132___ / _[signature]_     #522138
DE LA TORRE , A

120

Deputy's / C.A.'s Last Name   Deputy De La Torre, A

File #:  911-01245-5100-505

Unit Ref.#:  5100-2011-5100-223. 002

I then turned off the "taser" and repositioned myself to get a clear shot just in case the "taser" was going to be needed. I saw I/M Jackson pulling away from Deputy Rivera's grasp and control hold, and I got scared. I/M Jackson is a very tall and a well built man/inmate, so I feared he would seriously injure me and my partners if he broke free from Dep. Rivera.

I was in close proximity to my partners, and was afraid I would hit one of them when I fired the "taser" so I removed the cartridge from the taser in case I needed to "drive stun" I/M Jackson.

Deputy Rivera was still struggling with I/M Jackson's left arm/hand so I turned on the "taser" and placed it on his upper back and told I/M Jackson to give up his left arm or he will be "tased". I/M Jackson still didn't comply and continued to try and brake away from Deputy Rivera's grasp.

I announced to my partners that I was going to use the "taser". At this time I "drive stuned" I/M Jackson on the upper portion of his middle back for five seconds. I/M Jackson still didn't render his left arm/hand. Deputy Rivera continued to struggle in gaining control of his left arm/hand. My fear level became elevated since the "Drive Stun" didn't gain compliance.

I announced to my partners that again that I was going to use the "taser." I "drive stunned" I/M jackson in his upper middle back for another five seconds.

Deputy Personnel were finally able to gain control of his left arm/hand and he was handcuffed.

I/M Jackson was then hobbled by Deputy Personnel.

121

Deputy's Use of Force Report

Force Review Package (Memorandum)

Page  1  of  2

☑ Primary Deputy /C.A.     ☐ Witness Deputy / C.A.

File #:  911-01245-5100-505

Unit Ref.#:  5100-2011-1211-223 00 ✓

Deputy / C.A.:  Ethridge

Emp.#:  478963

| Involved Inmate(s) | Booking Number |
|---|---|
| Alquan Jackson | 2249532 |
|  |  |
|  |  |
|  |  |

Date: 12-11-11          Time: 0837          Location of Occurrence: 3000 Floor Hallway

### Incident Narrative

The purpose of this report is to provide additional information as to my actions and observations during the force incident involving Inmate Jackson (Bkg. #2249532).

On the indicated date and time I was assigned as the 3200/3400 Recreation Room Deputy. It should be noted that at the time the 3200/3400 Rec. Room was closed as electricians were working in there. At approximately 0820 hrs., I was assisting with the searching of a transfer line of inmates from Module 3600/3800 to Module 3200/3400 for rehousing. I recognized Inmate Jackson as an inmate that was previously housed inside Module 3200 C-10, a cell in which a murder had occurred on 12-09-11. I called Sgt. Zonver (#458132) via my handheld radio to meet me in order to see if Inmate Jackson was able to be housed in Module 3200/3400.

At approximately 0837 hrs., I was standing in front of the 3000 Floor Control Booth when I heard a loud voice say "Fuck you man!" I turned to my right and saw Inmate Jackson, as well as several deputies, standing in the hallway. I began to walk towards them, and heard on my radio that an unknown deputy was requesting Sgt. Zonver to 10-19 (respond) to the 3000 floor hallway.  As I approached I saw Inmate Jackson turn toward the wall and lay down in a "prone" position. Deputies who were standing across the hallway approached him. My attention was then drawn to an unknown inmate who was sitting in front of the 3000 Floor Chapel, and I ordered him to sit down and face the wall. Once the unknown inmate was seated I again approached the deputies location and could hear them instructing Inmate Jackson to give up his left arm, and could hear him yelling, "Fuck y'all mother fuckers!".

Once I reached their position I could smell the odor of O.C. spray and could see that Inmate Jackson's left arm was outstretched with his fist clinched. I could see that Deputy Rivera (#531579) and Dep. Delatorre (#522138) were on the left side of Inmate Jackson's body and were attempting to gain control of his left arm in order to get him handcuffed. All the while, Dep. Rivera was telling Inmate Jackson to calm down and to put his hand behind his back. All of Dep. Rivera's orders were met with non-compliance.

Deputy's Signature: SGT. ZONVER 458132 / ⟨signature⟩ #478963

122

Deputy's Use Of Force Report ... continued                                    Page  2  of  2

Deputy's / C.A.'s Last Name  Ethridge

File #:  911-01245-5100-505

Unit Ref.#:  5100-2011-1211-223

I saw that Inmate Jackson's feet were spread apart, so I placed my right foot on his left ankle in order to prevent him from possibly kicking at deputy personnel or standing up.  I heard Dep. Delatorre tell Inmate Jackson to stop fighting and to place his hand behind his back.  I heard the sound of the "taser" being employed, but Inmate Jackson continued keep his left arm outstretched.  Dep. Rivera continued try and gain control of Inmate Jackson's left arm, while repeatedly ordering him to put his hand behind his back.  Dep. Delatorre again gave Inmate Jackson orders to put his hand behind his back and I again heard the sound of the "taser" being employed.  Inmate Jackson's hand was then place behind his back and handcuffed.

Once Inmate Jackson was handcuffed he continued to yell "Y'all mutha fuckers gonna get yours!"  Sgt. Hinchman (#460227), who responded to our location, ordered Dep. Rivera and I to apply the hobble restraint device to Inmate Jackson's legs.  Dep. Rivera and I applied the hobble to Inmate Jackson's legs with no resistance.

Once inmate Jackson was secured, Dep. Valencia (#521421), Dep. Raniag (#542832), and I escorted inmate Jackson to the MCJ clinic under the direction of Sgt. Zonver.

123

## Deputy's Use Of Force Report

Force Review Package (Memorandum)

Page  1  of  1

☐ Primary Deputy /C.A.      ☑ Witness Deputy / C.A.

File #:  911-01245-5100-505

Unit Ref.#:  5100-2011-1211-223  602

Deputy / C.A.:  Deputy Moorman

Emp.#:  525198

| Involved Inmate(s) | Booking Number |
|---|---|
|  |  |
|  |  |
| Inmate Alquan Jackson |  |
|  | 2249532 |

Date: 12/11/11          Time: 0837          Location of Occurrence: 3000 floor hallway

### Incident Narrative

This memo is to provide additional information regarding my actions in the above file number

On 12/11/11 I was assigned as the 3100/3300 movement Deputy. I was assigned the 40 mm weapon to provide security in the 3000 floor hallway for inmates being transferred from module 3600/3800 to module 3200/3400.

At approximately 0837 Hours I was standing in front of the 3000 floor booth when I heard profanities being yelled at the other end of the hallway. I looked to my right and saw Deputy personnel giving verbal commands to an unknown Inmate ( Later identified as Inmate Jackson). I saw Inmate Jackson lay on the floor. As Deputy personnel went to handcuff Inmate Jackson, I could see that he began to struggle. I immediately began to respond to their location as I put out radio traffic via my hand held radio "415 Deputy involved 3000 hallway". As I responded, I could hear verbal commands being given to Inmate Jackson to give up his hands. I then heard code 4 via my hand held radio while in route to their location. As I arrived at the location, I kept a distance as I was carrying a tactical weapon. I could see that Inmate Jackson no longer posed a threat and sufficient personnel were on scene. I then returned to the other end of the hallway to provide security for the remaining inmates in the hallway. I did not use nor did I witness any other use of force.

Sergeant Zonver # 458132 was immediately notified of my actions regarding the incident

Deputy's Signature:  SGT. ZONVER 458132 / DEPUTY MOORMAN #525198

124

Deputy's Use of Force Report

Force Review Package (Memorandum)

Page  1  of  1

☐ Primary Deputy /C.A.  ☑ Witness Deputy / C.A.

File #:  911-01245-5100-505

Unit Ref.#:  5100-2011-5100-223  LV 11-002

Deputy / C.A.:  Deputy Sharp, J.

Emp.#:  524009

| Involved Inmate(s) | Booking Number |
|---|---|
| Jackson, Alquan | 2249532 |
|  |  |
|  |  |
|  |  |

Date:  12/11/2011          Time:  0837      Location of Occurrence:  3000 Hallway

## Incident Narrative

The purpose of this memo is to provide additional information regarding the incident that occurred on 12-11-2011 at approximately 0837 hours.

On 12-11-2011 I was assigned as a 3000 Prowl Deputy. At approximately 0837 hours I was assisting with the transfer of approximately 14 inmates from Modules 3600/3800 to 3200/3400. The inmates and I were toward the end of the hallway closest to Modules 3600/3800 and 3500/3700. While searching the inmates property, I heard a request via my handheld radio for a sergeant to respond to the 3000 Hallway. I immediately looked to my right at the opposite end of the hallway toward Modules 3200/3400 and 3100/3300.  I saw deputy personnel standing over Inmate Jackson, and attempting to gain control of Inmate Jackson, Alquan BK# 2249532.

I heard deputy personnel order Inmate Jackson several times to place his hands behind his back. I maintained my position in the hallway to providing security over the transferring inmates. I heard deputy personnel continue to order Inmate Jackson to put his hands behind his back. I also heard a "Taser" being employed.

Following the incident I escorted Inmate Jackson to the Men's Central Jail Clinic to be treated for any possible injuries. This concludes my involvement during the incident.

Deputy's Signature: _SGT. ZONNE 459132     DEP. SHARP #524009_

Deputy's Use of Force Report

Force Review Package (Memorandum)

Page 1 of 1

☐ Primary Deputy /C.A.   ☑ Witness Deputy / C.A.

File #: 911-01245-5100-505

Unit Ref.#: _____

Deputy / C.A.: NAVARRETE, D.

Emp.#: 526389

| Involved Inmate(s) | Booking Number |
|---|---|
| JACKSON, ALQUAN | 2249532 |
| | |
| | |
| | |

Date: 12-11-11          Time: 0837 HRS   Location of Occurrence: 3000 FLOOR HALLWAY

### Incident Narrative

The purpose of this report is to provide active/additional information on the above file number.

On the above indicated date and time I was working as the 2200/2400 module title 15 deputy. I was in the 3000 floor control booth. While leaving the floor I heard radio traffic requesting for a sergeant to respond to the 3000 floor hallway.

I then saw a M/B inmate, (later identified as I/M Jackson #2249532) lay face down on the floor. I saw sufficient deputy personnel dealing with I/M Jackson.

I did not see any actions taken by deputy personnel or by the inmate.

Sgt Zonver #458132 was notified of the incident.

Deputy's Signature: _SGT. ZONVER  458132     DEP. NAVARRETE # 526389_

126

Deputy's Use of Force Report

## Force Review Package (Memorandum)

Page 1 of 8

☐ Primary Deputy /C.A.   ☑ Witness Deputy / C.A.

File #: 911-01245-5100-505

Unit Ref.#: 5100-2011-1211-223 *oon*

Deputy / C.A.: Deputy Valencia, S.

Emp.#: 521421

| Involved Inmate(s) | | Booking Number |
|---|---|---|
| Jackson, Alquan | | 2249532 |
| | | |
| | | |
| | | |

Date: 12-11-11      Time: 0837 Hours   Location of Occurrence: 3000 Floor Hallway

### Incident Narrative

The purpose of this memo is to provide active additional information regarding the above file number.

On 12-11-11 I was assigned to module 3100 on the 3000 floor. At approximately 0837 hours I stepped outside of module 3100/3300 to assist other deputies search inmates who were getting rehoused from modules 3600/3800 to modules 3200/3400 for weapons and contraband.

Once in the hallway, I saw deputy personnel on the floor attempting to gain control of I/M Jackson's hands. Soon after, I heard deputies order I/M Jackson to place both hands behind his back, however, he ignored all commands and refused to give up his hands. Due to multiple deputies involved during the struggle with I/M Jackson, I stood aside to provide additional security while deputies attempted to place I/M Jackson in handcuffs.

During the struggle, I saw Deputy Aldama #531565 place I/M Jackson's right arm behind his back allowing him to place the handcuff on his right wrist. From my position, I also heard Deputy Rivera #531579 continue to order I/M Jackson to place his left hand behind his back. However, I/M Jackson ignored his command and continued to struggle. After numerous ignored orders, I saw Deputy Rivera retrieve his can of O.C spray and spray I/M Jackson in the face with a 2-3 second burst of spray. The spray had little to no effect on I/M Jackson as he continued to refuse to place his left hand behind his back.

Soon after, I saw Deputy De La Torre #522138 retrieve his X-26 TASER and "drive stun" I/M Jackson's upper middle back. After the "drive stun", I saw it had little to no effect as he continued to refuse to give up his left hand. After deputies ordered I/M Jackson a second time, I saw deputy De La Torre "drive stun" his upper middle back again. The second "drive stun" allowed Deputy Rivera to place his left hand behind his back. I/M Jackson was subsequently handcuffed by deputies. Due to his actions, Sergeant Hinchman #460227 ordered deputies to place a hobble around I/M Jacksons legs to prevent any further incidents.

I, along with Deputies Raniag #542832 and Ethridge #478963 escorted I/M Jackson to the Men's Central Jail clinic for medical treatment without further incident.

Sergeants Hinchman and Zonver #458132 were immediately notified of my use of force or witness to force.

Deputy's Signature: SGT. ZONVER 458132      #521421

127

Deputy's Use of Force Report

Force Review Package (Memorandum)

Page   1   of   2

☑ Primary Deputy /C.A.      ☐ Witness Deputy / C.A.

File #:  911-01245-5100-505

Unit Ref.#:  5100-2011-1211-223  602

Deputy / C.A.:  Rodriguez, J

Emp.#:  532460

| Involved Inmate(s) | Booking Number |
|---|---|
| Jackson, Alquan | 2249532 |
| | |
| | |
| | |

Date: 12-11-11          Time:  0837      Location of Occurrence: 3000 Hallway

### Incident Narrative

The purpose of this report is to provide additional information regarding my involvement and observations regarding the use of force involving Inmate Jackson #2249532.

While working as the 3200/3400 Title 15 Deputy I was in the 3000 floor hallway searching inmates who were being rehoused from 3600-3800 modules to 3200/3400 modules.

Once the search of the inmates and their property was concluded Inmate Jackson wanted to speak to the deputies who searched his property regarding a pass that was taken from his property, which was two days old. Inmate Jackson was told by Deputy Rivera #531579 that he did not need a pass that was days old. I then told Inmate Jackson that if he needed a copy for whatever legal reason later that it is stored in his movement history. Inmate Jackson then stood up and turned to face Deputy Rivera #531579 and continued to ask for his pass and was again told no. I heard Inmate Jackson say "fuck you then, take me to the hole". At this time I heard Deputy Aldama #531565 request for Sgt Zonver # 458132 to meet in the 3000 floor hallway regarding a hostile inmate. Inmate Jackson was then ordered to face the wall and he replied with "fuck you". He was again ordered to face the wall and place his hands behind his back. Inmate Jackson then turned facing towards the wall and proceeded to lay on the floor. I saw Deputy Aldama take control of Inmate Jackson's right hand and handcuff it. I heard Deputy Rivera #531579 give Inmate Jackson orders to place his left hand behind his back serveral times. I then noticed that Inmate Jackson no longer had his legs together but rather they were sprawled out. I grabbed hold of his right leg so he could not get up and begin to fight with my partners.

I continued to hold his right leg until he was successfully handcuffed behind his back. Sgt Hinchman #460227 was now at the scene, and directed Deputy Aldama #531565 to place his knee in the middle of Inmate Jackson's back to prevent him from getting up. She then directed Deputy Ethridge #478963 and Deputy Rivera #531579 to hobble Inmate Jackson's legs.

I then saw Inmate Jackson was escorted to the MCJ main clinic by Deputy Valencia #521421.

Deputy's Signature:  SGT. ZONVER  458132       DEP RODRIGUEZ #532460

128

Deputy's Use Of Force Report

Force Review Package (Memorandum)

Page 1 of [ ]

☐ Primary Deputy /C.A.    ☑ Witness Deputy / C.A.

File #: 911-01245-5100-505

Unit Ref.#: 5100-2011-1211-223 002

Deputy / C.A.: Raniag, Joshua          Emp.#: 542832

| Involved Inmate(s) | Booking Number |
|---|---|
| Jackson, Alquan | 2249532 |
|  |  |
|  |  |
|  |  |

Date: 12/11/2011     Time: 0837     Location of Occurrence: 3000 Floor Hallway

## Incident Narrative

The purpose of this memo is to provide additional information of my actions and observations for the above file number.

I was standing in the hallway by the 3000 floor control booth when I heared a commotion coming from the other end of the hallway. I heard an unknown inmate (later identified as Jackson, Alquan # 2249532) telling a group of deputies standing around him, "Fuck you!, Fuck you." I made my way down to that end of the hallway when I heard Deputy Aldama # 531565 ask for the 3000 floor Sergeant via his handheld radio. I saw I/M Jackson then lay down on the floor with his hands behind his head. I saw Deputy Aldama contact I/M Jackson by grabbing his right hand in order to handcuff it. However, I/M Jackson would not put his left hand behind his back. I saw Deputy Rivera # 531579 struggling to control his left arm. I heard Deputy Rivera give him multiple commands to comply and put his hand behind his back, but to no avail. I/M Jackson continued to say "Fuck you, Im not giving it up." Deputy Rivera then sprayed I/M Jackson in the face with a burst of O/C spray, however it did not have the desired effect as he still did not put his hand behind his back.

Deputy Rivera again, gave I/M Jackson commands to comply, but he was still saying, "Fuck you." At this point I saw Deputy De La Torre # 522138 say to I/M Jackson, that he was going to "tase" him if he did not put his hand behind his back. I/M Jackson still did not comply. I saw Deputy De La Torre "Drive Stun" I/M Jackson's back. I turned around to direct the responding deputies away because sufficient deputies were already on scene. By the time I turned back around to the inmate, he was already handcuffed. SGT Hinchman #460227 responded and directed Deputy Ethridge # 478963 to hobble I/M Jackson's legs.

SGT Zonver #458132 was notified of this incident.

Deputy's Signature: _SGT. ZONVER 458132_

_#542832_

129

Los Angeles County Sheriff's Department

# Inmate Medical Documentation

## Clinical Progress Notes

431416

2C-Progress Note

Clinical Progress Notes
11/17/11 01:21 pm Performed by ENRIQUEZ MD, POLICARPIO F. / PHYSICIAN -

Entered on 11/17/11 01:22 pm

NADF
A REANL STONE VS RHABDOMYOLISIS
P RENAL FUNCTION

2C-Progress Note
SOAP Charting

Clinical Progress Notes
11/17/11 01:24 pm Performed by LIN RN, GRACE / STAFF NURSE - 437798
Entered on 11/17/11 01:24 pm

Seen by Dr enriquez, order received.

2C-Progress Note
SOAP Charting

Clinical Progress Notes
11/17/11 05:03 pm Performed by ROBLES , KAREN /REGISTERED NURSE-499691
Entered on 11/17/11 05:03 pm

O: Went to Pt's room for 1600 pill call and Pt
was not there, per AJIS Pt is on pass to
infirmary 02

2C-Progress Note
SOAP Charting

Clinical Progress Notes
11/18/11 03:20 pm Performed by MOUAWAD , RAE E./NURSING ASSISTANT-545067
Entered on 11/18/11 03:20 pm

not in cell, out on pass at this time

2C-Progress Note
2C-Problem
SOAP Charting

Clinical Progress Notes
12/11/11 08:57 am Performed by HUYNH, ROWENA J. / RN - 517496
Entered on 12/11/11 09:25 am

S/P Altercation.
S-Pt. stated, "Just get rid of the spray. My eyes
burn. That's all your bitch asses. Shit it hurts.
Spray my eyes. " Pt. complains of burning to the
face and pain and tingling to his back from the
taser. Pt. denies any other pain or injury at
this time.

O-Pt. was escorted to the main clinic by Lt.
Stewart, Sgt. Zonver, Dep. Raniag, and Dep.
Valencia at approx 0845. Pt. is ambulatory with
stable gait. Pt. is AAOx4, skin is warm to touch,
respirations are even and unlabored. No SOB or
difficulyt breathing observed. Pt. is able to
speak in clear coherent sentences and a make
needs known. Pt. is very upset and is very
talkative and complaining. Pt. with hands cuffed
behind his back and upper thighs bound with
hobble. Pt. rocking back and forth while sitting
on the gurney. Pt. with eyes closed and redness

Printed By: GARCIA, MICHELLE R. /
CLERK - 481922
Print Date:  3/7/20148:50:43 AM

Page:     96 of 129

Inmate Name:      JACKSON, ALQUAN
CII Number  :     A12048370
Booking Number: 2249532
Booking Date:  3/4/2010  3:42:00 AM
Date of Birth:    3/16/1984    29 years
Housing Location:

130

Los Angeles County Sheriff's Department

# Inmate Medical Documentation

## Clinical Progress Notes

2C-Progress Note

Clinical Progress Notes
12/11/11 08:57 am Performed by HUYNH, ROWENA J. / RN - 517496
Entered on 12/11/11 09:25 am

around both eyes. No bleeding observed at this time. Two small areas with redness to mid upper back, no bleeding or ecchymosis observed. No taser prongs observed. Pt. able to move fingers without any difficulty. Pt. denies any other areas with pain at this time.

A-Acute pain r/t the effects of s/p OC spray and taser.

P-Administered Bioshied to face and provided eyewash. Comfort measures provided. Will call MOD with report.

| | |
|---|---|
| Heart Rate | 74 |
| Resp | 18 MIN |
| Systolic BP | 103 |
| Diastolic BP | 72 |
| Pain scale | 8 |

---

2C-Progress Note
2C-Problem
SOAP Charting

Clinical Progress Notes
12/11/11 09:26 am Performed by HUYNH, ROWENA J. / RN - 517496
Entered on 12/11/11 10:05 am

MOD call.
O- Report given to MOD Dr. Sarkissian. Pt. with custody at this time. Per MD. upon return reassess eyes and updated him. No other orders received at this time.

---

2C-Progress Note
SOAP Charting

Clinical Progress Notes
12/11/11 10:05 am Performed by HUYNH, ROWENA J. / RN - 517496
Entered on 12/11/11 10:06 am

O-Pt. returned to clinic at approx. 0950. Pt. eyes remained closed but he will open in occasionally. Continue to provided eye wash.

---

2C-Progress Note
SOAP Charting

Clinical Progress Notes
12/11/11 10:06 am Performed by HUYNH, ROWENA J. / RN - 517496
Entered on 12/11/11 10:07 am

O-Report given to nurse Obietikponah for continuity of care.

---

Printed By:  GARCIA, MICHELLE R. /
CLERK - 481922
Print Date:  3/7/20148:50:43 AM

Page:    97 of 129

| | |
|---|---|
| Inmate Name: | JACKSON, ALQUAN |
| CII Number  : | A12048370 |
| Booking Number: | 2249532 |
| Booking Date: | 3/4/2010  3:42:00 AM |
| Date of Birth: | 3/16/1984   29 years |
| Housing Location: | |

13 J

Los Angeles County Sheriff's Department
# Inmate Medical Documentation

**Clinical Progress Notes**

- 465423

2C-Progress Note
SOAP Charting

Clinical Progress Notes
12/11/11 10:49 am Performed by OBIETIKPONAH RN, ESTHER N. / STAFF NURSE

Entered on 12/11/11 10:52 am

S--Stated, "I feel better, now I can see."

O--Inmate alert, oriented, opened eyes very well,
no more yelling, breathing even and not labored.
He was escorted back to his module by Deputy
Medcarf. No apparent discomfort observed at this
time.

2C-Progress Note
2C-Problem
SOAP Charting

Clinical Progress Notes
12/16/11 04:30 pm Performed by DAYANGHIRANG, EVELYN O / SNS - 507197
Entered on 12/16/11 07:15 pm

telemedicine line
Patient informed and consent signed for
telemedicine consultation, as well as education
about the procedure and its confidentiality,
verbalizes understanding. RNP Clouse evaluated
patient for his complaints of, rashes on his face
fungal infection on his toenail, as well as
numbness and tingling of hands. Neuro line and
new medication ordered.

Temperature
Heart Rate
Resp
Systolic BP
Diastolic BP
Pulse Oximeter

98.0 DEGF
80
18 MIN
128
70
98
Comment: room air

436225

2C-Progress Note
SOAP Charting

Clinical Progress Notes
12/19/11 03:35 pm Performed by CELAJE RN, JANET A. / STAFF NURSE -

Entered on 12/19/11 03:38 pm

Pt. housed in 121 not appropriate for self med
program, ketoconazole and tolnaftate changed to
routine pill call, order obtained from Dr.
Silvanskaya.

SPECIALIST, M. D. 519431

Updated on
12/23/11 07:34 am by LAUGHLIN, LAWRENCE L./PHYSICIAN, SPECIALIST, M. D. 519431

2C-Progress Note
SOAP Charting

Clinical Progress Notes
12/23/11 07:31 am Performed by LAUGHLIN, LAWRENCE L./PHYSICIAN,

Entered on 12/23/11 07:32 am

PATIENT C/O TOOTHACHE. HE IS ALREADY SEEING THE
DENTIST

Printed By: GARCIA, MICHELLE R. /
CLERK - 481922
Print Date: 3/7/20148:50:43 AM

Page: 98 of 129

Inmate Name:      JACKSON, ALQUAN
CII Number  :     A12048370
Booking Number:   2249532
Booking Date:     3/4/2010  3:42:00 AM
Date of Birth:    3/16/1984    29 years
Housing Location:

132

# EXHIBIT COVER PAGE

C

EXHIBIT

Description of this Exhibit: LASD USE OF FORCE POLICY

Number of pages to this Exhibit: 21 pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

133

### 3-10/000.00  PREAMBLE TO THE USE OF FORCE POLICY

The Los Angeles County Sheriff's Department is committed to the sanctity and preservation of life, human rights, and the dignity of every individual as described in Our Core Values.  Department members are sometimes required to use force in self-defense, defense of others, and during the execution of lawful duties.  In all situations, Department members are required to conduct themselves in accordance with lawful and constitutional standards.

As leaders on the Sheriff's Department, all members shall view their duties in the context of safety for themselves and others, with an emphasis on respect, professionalism, and reverence for human life, even when force is required.

In cases where Sheriff's Department personnel must take action to conduct lawful duties where there is not necessarily an immediate physical threat, members shall take into account and communicate (where applicable) tactical considerations predicated on preventing the use of force whenever possible.

For planned tactical operations, such as service of warrants, parole compliance searches, tactical cell extractions, and prolonged passive resistance, members shall develop a tactical plan predicated on preventing the use of force whenever possible. Supervisors shall be present during planned tactical operations.

The Sheriff's Department is committed to upholding lawful, professional, and ethical standards through assertive leadership and supervision before, during, and after force incidents.  This includes force prevention efforts, effective tactics, dispassionate and objective review, and analysis of every incident.

### 3-10/005.00  FORCE PREVENTION PRINCIPLES

Department members shall only use that level of force which is objectively reasonable, and force should be used as a last resort.  Department members should endeavor to de-escalate confrontations through tactical communication, warnings, and other common sense methods preventing the need to use force whenever reasonably possible.

When force must be used, Deputies and staff shall endeavor to use restraint techniques when possible, and use only that level of force necessary for the situation.

### 3-10/010.00  USE OF FORCE DEFINED

Force is defined as any physical effort used to control or restrain another, or to overcome the resistance of another.

134

### 3-10/020.00  AUTHORIZED USE OF FORCE

Department members are authorized to use only that amount of force that is objectively reasonable to perform their duties.  "Objectively reasonable" means that Department members shall evaluate each situation requiring the use of force in light of the known circumstances, including, but not limited to, the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the member or others, and whether the suspect is actively resisting, in determining the necessity for force and the appropriate level of force.  Department members maintain the right to self-defense and have a duty to protect the lives of others.

### 3-10/030.00  UNREASONABLE FORCE

Department members shall use only that force which is objectively reasonable. Unreasonable force is that force that is unnecessary or excessive given the totality of the circumstances presented to Department members at the time the force is applied. Unreasonable force is prohibited.  The use of unreasonable force will subject Department members to discipline and/or prosecution.

NOTE:       The basis in determining whether force is "unreasonable" shall be consistent with the Supreme Court decision of *Graham v. Connor*, 490 U.S. 386 (1989).

### 3-10/040.00  PROHIBITED FORCE

The following uses of force are prohibited unless circumstances justify the use of deadly force:

- head strike(s) with an impact weapon;
- deliberately or recklessly striking an individual's head against a hard, fixed object (e.g., roadway, driveway, concrete floor, wall, jail bars, etc.);
- from a standing position kicking an individual in the head with a shod foot while the individual is lying on the ground/floor; and/or,
- kneeing an individual in the head, deliberately or recklessly causing their head to strike the ground, floor, or other hard, fixed object.

### 3-10/050.00  DIRECTED FORCE DEFINED

Force used in the execution of one's duties under the immediate direction of a supervisor shall be classified as **Directed Force**.

135

to have been involved in, or a witness to, the incident, the inquiry shall be assigned to another supervisor.

The supervisor conducting the inquiry shall adhere to the following guidelines:

- follow up on information provided by the individual making the allegation (i.e., interview person(s) whom the individual said were present and/or witnessed the incident, look for and collect evidence that the individual mentions);
- collect evidence and take statements;
- take photographs of the location, if appropriate;
- review any medical records (in cases of an inmate, review the inmate injury report). If an inmate injury report was not prepared for an inmate, ensure that one is prepared and the inmate is medically treated;
- photograph all visible injuries (if applicable); and, thoroughly document/describe all statements taken and evidence collected; and
- determine if the force incident was recorded and secure any such recordings of the incident.

An inquiry into a force allegation shall be documented in a memorandum from the supervisor to the Unit Commander and shall include the supervisor's conclusions regarding the validity to the allegation. The Unit Commander shall take one of the following actions:

- close the inquiry if there is no validity to the allegation;
- initiate an administrative investigation if the inquiry reveals possible misconduct that could result in discipline, such as unreported use of force; or
- initiate a criminal investigation if the inquiry reveals reasonable suspicion that a crime occurred (e.g., assault under the color of authority).

Closed force allegation inquires shall be forwarded to the concerned Division Chief or Division Director for review/concurrence and subsequently forwarded to the Discovery Unit for retention.

## 3-10/115.00  VIDEO REVIEW AND ADMONISHMENT

The Sheriff's Department and its personnel have a duty to accurately report the facts of every force incident through normal reporting procedures. This includes amendments and supplemental reports when additional information or clarification is available.

Department members shall prepare all necessary written reports related to a force incident prior to reviewing a video recording of the incident. Upon completion of the written report, involved Department members shall be provided the opportunity to review the recorded incident for the purposes of refreshing their memory after the Field Sergeant or immediate supervisor has reviewed the first reports and any separate supplemental reports of the force incident, and concluded that there is no such evidence

136

of apparent misconduct, or a failure to properly notify.  Once the video tape has been reviewed, personnel will have the opportunity to acknowledge in their report that they observed the video and that it either refreshed their memory, adding any corrective language, or that the original written statements were accurate.

Because Department personnel are required to provide a written account of their actions prior to viewing video recordings, the Department will not assume an adverse inference when personnel amend or supplement their reports if a video review prompts further recollection of incident details.  Whether an adverse inference should be drawn from amendment or supplement will depend upon the facts and circumstances in each case.

Any review of a recording by a Department member shall be documented in their reports and should not be undertaken in the presence of another Department member who was either involved in, or a witness to, the force incident.  Should the review enable a Department member to provide greater clarity to any incident based upon additional recollection or perception of specific actions, the member shall either amend their initial report, or prepare a separate supplemental report.  Any additional information should be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows:".

Prior to reviewing any video recording, Department members shall read the following admonition:

**VIDEO ADMONISHMENT**

*You are about to view a video recording. It is important to understand that while this recording depicts visual information from the scene, the human eye and brain could perceive some things in stressful situations differently than a camera records them, so this photographic record may not reflect how the involved personnel actually perceived the event.*

*The recording may depict things that personnel did not see or hear. Personnel may have seen or heard things that were not recorded by the camera. Depending on the speed of the camera, some action elements may not have been recorded or may have happened faster than personnel could perceive and absorb them. The camera has captured a 2-dimensional image, which may be different from a person's 3-dimensional observations. Lighting and angles may also have contributed to different perceptions.*

*This recording is being shown in order to facilitate recollection of the incident. Video images are only one piece of evidence to be considered in reconstructing and evaluating the totality of the circumstances. Some elements may require further exploration and explanation before the investigation is concluded.*

*Additional admonishment to personnel involved in recorded incident:*

9.

*If the video appears to show some details of the incident differently from what you recall, you should note those differences in your report.*

## 3-10/110.00  USE OF FORCE REVIEW PROCEDURES

<u>Immediate Supervisor's Responsibilities</u>

   <u>Responding to Force Incidents</u>

The Field Sergeant or immediate supervisor shall respond without unnecessary delay to any incident involving Reportable Force, and advise the Watch Commander or Supervising Lieutenant of any Reportable Force incident.

With respect to any Category 1 or Category 2 Force incident, the Field Sergeant or immediate supervisor shall do the following:

- locate and interview all potential witnesses, including Department personnel and, in custody force cases, medical staff, chaplains, and any other civilians who may have been present, and document their statements, including those who could have witnessed but claim not to have witnessed the incident;
- photograph and/or record the scene in conditions as near as possible to those at the time of the force incident, if appropriate;
- determine if the force incident was recorded and secure any such recordings of the incident whenever able to do so;
- ensure that Department members who used force or witnessed force prepare required reports in a timely manner;
- review first reports and separate supplemental reports or memorandums to ensure that, consistent with this section, they describe in detail the actions of the suspect necessitating the use of force and the specific force used in response to the suspect's actions;
- in cases where a recording has been secured, if the supervisor determines, after their initial review of the video and the incident reports, that there is evidence of apparent misconduct, or it appears that a Department member failed to make proper notifications of the incident, the supervisor should consult with the Watch Commander or Supervising Lieutenant before proceeding further (refer to Watch Commander/Supervising Lieutenant's Responsibilities subsection);
- after first reports and separate supplemental reports have been reviewed by the supervisor, and where there is no such evidence of apparent misconduct, or a failure to properly notify, afford Department members an opportunity to review the recording of the force incident to facilitate recollection of additional details (refer to MPP section 3-10/115.00, Video Review and Admonishment);
- complete a "Supervisor's Report, Use of Force" (SH-R-438 P) documenting each member who used force, or witnessed force;
- interview the attending physician or other qualified medical personnel, when the suspect is taken to a medical facility for examination, as to the extent and nature of the suspect's injuries, or lack thereof, and whether the injuries are consistent

138

The Electronic Immobilization Belt is a less lethal electronic restraint device designed for the control and temporary immobilization of County inmates, prisoners from other jurisdictions and defendants. The belt is designed to provide a greater measure of control of suspects whose actions pose a threat to their own safety, or the safety of others. Activation of the Electronic Immobilization Belt, while it is being worn, shall be in accordance with the Department's Situational Use of Force Options Chart in the "High Risk/Assaultive" category.

The Department approved Electronic Immobilization Belt shall consist of a belt carrier, transmitter, receiver, stun package and a power source. The belt carrier shall be made of four inch wide heavy duty nylon, with built-in restraints for additional security. The receiver shall be controlled by an "on/off" key lock switch. An additional belt carrier made of five inch wide soft nylon, with no additional restraint levels can also be used interchangeably with the listed components. Personnel will be qualified to use the Electronic Immobilization Belt only after successfully completing Department approved training.

## 5-06/040.95   ELECTRONIC IMMOBILIZATION DEVICE (TASER) PROCEDURES

The TASER is a less lethal hand held electronic immobilization device used for controlling assaultive/high risk persons. The purpose of this device is to facilitate a safe and effective response in order to minimize injury to suspects and deputies.

### Use of the Electronic Immobilization Device (TASER)

The following policy guidelines shall be adhered to:

- only a Departmentally approved TASER shall be utilized by personnel;
- a TASER shall be issued to and used only by those personnel who have completed the Department's TASER Training Program;
- personnel authorized to carry a TASER on duty, may purchase a Departmentally approved TASER for on and off duty use;
- prior to the use of the TASER, whenever practical, Department personnel shall request a supervisor;
- any individual subjected to an application of the TASER, in either the "probe" or the "touch/drive stun" mode, shall be taken to a medical facility prior to booking, for appropriate medical treatment and/or removal of the probes; and
- application of the TASER shall be discontinued once the suspect does not pose an immediate threat to themselves, Department personnel or the public.

Except in emergent circumstances, the TASER should not be applied to the following or used in any other situation where there is a reasonably foreseeable likelihood of severe injury or death. In the extraordinary instance that Department personnel feel compelled to utilize the TASER in the following circumstances, the conduct of the involved

139

personnel shall be evaluated in accordance to the Use of Force policy with sound tactical principles.

- handcuffed persons;
- persons detained in a police vehicle;
- persons detained in any booking or holding cell;
- persons in control of a motor vehicle;
- persons in danger of falling or becoming entangled in machinery or heavy equipment which could result in death or serious bodily injury;
- persons near flammable or combustible fumes;
- persons near any body of water that may present a drowning risk; and
- persons known to have a pacemaker or known to be pregnant.

The Custody Division Manual may define criteria for a unique application of the TASER within a custodial setting.

Verbal Warning

Unless it would compromise officer safety or is impractical due to circumstances, a verbal warning of the intended use of the TASER shall precede the activation of the device in order to:

- provide the individual with a reasonable opportunity to voluntarily comply; and
- provide other sworn personnel and individuals with a warning that a TASER may be activated.

The fact that a verbal and/or other warning was given or reasons it was not given shall be documented in any related reports.

Authorized Department personnel discharging a TASER shall request the response of a supervisor if not already en route or on-scene.

Reporting the Use of the Electronic Immobilization Device (TASER)

The use of the TASER, either by utilizing the probes or the touch/drive stun mode, shall be reported as a "significant" use of force as defined in the Department Manual of Policy and Procedures, section 3-10/100.00, "Use of Force Reporting and Review Procedures."

Whenever a use of a TASER requires force reporting, a download of the TASER stored data and video shall be conducted and submitted with the force package.

Personally Owned Electronic Immobilization Devices (TASER)

Authorized Department personnel shall only carry Department authorized Electronic Immobilization Devices (TASER) whether on or off-duty.

140

that the suspect(s) is unaware of the Aero unit's presence.  The Aero unit shall advise the Watch Commander of the rooftop number of any unit that does not immediately reduce its speed and disengage from the pursuit.  If the suspect vehicle does not slow to normal traffic speeds after a reasonably short time during Surveillance Mode, the operation shall be discontinued.  If the suspect vehicle stops, ground units will be advised and a tactical containment may be initiated unless prohibited by the Watch Commander.  Refer to MPP section 3-10/150.00, Tactical Incidents.  Once the suspect vehicle has stopped, the Watch Commander may allow a primary and one or more back-up units to respond to the terminus Code 3.

The Watch Commander, Aero unit, Field Supervisor, or primary unit is encouraged to employ Surveillance Mode as an operational tactic to allow termination of a pursuit, whether or not "unreasonably dangerous" conditions exist.

### 5-09/210.20  USE OF FIREARMS DURING PURSUITS

The use of firearms against moving motor vehicles is inherently dangerous and almost always ineffective.  Personnel engaged in pursuits shall conform to the policy regarding use of firearms against motor vehicles as described in MPP section 3-10/220.00, Assaults by Moving Vehicles - Firearms Policy.

### 5-09/220.05  DEPUTY HAS BEEN FIRED UPON

When a Deputy has been involved in a shooting and has been fired upon, he shall broadcast a "998" through SCC if the situation warrants.  Often, Deputies who are involved in shootings either wound or kill their opponent and terminate the shooting incident in a matter of seconds.  To issue a Code 998 broadcast when only minimal assistance is required would cause needless hazard to responding Deputies rolling rapidly to a non-emergent situation.  Code 998 will not be used merely to signify that a Deputy has fired his weapon.

The response shall be the same as for a "997" unless the requesting Deputy limits or increases the number of field units required.

### 3-02/035.00  PREAMBLE TO FORCE MANUAL – CUSTODY DIVISION MANUAL

It is the Sheriff's Department's responsibility to provide a safe custody environment for the inmates and a safe working environment for Sheriff's personnel.  All employees shall view their professional duties in the context of safety for themselves, other employees, and inmates.

All jail personnel should maintain a professional demeanor, according to each situation, keeping in mind the Department's Core Values.  All Department members shall focus on upholding safety, respect and professionalism, even in situations where force is

141

required.  Our collective and individual goal is to prevent force through effective
communication emphasizing safety, respect, and professionalism as emphasized in the
Department's Core Values.

### 3-02/035.05  FORCE PREVENTION POLICY

Department members shall only use that level of force which is objectively reasonable
to uphold safety in the jails and should be used as a last resort.  Reasonable efforts,
depending on each situation, should be made by jail personnel to de-escalate incidents
by first using sound verbal communications when possible.  If verbal communications
fail, reasonable efforts should be made to call a supervisor to assist in seeking
compliance from disruptive inmates (Refer to CDM 5-05/090.05, Handling
Insubordinate, Recalcitrant, Hostile or Aggressive Inmates).

When force must be used, deputies and staff shall endeavor to use restraint techniques
when possible, and use only that level of force required for the situation.

> NOTE:  In the Supreme Court decision of *Hudson v. McMillan*, **503 U.S. 1
> (1992)**, it was held that, "the use of excessive physical force against a prisoner
> may constitute cruel and unusual punishment even though the inmate does not
> suffer serious injury."  The "core judicial inquiry is. . .whether force was applied in
> a good faith effort to maintain or restore discipline. . . In determining whether the
> use of force was wanton and unnecessary, it may also be proper to evaluate the
> need for application of force, the relationship between that need and the amount
> of force used, the threat 'reasonably perceived by the responsible officials,' and
> 'any efforts made to temper the severity of a forceful response.' The absence of
> serious injury is therefore relevant to the Eighth Amendment inquiry, but does not
> end it."

### 3-02/035.10  PLANNED, DIRECTED AND SUPERVISED FORCE

When force is required, every effort shall be made to plan, supervise, and direct force in
an effort to control confrontations in a calm and professional manner.

In cases where Sheriff's Department personnel must take action to conduct lawful
duties where there is not necessarily an immediate physical threat, such as prolonged
passive resistance or cell extractions, there shall be a tactical plan predicated on
preventing the use of force whenever possible.  Supervisors shall be present during
planned tactical operations.

### 3-02/035.10  PLANNED USE OF FORCE FOR INMATES WITH SPECIAL NEEDS

If a situation arises involving a special needs inmate, the appropriate medical or mental
health staff should be consulted, whenever possible, prior to the planned use of force.

142

### 5-12/005.05  ANTI-RETALIATION POLICY

Inmates shall not be subject to retaliation for any reason.  When inmate conduct requires a response from Department members, it shall be handled through the criminal justice system, inmate disciplinary system, or other methods consistent with the Department's Core Values, policies, and procedures.

Inmates shall not be threatened, intimidated, mistreated, abused, denied privileges, denied access to programs or services, or disciplined in retaliation for speaking with a legal representative, any inmate advocacy organization, any investigative entity, or for expressing dissatisfaction with any Department personnel or any conditions of confinement such as:

- Meals,

- Housing,

- Exercise,

- Visiting,

- Mail,

- Showers,

- Phones,

- Commissary,

- Medical treatment or medications,
- The performance of duties of Custody, Department of Mental Health, or Medical Services personnel.

Inmates are part of a community inside the jail system and shall not be discouraged from filing or expressing complaints, requests, or recommendations to Department members.  Inmates shall also have the right to communicate with legal representatives, inmate advocacy organizations, or any investigative entities about complaints or personal legal matters.  Members shall not ask inmates for details of their communications, or interfere with the intent to discourage complaints.  Department member's relationships and communications with inmates shall remain professional at all times.

143

Department members shall not remove, destroy, or deprive an inmate from
correspondence, including names, phone numbers, contact information, or any
information that is used for legitimate and lawful purposes.

The unit commander shall immediately forward a copy of the retaliation complaint to
Custody Services Division Headquarters.  The complaint shall be reviewed by the area
commander, as directed by the respective Division chief, and forwarded to the
appropriate unit for handling within the fifteen (15) day time frame as outlined in the
inmate complaint policy.

## 4-01/025.00  INMATE ASSAULT AND FORCE REPORTING IN F.A.S.T.

Supervisor Responsibility

When *any* assault, inmate on staff or inmate on inmate (e.g. battery, assault with a
deadly weapon, etc.) occurs within the Custody Services Divisions, it is the
responsibility of the handling supervisor to ensure the completion of the Inmate Assault
Load Sheet.  This form shall be completed in addition to any other required reports (see
Custody Division Manual section 4-07/010.00, "Notification and Reporting of Significant
Incidents").  Data from load sheets shall be entered into the Facilities Automated
Statistical Tracking (F.A.S.T.) system.  Inmate Assault Load Sheets shall not be
completed if an Inmate Disturbance Load Sheet is completed (see Custody Division
Manual section 4-01/020.00, "Disturbance Reporting").  The handling supervisor shall
also ensure the completion of a load sheet for any reportable force incident.

Watch Commander Responsibility

Following any inmate assault or use of force, the watch commander shall ensure that all
required load sheets are completed by the handling supervisor prior to the end of the
shift.  A copy of the completed load sheet(s) shall be forwarded to the Unit Statistical
Coordinator for entry into the F.A.S.T. system.

The original load sheet shall be placed into the URN file.  A second copy shall be placed
in the related use of force package(s).

Statistical Coordinator Responsibility

Upon receipt of a load sheet, the Unit Statistical Coordinator shall ensure that data is
entered into the F.A.S.T. system by the next business day.  Load Sheets generated
from Friday afternoons through Sunday shall be input on Monday (holidays exempt).

Unit Commander Responsibility

Prior to the final approval of a use of force packet, unit commanders shall ensure the
data from load sheets was accurately captured in F.A.S.T. and the Command
Accountability Reporting System (C.A.R.S.).

144

## 4-01/025.10  INMATE RETALIATION REPORTING IN F.A.S.T.

The unit commander shall be responsible for reviewing all retaliation complaints, and ensure all allegations of retaliation are entered into the Facility Automated Statistical Tracking (FAST) system as well as forwarded to the Area Commander.  The unit commander should refer to the inmate complaint policy and 5-12/005.05 Anti-Retaliation Policy for the handling of retaliation complaints.

The Unit Statistical Coordinator shall ensure that data is entered into the F.A.S.T. system by the next business day.  Load Sheets generated from Friday afternoons through Sunday shall be input on Monday (holidays exempt).

## 4-07/005.00  CUSTODY FORCE REVIEW COMMITTEE

The Sheriff's Department has created a custody facility specific Custody Force Review Committee comprised of three commanders assigned to one of the Custody Services Divisions, one of whom will be appointed as Chairperson.  Additionally, a member of the Office of Independent Review (OIR) will participate as a monitor and provide input.  The goals of the Custody Force Review Committee are to evaluate the force applied within custody facilities, the quality of Use of Force investigations, and the effectiveness of supervision in their units.

The Custody Force Review Committee (CFRC) shall review all Category 2 force incidents subject to oversight by the Custody Force Response Team (CFRT).  Refer to CDM 4-07/005.05, Custody Force Response Team.  In addition, the CFRC can review incidents at the request of a unit commander or based on factors such as an increase in force incidents by facility, shift, or employee.

The CFRC will calendar completed force packages for review and will require the unit commander (or his or her designee); the handling facility sergeant, and the approving watch commander to attend.  They shall be prepared to discuss specifics of the force incident, answer questions about the incident and the force review, and justify their recommendations regarding the incident.  The CFRC shall review the force incident as a whole, including the events that precipitated the use of force and any prevention efforts (if applicable), as well as the quality of the force review.  The handling Custody Force Response Team sergeant will present the basic facts of each incident and will act as a subject matter resource.

The CFRC chairperson shall report the Committee's finding, including recommendations, to the specific unit commander via memorandum.  Recommendations to debrief involved and/or uninvolved personnel provide additional training, or conduct counseling shall be included in the Committee's memorandum.  Exemplary performance or conduct shall also be acknowledged and appropriate commendations recommended.

145

The unit commander shall evaluate the Committee's findings, act on their recommendation(s), document their actions, address any disagreements, and report back to the Committee within thirty (30) business days.

If the CFRC determines that the force incident may have involved a violation of the Department policy, the specific Manual of Policy and Procedures section(s) shall be cited in the Committee's findings.  The CFRC shall order that an administrative investigation be opened and assigned to the appropriate unit, which in the case of Category 2 force incidents shall be the Internal Affairs Bureau.

When completed, the administrative investigation shall be returned to the respective facility unit commander for disposition.  Prior to issuing a Letter of Intent, the unit commander shall report on the findings of the investigation at the next scheduled CFRC session.  The disposition shall then be processed through normal channels with the respective Custody Services Division chief having final approval.  Discipline imposed as a result of CFRC review can be grieved via the normal grievance process.

Issues concerning tactics, training, and/or policy revisions shall be cited and a memorandum forwarded to the appropriate Department Unit/Bureau for consideration.  After review by the CFRC, the Force Package shall be returned to the facility for processing to the Discovery Unit.

## 4-07/005.05   CUSTODY FORCE RESPONSE TEAM

The goal of the Custody Force Response Team (CFRT) is to ensure high quality force investigations through incident oversight and investigative evaluation.  The (CFRT) is comprised of sergeants, designated to respond to specific force incidents, where they shall monitor various aspects of the inquiry, including but not limited to:  interviewing participant employees, inmates, and witnesses, examining any video or evidence and monitoring the facility supervisor as they conduct their inquiry.

### CFRT Notification

Watch commanders shall make immediate verbal notification to the CFRT lieutenant whenever any of the following force incident criteria are present:

- Significant inmates injuries as a result of employee contact or alleged contact

- Significant employee injuries as a result of inmate contact

- Taser use

- Carotid restraint

146

Significant injuries consist of more than minor redness, swelling, or bruising. Complaints of pain will not be considered notification criteria unless the complaint is regarding the head, neck, or spine; or, may possibly be indicative of an internal injury.

In addition, watch commanders may notify the CRFT lieutenant whenever he or she believes that the investigation of a force incident requires additional oversight and expertise.

All notifications shall be made through Sheriff's Headquarters Bureau:  (323) 267-4800.

## CFRT Response

The CFRT lieutenant shall evaluate the information and determine if response is appropriate and, if so, shall notify the unit commander that the CFRT shall oversee the force investigation and assign a Response Team sergeant to act as an on-scene resource for the handling supervisor, providing information, guidance, analysis and recommendations.

The Response Team sergeants shall in the course of reviewing the incident, the Response Team sergeant may give specific direction to the handling supervisor, if appropriate.  The facility supervisor has the primary responsibility of handling and documenting the force incident; however, the CFRT has the authority to take control and assume responsibility for the investigation.  In the event of policy violations the CFRT lieutenant may initiate a request for an administrative (internal) investigation, through proper channels.

In examining force incidents, Response Team sergeants shall pay particular attention to events that precipitated the use of force and the tactics used.  In incidents where multiple employees are participants, additional focus shall be placed on the actions of responding personnel and the tactics involved in their engagement.

## Unit Commander Duties

The unit commander shall forward the completed Use of Force package to the Custody Training and Standards Bureau captain no later than 30 days after the incident.  The force investigation will then be scheduled for a CFRC review hearing.  Refer to CDM 4-07/0050.05, "Custody Force Review Committee."

When an unforeseen circumstance interferes with a unit's ability to meet the above stated time lines, the unit commander shall advise the CFRC chairperson (commander) and formally request an extension in writing, explaining the reason for the delay.

## 4-07/010.00  NOTIFICATION AND REPORTING OF SIGNIFICANT INCIDENTS

All significant incidents shall be reported to the Division/Department executives. Significant incidents of a serious/extraordinary nature shall be entered into the Custody

147

Division Operational Log.  The purpose of the log is to immediately inform the Division and Department executives of all incidents, actions, and/or events beyond the normal scope of routine operations.   The unit watch commander shall promptly notify the Inmate Reception Center's (IRC) watch deputy by phone of any significant incidents. The IRC watch deputy shall enter all significant incidents in the Custody Division Operational Log and shall maintain the log.

Reference to the Custody Division Manual, section 7-52/000.00, "Significant Incident Notification Matrix," may assist personnel in determining those events to be reported. Significant incidents include, but are not limited to:

- Death or serious injury of any Custody Services Division employee (on or off duty),
- Employee relieved of duty,
- Officer-involved shooting (on or off duty),
- In-custody inmate deaths (natural, accidental, homicide, suicide)*,
- Attempted suicides, where the inmate was transported to the hospital*,
- Major disasters at Custody Services Division facility*,
- Riots or major inmate disturbances (require a Department and Division Log Entry). Minor inmate disturbances do not require a Department or Division Operations Log entry*,
- Escape or attempted escape*,
- Major mechanical failure causing a serious disruption at any Custody Services Division facility*,
- Special Weapons Team responses,
- Any significant incident (visit or arrest) involving a contract city, elected official, foreign official, consular, dignitary, or person of notoriety.
- Facility inspections by other county or government agencies*,
- Local court decisions affecting any Custody Services Division facility (housing, injunctions, suits, etc.),
- Interviews by news media,
- Any incident of significant risk management liability*,
- Off duty incidents,
- Erroneous releases,
- Mattress sleepers.

*In the event of the above significant incidents marked with an (*) occur *in* any facility within Custody Services Divisions, the watch commander (or designee) shall contact Custody Support Services (CSS) via telephone at (424) 234-6798, within thirty (30) minutes from the time of occurrence.

Additionally, all significant incidents require a memorandum to the respective Division chief from a unit commander and/or a memo from the respective Division chief to the Sheriff. This report shall be typed, approved by the unit watch commander, and delivered or E-mailed to the respective Division chief's office without delay.

148

If the significant incident occurs during the evening or early-morning hours, or during a weekend/holiday period, the report/memorandum shall be delivered to the respective Division chief's office prior to 0830 hours the following business day. A copy of the Significant Incident Notification Log of the incident shall accompany the memo.

The concerned unit's watch commander shall also initiate the following actions in response to a significant incident:

- Notify all Custody unit commanders via computer E-mail system in the event of a riot or major inmate disturbance,
- Initiate E-mail to appropriate units, including the respective Division chief's office,
- Telephonically notify the concerned area commander prior to sending the required memorandum,
- Ensure that the proper Significant Incident Notification Log forms have been filled out completely and a copy forwarded with the appropriate memorandums.

Minor Inmate Disturbances

It is not necessary to report minor inmate disturbances for inclusion in the Custody Division Operational Logs. However, minor inmate disturbances shall be recorded in the facility log. Notification of the incident to the area commander and the respective Division chief by memorandum is required.

Refer to the Custody Division Manual, section 7-18/000.00, "Facility Significant Incident Log", section 7-34/000.00, "Inmate Significant Incident Log", and section 7-17/000.00, "Employee Significant Incident Log."

4-07/015.00   NOTIFICATION OF INCIDENTS TO CUSTODY INVESTIGATIVE SERVICES UNIT (CISU)

Unit commanders, or their designees, shall notify CISU upon the discovery of a serious criminal event.

A serious criminal event includes but is not limited to the following:

- Attempted murder,

- Assault with a deadly weapon (resulting in great bodily injury and/or hospitalization),

- Assault on staff (resulting in felonious injury, including 69 PC, 148 PC and 243(b) PC),

- Significant sexual assault,

53

149

- Attempt escape,

- Any significant inmate disturbance event, particularly those deemed to be of a racial motivation.

The CISU lieutenant or sergeant shall determine the appropriateness for an immediate response of investigative resources based on the nature of the crime/incident.

All CISU notifications during normal business hours shall be made directly to CISU. After normal hours, notifications shall be made to the Twin Towers Correctional Facility's (TTCF) Main Control which shall make immediate contact with the CISU lieutenant or designated sergeant who will in turn, contact the individual requestor of services.

## 4-07/015.05  USE OF FORCE PACKAGE

Watch commanders/supervising lieutenants of the Custody Services Divisions shall prepare and submit a force review package to the unit commander for all reviews of force not conducted by an Internal Affairs Bureau (IAB) Force/Shooting Response Team. In addition to the required items set forth in the Manual of Policy and Procedures (MPP) Use of Force policies, Custody Services Division force review packages shall include the following items:

- Involved employee's use of force memos if no SH-R-49 was submitted,
- In cases of hospital/urgent care treatment or when the inmate is scheduled for a follow-up examination, that a timely additional investigation was conducted to verify the injuries or inmate's medical status,
- Audio or video recordings (Closed Circuit Television (CCTV) or hand-held camera) of the actual incident (if applicable),
- In instances of the Total Appendage Restraint Procedure (TARP) being applied, the TARP-related information obtained from the immediate supervisor, as outlined in the Immediate Supervisor's Responsibilities subsection, shall be documented in the memorandum. For additional information, refer to Manual of Policy and Procedures (MPP) section 3-01/110.22, "Total Appendage Restraint Procedure (TARP)",
- Inmate Inventory by Permanent Housing Location (Purge), if applicable,

### Review of Multi-media Documentation

Custody Services Division watch commanders shall personally review any facility CCTV footage, video and audio recordings, and any photographs that are related to a force investigation they are assigned to review and approve.

54

150

Watch commanders shall include the following notation at the end of the "Watch Commander's Review" section of the Supervisor's Report on Use of Force (Form SH-R-438P):

> "I have viewed all video and audio recordings (including facility CCTV, handheld camera footage of the incident, interviews, and photographs) that document any aspect of this force incident."

If the facility has a CCTV system and no video is available for the incident, the watch commander shall indicate the reason (for example: the system was down, no camera is positioned to cover that area of the facility). The watch commander shall document if a repair request was submitted, if a new camera needs to be installed to provide additional coverage, or whatever remedy was required to address the problem.

The unit commander shall follow-up on the video issues noted by the watch commander and shall ensure the problem is remedied.

Submission of Force Package

Refer to MPP section 3-10/110.00, "Use of Force Review Procedures."

## 5- 03/115.00 PREGNANT INMATES

Upon arrival at a custody housing facility, female inmates shall be screened by medical personnel and, if requested, provided a pregnancy examination.  Inmates who are deemed by medical staff to be pregnant shall receive the following considerations:

- A balanced, nutritious diet approved by a doctor,

- Prenatal and postpartum information and healthcare, including, but not limited to, access to necessary vitamins as recommended by a doctor,

- Information pertaining to childbirth education and infant care,

- A dental cleaning

Restraining Pregnant Inmates

When security demands require the restraint of a pregnant inmate, while either in a custody facility or during transportation, the inmate shall be restrained in the least restrictive manner possible.  The method of restraint shall be consistent with the legitimate security needs of each inmate, as determined by the inmate's criminal history and propensity for violence or escape.

Labor and Childbirth

55

151

team or other inmate. Impact munitions shall not be used against passive resistors.

- 40 MM Baton Round: Use of these weapons shall be limited to situations wherein an inmate is known to be armed with a deadly weapon or object that could be utilized to inflict serious bodily injury, or to overcome the inmate's use of deadly force or other assault that could result in serious bodily injury or death.  Further, it shall be used only as a last resort, when no other less-lethal means, including the Stinger round, can reasonably be employed to neutralize the threat.  The 40 mm Baton round and Stinger rounds shall not be utilized against an inmate or group of inmates as merely a diversionary tactic.

Strict control shall be maintained with the ultimate responsibility for the use of these weapons resting with the unit commander. Within this responsibility, the unit commander must ensure that watch commanders are cognizant of all Departmental orders and regulations pertaining to their use, and that the manufacturers guidelines are followed.

## 5-05/090.00  ESCORTING PROCEDURES FOR COMBATIVE OR UNCOOPERATIVE INMATES

The following procedures are to be used in conjunction with all current use of force policies as well as all other applicable procedures, policies, and guidelines.  At all times Department members shall employ appropriate defensive tactics and control techniques.

Uncooperative inmates being escorted shall be properly handcuffed and searched prior to movement.  To reduce the opportunity for inmates to make false allegations, inmates shall be kept in normal traffic areas.

Inmates who are uncooperative and combative, or have a history of making false allegations, shall be escorted by two Department members, one member being a supervisor.  The movement shall be video recorded.

Personnel involved in an incident/altercation with a recalcitrant, uncooperative, or combative inmate shall not be part of the escorting team.

No section of this policy is intended to preclude Department personnel from making contrary decisions due to exigent/unique circumstances.

Reference the following Custody Division Manual sections 3-04/010.00, "Treatment of Inmates."

152

Strict control shall be maintained with the ultimate responsibility for the use of these weapons resting with the unit commander. Within this responsibility, the unit commander must ensure that watch commanders are cognizant of all Departmental orders and regulations pertaining to their use, and that the manufacturer's guidelines are followed.

## 5-05/090.00  ESCORTING PROCEDURES FOR COMBATIVE OR UNCOOPERATIVE INMATES

The following procedures are to be used in conjunction with all current use of force policies as well as all other applicable procedures, policies, and guidelines. At all times Department members shall employ appropriate defensive tactics and control techniques.

Uncooperative inmates being escorted shall be properly handcuffed and searched prior to movement. To reduce the opportunity for inmates to make false allegations, inmates shall be kept in normal traffic areas.

Inmates who are uncooperative and combative, or have a history of making false allegations, shall be escorted by two Department members, one member being a supervisor. The movement shall be video recorded.

Personnel involved in an incident/altercation with a recalcitrant, uncooperative, or combative inmate shall not be part of the escorting team.

No section of this policy is intended to preclude Department personnel from making contrary decisions due to exigent/unique circumstances.

Reference the following Custody Division Manual sections 3-04/010.00, "Treatment of Inmates."

## 5-05/090.05  HANDLING INSUBORDINATE, RECALCITRANT, HOSTILE, OR AGGRESSIVE INMATES

The following procedures are to be used in conjunction with all current use of force policies as well as all other applicable policies, procedures, and guidelines. When confronted with an immediate threat by an inmate to their safety or the safety of others, personnel shall take necessary and reasonable actions to defend themselves and control the inmate.

An insubordinate or recalcitrant inmate shall be defined as any inmate who displays any of the following characteristics:

153

- Is continually verbally defiant,

- Uncooperative to any verbal commands given by personnel,

- Displays aggressive, assaultive, hostile, or violent behavior toward personnel or other inmates,

- Passively resists the efforts of personnel by ignoring commands or not acknowledging their presence.

Personnel encountering such inmates shall be guided by the following:

- Withstanding the imminent threat of physical injury or the need for immediate intervention, personnel shall request the presence of appropriate back-up and a sergeant or supervising line deputy, prior to handling any recalcitrant inmate.

- Personnel should not make an attempt to enter a cell, dayroom, holding area or confined space to contact or remove an uncooperative, aggressive, hostile or armed inmate unless an immediate threat is present. A sergeant shall develop a planned tactical approach to the situation that will reduce the possibility of physical confrontation or injuries. Tactical equipment, such as OC spray, may be utilized if an inmate displays resistive behavior.

- In the instance of an immediate threat of physical harm or the need for immediate intervention, custody personnel shall not be restricted from taking appropriate action, including the use of force. Should the need arise to use force; all personnel shall immediately contact a sergeant at the conclusion of the incident.

- When the inmate is, or appears to be mentally ill, personnel shall request a sergeant and a mental health professional to respond.

- Should the need arise to confront and/or handcuff a recalcitrant, hostile or aggressive inmate, they shall be searched and kept in normal traffic areas and not be taken to secluded areas such as recreation yards, dayrooms, or laundry rooms, without the direction of a supervisor.

- Inmates who are uncooperative and combative, or have a history of making false allegations, shall be escorted by two deputy or custody assistants, and one sergeant.  The movement should be videotaped in order to safeguard personnel against potential future litigation.

- Personnel involved in an altercation with an insubordinate inmate shall not be part of the escorting team.

72

154

# EXHIBIT COVER PAGE

D

EXHIBIT

Description of this Exhibit: TASER CAM USER MANUAL

Number of pages to this Exhibit: 18 pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

155



# TASER® CAM™ Recorder

## User Manual



Models 22000, 22001, 22002, 22003

 **IMPORTANT SAFETY INSTRUCTIONS.**
Read all warnings and instructions. Save these instructions.

MMU0041 Rev: B

156

# Contents

**4   Chapter 1: Warnings & Cautions**
**4**   General Safety Information
**4**   Battery Safety Information
**6**   Safety Information: General Maintenance & Use
**7**   Safety Information: Loss of Data

**8   Chapter 2: General Overview**
**8**   What is the TASER CAM Recorder?
**8**   TASER CAM General Features
**8**   Minimum System Requirements
**9**   In the Box

**10   Chapter 3: Charging**
**10**   Charging the TASER CAM Recorder
**10**   Charging the TASER CAM Recorder Using the Wall Power Charging Cable

**12   Chapter 4: Software Installation**
**12**   Installing the EVIDENCE Sync Software

**13   Chapter 5: Configuration**
**13**   Configuring the TASER CAM Recorder with EVIDENCE Sync Software
**14**   Viewing Device Information

**15   Chapter 6: Operation**
**15**   Operating the TASER CAM System
**15**   Testing the TASER CAM Recorder
**16**   Using the TASER CAM Recorder

**17   Chapter 7: Records**
**17**   Downloading and Viewing Records
**17**   Uploading Records to EVIDENCE.com Services with EVIDENCE Sync Online
        Software(Available with Evidence Sync 1.30 and Above)
**18**   Viewing Uploaded Videos (Online)
**19**   Viewing the ECD Data (Online)
**19**   Downloading Records to Your Computer with EVIDENCE Sync Offline Software
**20**   Viewing Downloaded Videos (Offline)
**21**   Viewing the ECD Data (Offline)

2

157

**22   Chapter 8:  Use & Care**
22   Storage
22   Cleaning the Lens
**22   Cleaning the** Gold Contacts
22   Battery

**23   Chapter 9: Troubleshooting**
23   Troubleshooting the TASER CAM

158

# Warnings & Cautions

# 1

## General Safety Information

| ⚠ **CAUTION** |
|---|
| Read, study, understand, and follow all instructions, product manuals, warnings, information, training bulletins, and TASER training materials before using the TASER CAM system. Failure to comply could result in injury, system malfunctions, or loss of data. |

## Battery Safety Information

| ⚠ **CAUTION** |
|---|
| Failure to maintain the TASER CAM as instructed may cause the battery, X26 ECD or system to malfunction or fail to function properly or optimally. Follow and comply with the following instructions to reduce the risk of malfunction, including failure: |
| **Charge the Battery Before Use.** The TASER CAM battery must be charged and functional prior to use. Be aware that a battery can fail to function, fail to charge, fail to maintain a charge, or deteriorate over time. Properly maintain the battery and ensure that it is fully functional. |
| **Cleaning Battery Terminals.** In case the battery terminals (electrical contacts) are contaminated, clean the terminals with a dry cloth before use. Otherwise power failure or charge failure may occur due to the poor connection between the battery and the electronic circuitry of the device. |

# General Overview

2

## What is the TASER CAM Recorder?

The TASER CAM recorder is an optional accessory for use with TASER X26™ electronic control device (ECD).  It does not change any of the existing functions of the weapon.  The TASER CAM system, with its microphone and light-sensitive camera, adds audio and video recording capabilities to the X26 ECD.  It is also rechargeable.

The TASER CAM recorder can be configured without the audio recording capability for locations where audio recording is restricted.  Configuration settings are available in the EVIDENCE Sync software.

The TASER CAM recorder works with EVIDENCE Sync software to download audiovisual files onto a local computer or server and store them in a searchable library.  Files may also be stored on the EVIDENCE.com website, offering digital storage in a highly secure easily accessible environment.

## TASER CAM General Features

The latest TASER CAM recorder improves upon the previous TASER CAM product with enhanced image and sound quality.

A fully charged battery will provide enough power for approximately 100 5-second firings and approximately 4.5 hours of video/audio recording at VGA quality.

The TASER CAM system records both video and audio any time the ECD's safety is in the up (ARMED) position, and stops recording when the safety is in the down (SAFE) position.

NOTE: There is an approximate 2-second delay between the safety switch being placed in the up (ARMED) position and when the TASER CAM begins to record.

The TASER CAM recorder stores the video and audio records; the X26 ECD stores the firing records.  Because these data are kept in different places, the same recorder and ECD should be used together.

There is a distinct difference between the TASER CAM battery and a DPM/XDPM battery pack. The TASER CAM battery supplies less voltage to the X26 ECD than a standard X26 DPM/XDPM battery pack, therefore when a TASER CAM is installed the X26 ECD's Low Intensity Lights may flash when the unit is firing. This is normal and DOES NOT indicate a low battery or a low power output.

## Minimum System Requirements

- Windows® 2000, 2003, XP, or 7
- Microsoft Direct X® (Version 7.0 or greater for exported incident video processing)

8

*160*

- Adobe® Reader®
- Apple® QuickTime® or VLC™ media player
- Pentium® 4 or AMD Athlon™ processor
- 128 MB of RAM
- Audio card
- Video card (800 x 600 resolution or better, with 24-bit color)
- PATA hard drive with at least 2 GB of available disk space
- Internet access (recommended)
- 2.0 self-powered USB BUS or HUB

## In the Box

Your TASER CAM system includes a wall charger assembly.  A USB download cable is available separately.



Wall Charger                              TASER CAM

*161*

# Charging

# 3

## Charging the TASER CAM Recorder

*Ensure that you fully charge the TASER CAM recorder before the first use (before it is inserted into an X26 ECD).*

For any subsequent charging performed with the recorder inserted in the ECD, ensure that the safety switch is in the down (SAFE) position and that the cartridge is removed from the ECD.

Depending on the amount of charge in the battery, it may take up to 5 hours for the TASER CAM recorder to fully charge. Charging can be accomplished with the TASER CAM recorder in the X26 ECD or independently (with the TASER CAM recorder out of the X26 ECD).

NOTE: Never remove the TASER CAM recorder from the ECD while the recorder is plugged into a computer.

## Charging the TASER CAM Recorder Using the Wall Power Charging Cable

NOTE: Some previous TASER CAM models could be charged with a PC USB cable. This will not work with TASER CAM recorders with serial numbers starting with V13.

1. Shift the X26 ECD's safety switch to the down (SAFE) position.
2. Safely remove the TASER cartridge.
3. Remove the data port plug from the bottom of the TASER CAM recorder.
4. Connect the wall power cable to the TASER CAM recorder.

   NOTE: When inserting the power cable, it is important that the gold tabs face forward toward the camera lens.

 

10

162

# Software Installation

# 4

## Installing the EVIDENCE Sync Software

To download videos from your TASER CAM recorder, you will need to install the EVIDENCE Sync software onto your PC.

NOTE:  Do NOT plug the TASER CAM recorder's USB cable into the computer at this step.

1.  On your computer, close all open applications.

2.  Launch your web browser.

3.  Go to www.TASER.com/sync_download.

4.  Click *Download Software Evidence Sync* and follow the instructions.

5.  When the installation is complete, click *Finish* to exit.



# Configuration

# 5

## Configuring the TASER CAM Recorder with EVIDENCE Sync Software

The EVIDENCE Sync software is used to set up your recorder.

1   Shift the X26 ECD's safety switch to the down (SAFE) position.

2   Safely remove the TASER cartridge.

3   Connect the USB download cable (available separately) to the TASER CAM recorder.



4   Connect the USB download cable to your computer.

The LED status indicator on the TASER CAM recorder will flash green, then red.

If the TASER CAM recorder is installed in an X26 ECD, a "U" is displayed on the CID when the TASER CAM recorder is plugged into a computer. While the recorder is plugged into the computer, the CID will display the battery percentage, followed by a letter U, and then a blank screen.

5   Click *Start* and select *All Programs*.

   5a   Click *TASER International* and select *SYNC*.

5   If you have an EVIDENCE.com account, type your login information and click *Submit*.

If you do not have an EVIDENCE.com account, click *Go Offline* and then click *OK*. The program will restart in the offline mode.

7   Click *DEVICE SETTINGS*.

You can turn your recorder's microphone on or off.  This option is included because some jurisdictions restrict audio recordings.

164



## Viewing Device Information

The EVIDENCE Sync software is used to set up your recorder.

1   Shift the X26 ECD's safety switch to the down (SAFE) position.

2   Safely remove the TASER cartridge.

3   Connect the TASER CAM recorder to your computer with the USB download cable.

4   Click **Start** and select **All Programs**.

   4a  Click **TASER International** and select **SYNC**.

- If you have an EVIDENCE.com account, type your login information and click **Submit**.

- If you do not have an EVIDENCE.com account, click **Go Offline** and then click **OK**. The program will restart in the offline mode.

5   Click **DEVICE SUMMARY**.

   The screen displays information about the ECD and the TASER CAM recorder, and provides you the ability to print reports and update device firmware.



# Operation

# 6

## Operating the TASER CAM System

When the TASER CAM recorder is inserted into an X26 ECD and disconnected from an external charging source (PC or wall power), it provides power to the ECD and to the sensitive camera and microphone used by the TASER CAM recorder.

Install the EVIDENCE Sync software on your computer, update the X26 and TASER CAM devices' firmware, and configure your TASER CAM recorder before attempting to use it with the ECD.  See *Chapter 3: Charging the TASER CAM Recorder* and *Chapter 5: Configuring the TASER CAM Recorder with EVIDENCE Sync Software.*

## Testing the TASER CAM Recorder

1   Disconnect the TASER CAM recorder from the PC or wall power and remove the charging cable from the recorder.

2   Confirm that the X26 safety is in the down (SAFE) position.

3   Remove the TASER cartridge from the X26 ECD. (See the *TASER X26E ECD User Manual* for more information on unloading TASER cartridges.)

4   Confirm that the charging cable is removed from the TASER CAM recorder.

5   Firmly insert the TASER CAM recorder into the ECD until it clicks and the X26 ECD's ejector button pops out completely.

- If the X26 weapon software is an older revision, the TASER CAM recorder will update the software. A "P" will appear on the X26 CID indicating that the weapon software is being updated. DO NOT REMOVE THE TASER CAM RECORDER UNTIL THE SOFTWARE UPDATE AND BOOT UP SEQUENCE IS COMPLETE. DOING SO WILL CORRUPT THE SOFTWARE IN THE X26 ECD.



166

6  Observe the boot up sequence on the X26 CID. The boot up sequence should be the same as when a standard DPM/XDPM battery pack is inserted.

7  Shift the safety to the up (ARMED) position. The TASER CAM recorder will begin recording in approximately 2 seconds.

NOTE: The CID will flash "88" if the camera lens is blocked resulting in poor or no visibility in the video. Audio recording is unaffected.

NOTE: When the ECD's safety is in the up (ARMED) position, the TASER CAM unit starts recording. The light next to the TASER CAM recorder's lens will blink red to indicate the unit is recording. When the ECD's safety is in the down (SAFE) position, the TASER CAM recorder stops recording. (If the ECD is in the stealth mode or the flashlight and LASERs are turned OFF [OO], the red LED will STILL blink. See the *TASER X26E ECD User Manual* for more information on light and LASER settings.)

8  Test fire the X26 ECD. The flashlight may flash. This is normal.

9  Shift the safety to the down (SAFE) position. The TASER CAM recorder will stop recording.

10  Connect the TASER CAM recorder to a PC to download and view the video/audio recorded during this test. You also can use the TASER CAM recorder to download the firing logs from the weapon (see *Chapter 6: Operating the TASER CAM System* for more information).

NOTE: Remember that the X26 ECD is being powered by the TASER CAM battery, and as with any X26 ECD, it must not be without power for an extended period of time (4 or more hours) in order to maintain the integrity of the software and clock. If the TASER CAM recorder is removed from an X26 ECD, a DPM/XDPM battery pack should be inserted to keep the unit continually powered. The X26 ECD (with weapon software that supports the TASER CAM recorder) will support an older-version DPM/XDPM battery pack.

## Using the TASER CAM Recorder

The function and use of the X26 ECD do not change with the addition of a TASER CAM recorder. However, there are a few points to remember:

- The TASER CAM recorder does not have a flashlight. For low-light video recording, the X26 ECD must have its LED flashlight turned on.
- Hold the ECD as steady as possible while recording.
- Recharge the TASER CAM recorder before the remaining battery capacity is less than 50 percent.
- Do not block the lens of the TASER CAM recorder. If the lens is blocked, "88" will flash on the CID and the LASER will flash. With a two-handed hold, the user might unintentionally block the lens, particularly when wearing gloves.

NOTE: The CID also may flash in conditions of extreme darkness even if the lens is not blocked.

# Records

# 7

## Downloading and Viewing Records

The proper software must be installed before video/audio recordings and firing logs can be downloaded (see *Chapter 4: Installing the EVIDENCE Sync Software*).

The TASER CAM recorder can store approximately 4.5 hours of records. After that, new footage will overwrite the old footage in 10-minute segments.

NOTE: Because video/audio records are stored in the TASER CAM recorder and firing record data are stored in the X26 ECD, if downloading records separately, remember to download firing records from the weapon before or after downloading video/audio from the TASER CAM recorder. You also can download both video/audio records and firing data by inserting the TASER CAM recorder in the associated ECD and then downloading both through the EVIDENCE Sync software.

## Uploading Records to EVIDENCE.com Services with EVIDENCE Sync *Online* Software (Available with Evidence Sync 1.30 and Above)

Follow these instructions if you have an EVIDENCE.com account. If you do not have an EVIDENCE.com account, see *Downloading Records to Your Computer with EVIDENCE Sync Offline Software*.

1. Confirm that the X26 safety is in the down (SAFE) position.
2. Remove the TASER cartridge from the ECD. (See the *TASER X26E ECD User Manual* for more information on unloading TASER cartridges.)
3. Connect the TASER CAM recorder to your computer with the USB download cable.
4. Click *Start* and select *All Programs*.
   4a. Click *TASER International* and select *SYNC*.
5. Type your login information and click *Submit*.
6. Click *DEVICE VIDEOS*.
7. Click UPLOAD for the video(s) you wish to review. The TIME STAMP column gives you the time each video was recorded.

   NOTE: When an ECD is connected to the recorder during this process, the X26 ECD's data will be uploaded automatically into the EVIDENCE Sync application from the ECD. The time stamp is created by the ECD in Greenwich Mean Time (GMT), but the EVIDENCE Sync software will convert it to your computer's local time. Videos will remain stored on the TASER CAM recorder (until overwritten by new footage) whether they are uploaded or not.

   After the videos and the ECD's data have been uploaded, you can play the video(s) or upload another TASER

168

CAM recorder and/or X26 ECD.

You will be able to see records only for the recorder and ECD connected to your computer. To view records for other devices, disconnect and follow the instructions in *Viewing Uploaded Videos (Online)*.



# Viewing Uploaded Videos (Online)

As described in *Uploading Records to EVIDENCE.com Services with EVIDENCE Sync Online Software*, you can view videos you just uploaded while your recorder is connected to your computer. (If you have disconnected the recorder from your computer, go to the EVIDENCE.com website to view the records.)

1  Ensure your device is connected to the computer.

2  Click *Start* and select *All Programs*.

   2a  Click *TASER International* and select *SYNC*.

3  Type your login information and click *Submit*.

4  Click *UPLOADED VIDEOS*.



5  Click the thumbnail for the video you want to watch.

## Viewing the ECD Data (Online)

If you uploaded your TASER CAM recorder while it was installed in the ECD, you can use the EVIDENCE Sync program to view the ECD Data.

1  Click *Start* and select *All Programs*.

   1a  Click *TASER International* and select *SYNC*.

2  Type your login information and click *Submit*.

3  Click *EVENT LOG*.

You can filter (sort) the events by type, and the time they occurred.  You also can generate a formatted event report by clicking the **PDF REPORT** button.



## Downloading Records to Your Computer with EVIDENCE Sync Offline Software

Follow these instructions if you do not have an EVIDENCE.com account.  If you have an EVIDENCE.com account, see *Uploading Records to EVIDENCE.com Services with EVIDENCE Sync Online Software*.

1  Confirm that the X26 safety is in the down (SAFE) position.

2  Remove the TASER cartridge from the ECD.  (See the *TASER X26E ECD User Manual* for more information on unloading TASER cartridges.)

3  Connect the TASER CAM recorder to your computer with the USB download cable.

4  Click *Start* and select *All Programs*.

   4a  Click *TASER International* and select *SYNC*.

5  Click *Go Offline*.

   5a  Click *OK*.

6  Wait for the device information to load.

7  Click *DEVICE VIDEOS*.

8  Click *DOWNLOAD* for the video(s) you wish to review.  The TIME STAMP column gives you the time each video was recorded.

*170*



The time stamp is created by the ECD in Greenwich Mean Time (GMT), but the EVIDENCE Sync software will convert it to your computer's local time. Videos will remain stored on the TASER CAM recorder (until overwritten by new footage) whether they are uploaded or not.

NOTE: When an ECD is connected, the ECD's data will be downloaded automatically into EVIDENCE Sync from the ECD.

After the videos and firing records have been downloaded, you can play the video(s) or download another TASER CAM recorder and/or X26 ECD.

You will be able to see records only for the recorder and ECD connected to your computer. To view records for other devices, disconnect and follow the instructions in *Viewing Downloaded Videos (Offline)*.

## Viewing Downloaded Videos (Offline)

As described in *Downloading Records to Your Computer with EVIDENCE Sync Offline Software*, you can view videos you just uploaded while your recorder is connected to your computer.

1   Click *Start* and select *All Programs*.
    1a   Click *TASER International* and select *SYNC*.
2   Click *Go Offline*.
    2a   Click *OK*.
3   Click *DOWNLOADED VIDEOS*.

Al-Quan Jackson # V14150

CSP. Corcoran c·3/222.

P.o. Box 5246

Corcoran , CA 93212

CLERK, U.S. DISTRICT COURT

RECEIVED

OCT 24 2014

CENTRAL DISTRICT OF CALIFORNIA

JEM

United States District Court

OFFICE OF THE CLERK

U.S. Courthouse , Room G-8.

Los Angeles, CA 90012

172



173